## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:21-cv-22819-ALTMAN

**MEGLADON, INC., a Florida Corporation,**

*Plaintiff,*

*v.*

**VILLAGE OF PINECREST, a Florida municipal corporation,**

*and*

**MIAMI-DADE COUNTY, a political subdivision of the State of Florida,**

*Defendants.*

_____/

## ORDER

The unconstitutional-conditions doctrine—implicit in the Takings Clause of the Fifth Amendment—prohibits the government from requiring a landowner, as a land-use condition, to relinquish property rights the landowner is otherwise entitled to unless there's a "nexus" and "rough proportionality" between the property right and the social cost of the landowner's proposed use. *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 605–06 (2013). This case is, in the main, about the extent to which an incorporated municipality can absolve itself of liability under this doctrine by claiming that, in imposing the offensive condition, it was merely enforcing the county's will.

In 2016, our Plaintiff (Megladon) bought a piece of property in the Village of Pinecrest, an incorporated municipality within the territorial bounds of Miami-Dade County. Those two governmental entities are our Defendants. Megladon's plan was relatively straightforward: to tear down the existing single-family home on the property and to build a new one. To accomplish this,

Megladon hired an architect and applied to the Pinecrest Village Planning Director for a permit. But the Planning Director refused to issue the permit unless Megladon agreed to gift the Village a 7.5-foot strip of land, which the Village could then use as a right-of-way. Unhappy with this requirement—which hadn't ever encumbered the property before—Megladon sued the Village in state court. After the Village removed the case to us, the County asked to intervene—claiming that *it* (not the Village) was responsible for the dedication requirement. We allowed the County to intervene and ordered the Plaintiff to submit an amended complaint against *both* Defendants. Once that complaint was filed, the Defendants jointly moved to dismiss it. And here we are.

### THE FACTS

Our Plaintiff (Megladon) is a Florida corporation that "acquire[s] and redevelop[s] residential homesites within select neighborhoods in the Miami Area, particularly in the Pinecrest and Coconut Grove areas." Second Amended Complaint ("SAC") [ECF No. 77] ¶ 1. In April 2016, Megladon acquired a piece of land at 13100 S.W. 77th Avenue in the Village of Pinecrest "as a 'tear down' development site." *Id.* ¶¶ 2–3, 28. The parcel, located on the corner of 77th Avenue and SW 131st Street, "has been zoned for single-family residential use and [is] part of a long-established residential neighborhood." *Id.* ¶¶ 27–28. Megladon "proceeded to demolish the original home[ ] and applied to the Village for a building permit to construct a new home in 2019." *Id.* ¶ 3. At the time, Village Planning Director Stephen Olmsted was "authorized to decide Megladon's application[.]" *Id.* ¶ 58. To process applications, the Village uses "an online permit portal known as the Plan Review System," which "allows the Village to circulate staff review comments internally within the Village and externally with applicants." *Id.* ¶ 59. Village staff also regularly communicate with permit applicants via "meetings, phone calls, and emails[.]" *Ibid.*

The parties' dispute began on December 24, 2019, when a Pinecrest zoning department reviewer, Pat Janisse, posted the following comment about the Plaintiff's permit application in the Plan Review System portal:

> [H]aving Public Works Director to research possible road dedication as this property has not made a road dedication to SW 131 Street—if a dedication is required the building will need to be revised to respect the new property line and process of a road dedication will be required[.]

*Id.* ¶ 71 (errors in original). Concerned with this turn of events, Megladon met with Village officials, including Director Olmsted, on February 13, 2020, to "discuss potential solutions that would not prejudice Megladon." *Id.* ¶ 74. After the February 13, 2020 meeting, Megladon's architect "re-submitted progress plans, addressing several staff comments, but not acceding to the right-of-way demand." *Id.* ¶ 76.

Public Works Department staff then posted a responsive comment on April 1, 2020, saying: "R/W dedeication requeried along SW 131 St and radius dediation rquired at NE quadrant of property." *Id.* ¶ 72 (errors in original). Two days later, on April 3, 2020, Director Olmsted "posted an invitation for Megladon to comment in response to" the following communication:

> 1. Additional right-of-way (7.5 feet) adjacent to SW 131 Street is required to be dedicated to the village of Pinecrest. Please adjust the proposed northern property line 7.5 feet to the south and revise all setback, lot coverage, impervious coverage, green space, and building area information. Relocate the proposed residence to comply with required setback from the revised property boundary and note that proposed amounts of impervious coverage, greenspace, and building coverage may need to be revised to comply with minimum requirements of the EU-1, residential Estate zoning district.
>
> 2. Dedication of right-of-way to the Village of Pinecrest requires acceptance by the Village Council and can be completed prior to issuance of a certification of occupancy. Coordination with the Village Attorney will be required. Required documents include: Fully executed right-of-way deed; updated opinion of title; final sketches of the parcel; and a tax proration letter for 2020 taxes. An Owner's Affidavit and Agreement will be required prior to issuance of building permits[.]

*Id.* ¶ 73.

On April 30, 2020, Megladon's architect, Valeria Fossi, emailed Olmsted "to clarify the revision for Zoning comment #1 as it affects [Megladon's] design." SAC Ex. 5 ("Fossi Emails") [ECF No. 77-5] at 3. Fossi and Olmsted met "over the phone" later that day. *Id.* at 2. The following day (May 1, 2020), Fossi sent Olmsted a second email, summarizing their telephone conversation from the day before and asking Olmsted to "confirm that we have understood correctly as per our call." *Ibid.* When she received no response to her email, Fossi followed up with Olmsted twice: once on May 6, 2020, "to request confirmation on the conversation highlights from our phone call from the 30th"; and a second time on May 13, 2020, requesting "confirmation on the conversation highlights[.]" *Ibid.* On May 14, 2020, Olmsted answered Fossi's email with this:

> With regard to the existing survey of the property, the right-of-way will ***need*** to be dedicated to the Village of Pinecrest but the process is expected to take some time to complete. In the meantime, the Village can review your application for a building permit, ***provided*** the site plan and all required building setback, lot coverages, green space calculations, etc., are indicated for the property ***excluding*** the right-of-way ***to be*** dedicated. On the site plan that will be submitted for building permits, please crosshatch and indicate the portion that is the area of right-of-way ***to be*** excluded from the property and dedicated to the Village of Pinecrest.
>
> Prior to issuance of a building permit, an affidavit, similar to the attached affidavit, will ***need*** to be completed, signed, and submitted to the Village of Pinecrest. The affidavit ***includes*** the owners' consent to dedication of the right-of-way and their acknowledgment that ***a certificate of occupancy will not be issued until dedication of the right-of-way is complete***.

*Id.* at 1 (emphases added). To comply with these requirements, Megladon alleges, it would have had to "re-calibrat[e] setbacks, lot coverage calculations, and required green space" and "reduc[e] . . . the size of the one story home" or "re-design [it] as a two-story home[.]" SAC ¶ 65.

Although the County "invit[ed Megladon] to apply to the County Public Works Department for an exception or waiver" to the land-dedication requirement, Megladon refused because of the "legal inconsistency of doing so[.]" *Id.* ¶ 121. Instead, Megladon decided to sue. On October 1, 2020, Megladon "transmitted a pre-suit notice of proposed action compliant with § 70.45(3), Fla. Stat.," in which it "explain[ed] why Megladon believes the exaction is prohibited, and provid[ed] an initial

estimate of the damages." *Id.* ¶ 79. The Village responded on December 29, 2020, "declining to withdraw or otherwise modify its demand for a right of way dedication." *Id.* ¶ 134. So, on July 21, 2021, "Megladon sued the Village in state court for relief under Chapter 86 and § 70.45 of the Florida Statutes." *Id.* ¶ 12. The Village then "removed the action" here, *id.* ¶ 13, and Megladon subsequently "amended its complaint in September 2021 to add an unconstitutional conditions claim against the Village under 42 U.S.C. § 1983," *id.* ¶ 14.

We pause here to discuss something that happened in the early stages of this litigation— something that will play an outsized role in our overall story. On March 1, 2021, trying to find support for the position it had taken with respect to Megladon's permit, the Village emailed Miami-Dade County Chief Operations Officer Jimmy Morales, seeking "something in writing from [ ] Miami-Dade County confirming that it has jurisdiction over the right-of-way widths." SAC Ex. 4 ("Correspondence and Transfer Road Agreement") [ECF No. 77-4] at 2. But, far from getting the confirmation it was after, the Village received a disconcerting email from Morales later that day. In a nutshell, Morales attached a Transfer Road Agreement between the County and the Village from 1996 and told the Village that "the County transferred jurisdiction [over the road at issue in this litigation] to Pinecrest in 1996. The ROW [right-of-way] *is all yours.*" *Id.* at 1 (emphasis added).

Back to our narrative: On April 11, 2022, the County moved to intervene in our case under Rule 24(b) of the Federal Rules of Civil Procedure. *See generally* Miami-Dade County's Motion to Intervene [ECF No. 40]. In that motion, the County argued that "the Plaintiff is subject to the County's regulations governing the required right-of-way width, and the Plaintiff is obligated to apply to the County for relief from the applicable regulations." *Id.* ¶ 20. On June 3, 2022, we "GRANT[ED] Miami-Dade County's Motion to Intervene" and allowed Megladon to file an amended complaint against both Defendants by June 21, 2022. *See* Paperless Order [ECF No. 67].

Consistent with that directive, Megladon filed its now-operative SAC, which asserts three claims against the Village and one against *both* the Village *and* the County. *See* SAC ¶¶ 125–65. In Count I, Megladon alleges that, by imposing the dedication requirement, the Village violated § 70.45 of the Florida Statutes, *see id.* ¶ 125, which provides that "a property owner may bring an action in a court of competent jurisdiction under this section to declare a prohibited exaction invalid and recover damages caused by a prohibited exaction," FLA. STAT. § 70.45(2). In Count II, the Plaintiff claims that the Village violated Section 6 of Article 10 of the Florida Constitution, *see* SAC ¶ 125, which states that "[n]o private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner," FLA. CONST. art. X, § 6. In Count III—a claim under 42 U.S.C. § 1983—Megladon contends that the Village's dedication "has impermissibly burdened Megladon's Fifth Amendment rights by refusing to process Megladon's building permit application unless Megladon first surrenders its Fifth Amendment right to just compensation[.]" SAC ¶ 149. And Count IV basically reasserts the allegations of Count III—this time against *both* the Village *and* the County. Specifically, it avers that "the Village and County have jointly and impermissibly burdened Megladon's Fifth Amendment right by requiring the uncompensated dedication of land in fee simple as a condition of issuing a discretionary building permit[.]" *Id.* ¶ 156.[1]

---

[1] Because Count III's allegations reappear (essentially verbatim) in Count IV—and since Count III's cause of action is identical to the part of Count IV that's directed at the Village—we now **DISMISS** Count III as duplicative of Count IV. *See Harrison v. Digital Health Plan*, 183 F.3d 1235, 1237 (11th Cir. 1999) ("We find no error in the district court's . . . dismissal of plaintiff's claim . . . as duplicative[.]"); *Trief v. Am. Gen. Life Ins. Co.*, 444 F. Supp. 2d 1268, 1270 (S.D. Fla. 2006) (Ungaro, J.) ("[I]t appears Plaintiff's allegations in count II amount to nothing more than a general allegation for breach of contract and are therefore duplicative of count III. Accordingly, the Court finds that count II must be dismissed." (cleaned up)).

On July 6, 2022, the Defendants moved to dismiss the SAC. *See generally* Motion to Dismiss ("MTD") [ECF No. 82]. The Plaintiffs responded, *see generally* MTD Response [ECF No. 89], and the Defendants replied, *see generally* MTD Reply [ECF No. 94]. This Order follows.

## THE LAW

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545).

On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016). Unsupported factual allegations and legal conclusions, however, receive no such deference. *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). A complaint's "well-pled allegations must

'nudge the claims across the line from conceivable to plausible.'" *Hays v. Page Perry, LLC*, 627 F. App'x 892, 896 (11th Cir. 2015) (cleaned up) (quoting *Twombly*, 550 U.S. at 555, 570).

## ANALYSIS

We pause at the outset to identify a glaring deficiency in the MTD—its mysterious failure to cite *any* specific provision of Rule 12. The MTD thus leaves us to divine, as best we can, the Defendants' intentions—which, of course, we shouldn't have to do. If we were guessing,[2] though, we'd assume that the Defendants are asking us to dismiss Counts I–IV for failure to state a claim (Rule 12(b)(6)) and for lack of subject-matter jurisdiction (Rule 12(b)(1)).[3] As to the former, the Defendants are plainly of the view that the Plaintiff has failed to state a viable claim—either (1) because the Village had nothing to do with (or has no authority to alter) the County's land-dedication requirements, *see* MTD at 11 ("The County exercises authority and jurisdiction to require dedication, and the Village cannot ignore or circumvent the County's authority and jurisdiction."); (2) because (as to Count IV)

---

[2] And we *are* authorized to try to construe the MTD in this way. *See Patey v. Max Specialty Ins. Co.*, 2013 WL 12159055, at *1 (M.D. Fla. June 10, 2013) (Covington, J.) ("Although Max Specialty does not specify the procedural grounds for the Motion, the Court interprets the Motion as one seeking dismissal under Federal Rule of Civil Procedure 12(b)(6) and alternatively a Motion for a More Definite Statement under Rule 12(e).").

[3] With respect to Counts I–III, the Defendants *might* also want us to dismiss for failure to join a necessary party (Rule 12(b)(7)). As to these counts, after all, the Defendants insist that the Village *both* (1) "is not the only necessary party," MTD at 2, *and* (2) isn't the "relevant governmental entity," *id.* at 11 (quoting *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994)). For two reasons, though, we won't separately analyze these counts under the rubric of Rule 19. *One*, by its express terms, Rule 19 only requires the plaintiff to join an absent person as "a party." FED. R. CIV. P. 19(a), (b). Now that we've granted the County's Motion to Intervene, the County *is here*—in other words, the County's already joined as a party. And nothing in Rule 19 separately suggests that the County had to be added as a party to every *count* in the action. *See Talisman Cap. Alt. Invs. Fund, Ltd. v. Mouttet*, 2011 WL 13223534, at *2 (S.D. Fla. May 19, 2011) (Graham, J.) ("In making [a Rule 19(a)] determination, the court must inquire whether . . . in the person's absence complete relief cannot be accorded among those *already parties*[.]" (citing FED. R. CIV. P. 19(a)(1) (emphasis added))). *Two*, as we're about to see, we ultimately reject the Defendants' central contention—at least for today's purposes—which is that, in charging the Village, the Plaintiff has sued the wrong party. We do so because we've seen no County rule or ordinance that would've required the Village Planning Director to demand the land dedication the Plaintiff has sued about here. Since this contention undergirds the MTD's Rule 19 arguments also, we deny the motion as to Counts I–III under *either* 12(b)(6) or 12(b)(7).

the County's proposed dedication is a lawful exercise of its exclusive jurisdiction over traffic regulations, *see id.* at 6 ("[T]he County Home Rule Charter grants the County exclusive jurisdiction over traffic control and enforcement issues in all incorporated and unincorporated areas of the County."); or (3) because (as to Count I only) the Plaintiff waited too long to file suit, *see id.* at 18 ("Count I of Plaintiff's Complaint must be dismissed because Plaintiff's statutory presuit notice was untimely." (cleaned up)). With respect to Rule 12(b)(1), the Defendants repeatedly claim that the Plaintiff's claims are not yet ripe—either (1) because the Plaintiff could (and should) have appealed the Village's decision to the County, *see id.* at 16 ("Plaintiff's claims must be dismissed because neither the Village nor the County have committed to a final position—which requires the submission and resolution of at least one meaningful application, including any available variances or waivers[.]"), or (2) because the Village's Planning Director (Olmsted) never made a "final" decision, *id.* at 12; *see also id.* at 13 ("[The Village Director's] response to Fossi's email was not a refusal to continue processing the application absent a showing of dedication."). But, viewing the Complaint's allegations in the light most favorable to the Plaintiff—and drawing all reasonable inferences in the Plaintiff's favor—we think the Plaintiff *has* asserted a series of ripe, timely, and plausible claims. We thus reject the Defendants' arguments and deny the MTD.

## I.     The Village is a proper party

The main thrust of the Defendants' attack on the Plaintiff's claims *against the Village* is their contention that the Plaintiff has sued the wrong party. As the Defendants see things, the County imposed this land-dedication requirement—and so, only the County can be liable for it. *See id.* at 11 ("The County exercises authority and jurisdiction to require dedication, and the Village cannot ignore or circumvent the County's authority and jurisdiction."). But the Plaintiff has attached to its Complaint an email exchange between Yocelyn Galiano, the Pinecrest Village Manager, and Miami-Dade County staff, in which the Village asked the County for help in advancing *the precise argument* the Defendants

have now made here. *See generally* Correspondence and Transfer Road Agreement.[4] In the email, Ms. Galiano said the following to Miami-Dade Chief Operations Officer Jimmy Morales: "Pinecrest believes that the County has jurisdiction over right-of-way widths in the incorporated and unincorporated areas per the Miami-Dade public works manual." *Id.* at 2. Ms. Galiano then asked Mr. Morales for "something in writing from the Miami-Dade County confirming that it has jurisdiction over the right-of-way widths." *Ibid.* Mr. Morales promptly forwarded Ms. Galiano's request to the County's Deputy Director for Transportation and Public Works, asking him "to look into the issues" Ms. Galiano had raised. *Ibid.* The County COO received the Deputy Director's response on March 1, 2021, and quickly circled back to Ms. Galiano, *disclaiming* (in unambiguous terms) *any* jurisdiction over the road at issue in our case. *Id.* at 1. In his words: "Looks like the County transferred jurisdiction to Pinecrest in 1996. The ROW is all yours. Sorry I could not help." *Ibid.*

But that's not all. The County COO (Morales) also attached a Transfer Road Agreement, executed by our two Defendants way back in 1996, which purported to "officially transfer . . . all municipal roads within the boundaries of the Village of Pinecrest[.]" *Id.* at 5. In fact, the Transfer Road Agreement provides that "[t]he jurisdiction, ownership and control of all public roads within the corporate limits of the Village of Pinecrest ('the Public Roads') heretofore designated as part of the County road system prior to the effective date of this Agreement are hereby transferred and conveyed to the Village road system[.]"[5] *Id.* at 6. Of particular interest to us, the Transfer Road Agreement explicitly says this:

---

[4] We can consider these documents, which *are* attached to the SAC, without converting the MTD into a motion for summary judgment. *See Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014) (explaining that "documents attached to a complaint or incorporated in the complaint by reference can generally be considered by a federal district court in ruling on a motion to dismiss"); *see also* FED. R. CIV. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

[5] The Agreement exempts four roads from the transfer, but these roads are not at issue in our case. *See* Correspondence and Transfer Road Agreement at 2.

> [T]his Agreement shall be sufficient to accomplish the transfer of Public Roads from the County road system pursuant to Section 335.0415(3) F.S. and shall be deemed to include the transfer of the County's *regulatory and proprietary jurisdiction*, and the conveyance of all right, title, and interest of the County, *subject to any easements reserved for public utilities owned and operated by the County*.

*Ibid.* (emphases added). The agreement thus plainly suggests that, so long as the Agreement is valid, the Village is the *only* entity with authority to regulate Village roads. Indeed, the parties' decision to carve out of the Agreement—and to reserve to the County—"any easements reserved for public utilities owned and operated by the County" strongly implies that the jurisdictional transfer (from the County to the Village) is *not* "subject" to *any other limitations*. *See* A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 (2012) (describing the canon of *expressio unius* to mean that the "expression of one thing implies the exclusion of others").

In response to all this, the Defendants say, not that the Transfer Road Agreement has been abrogated or overruled, but that it was illusory at the very moment it was signed. According to the Defendants, the County Code preempts (in all cases and without exceptions) any supposed transfer agreement between the County and the Village. *See* MTD Hr'g Tr. 3:14–17 ("A resolution cannot supplant an ordinance. So there's legal reasons that the road transfer agreement can't execute a transfer of all county jurisdiction in a way that an ordinance might."). But the Defendants have cited no law for this proposition—which is belied by the plain terms of the Agreement in any case. The Agreement, after all, was executed pursuant to a state statute that *allows* jurisdictions to transfer "[p]ublic roads . . . by mutual agreement of the affected governmental entities." Correspondence and Transfer Road Agreement at 6 (citing FLA. STAT. § 335.0415(3)). The County never explains how its unidentified County Code provision takes precedence over an agreement that was signed pursuant to a duly enacted *state* law.

Even putting aside this provision, though, the County's position doesn't seem to make all that much sense. Why, after all, would the County and the Village take the time to memorialize a four-page

agreement (spanning some nine paragraphs) that was illusory and irrelevant as soon as it was executed? Why, too, would the County Manager have determined—in an email copying some of his employees—that the Transfer Road Agreement (far from representing a meaningless irrelevancy) worked a wholesale alteration in the parties' respective jurisdictions over *this* dispute? The parties will be free to answer these (and other) questions at summary judgment. But, for now, when we view the SAC's allegations in the light most favorable to the Plaintiff—and when we draw all reasonable inferences in the Plaintiff's favor—we conclude that this Transfer Road Agreement (especially together with the County COO's email attaching it) strongly supports the Plaintiff's view that the Village *had* jurisdiction over the land dedication at issue here.

Still resisting, the Defendants point to nine provisions of the County and Village Codes for their view that the County *required* the Village to abide by its land-dedication requirements, that the Village had no authority to alter (or vary from) those requirements, and that (as a result) the Village just isn't a proper party to this lawsuit. *See* MTD at 6 (citing Miami-Dade Cnty. Code § 2-95.1); *id.* at 7 (first citing Miami-Dade Cnty. Home Rule Charter, art. I, §§ 1.01(A)(1), (5), (13), (18); and then citing Miami-Dade Cnty. Code §§ 2-95.1, 2-96.1); *id.* at 7–8 (citing Miami-Dade Cnty. Dev. Master Plan Transp. Element, Traffic Circulation Subelement, Objective TC-2); *id.* at 8 (citing Miami-Dade Cnty. Dev. Master Plan Transp. Element, Traffic Circulation Subelement, Policy TC-2A, 2AB); *id.* at 8 n.1 (citing Miami-Dade Cnty. Code § 33-133); *id.* at 8 (citing Miami-Dade Cnty. Code §§ 2-100(d), 28-2, 28-3); *id.* at 8–9 (citing Miami-Dade Cnty. Code § 28-14); *id.* at 9 (citing Miami-Dade Cnty. Code §§ 28-11, 28-12, 28-20); *id.* at 10 (first citing Miami-Dade Cnty. Code §§ 28-11 & 28-14; and then citing Village Comprehensive Plan Objective 1-1.4.3); *id.* at 11 (citing Pinecrest Code Ch. 30, art. III, div. 3.2(a)). We address—and reject—the County's reliance on each of these provisions in turn.

*First*, the Defendants cite the County's Home Rule Charter, which outlines the governing framework for Miami-Dade County. *See* MTD at 6. According to the Charter, the Board of County

Commissioners is the "legislative and governing body of the county" with the power to "[p]repar[e] and enforc[e] comprehensive master plans for the development of the county" and to "[a]dopt[ ] and enforce[ ] uniform building and related technical codes and regulations for both the incorporated and unincorporated areas of the county[.]" Miami-Dade County Home Rule Charter, art. I, § 1.01. On the issue of traffic, the Charter vests the Board of County Commissioners with the power to "[p]rovide and regulate arterial, toll and other roads, bridges, tunnels, and related facilities; . . . and develop and enforce master plans for control of traffic and parking[.]" *Id.* § 1.01(A)(1). But nothing in the Charter *requires* the Village to impose land dedications of any size, *prohibits* the Village from granting permits like the one our Plaintiff has applied for here, or otherwise has *anything* to say about whether Director Olmsted was (or was not) authorized to approve the Plaintiff's permit application *without* a dedication.

In referencing the Charter, the Defendants rely mainly on the Florida Supreme Court's decision in *Miami Shores Village v. Cowart*, 108 So. 2d 468 (Fla. 1958). But *Cowart* has very little to do with our case. The court there held only that "the Home Rule Charter and county ordinances adopted thereunder shall *in cases of conflict* supersede all municipal charters and city ordinances, except in those instances where the charter of Dade County specifically provides otherwise[.]" *Id.* at 472 (emphasis added & cleaned up). But that just begs the question of whether, on the central issue we face here—*viz.*, whether the County *requires* dedications of a certain width on streets within the Village—there exists some County regulation that *conflicts* with a Village ordinance. As we're about to see, the Defendants have pointed us to no such conflict—and, as a result, *Cowart* seems to have little bearing on our facts.

The Defendants also rely on a Third DCA case—*A. L. Lewis Elementary School v. Metropolitan Dade County*, 376 So. 2d 32 (Fla. 3d DCA 1979)—for the proposition that "the County Home Rule Charter grants the County exclusive jurisdiction over traffic control and enforcement issues in all incorporated and unincorporated areas of the County." MTD at 6. Let's chalk this one up to wishful

thinking. The plaintiff in *Lewis*, "a student at A. L. Lewis Elementary School, was injured when struck by a motor vehicle in an intersection of a street adjacent to the school grounds." *Id.* at 33. She sued "the School and the Dade County School Board, alleging her injuries were caused by their negligence." *Ibid.* Those "defendants filed a third party complaint (subsequently amended) against Dade County, the City of Homestead and Florida City for indemnity and contribution." *Ibid.* "The third party complaint alleged the School had requested the County and said two cities (which shared jurisdiction of the adjoining street) to provide a school zone in said street, establish a speed zone and provide pedestrian control devices there; alleged their failure to do so and that such was the proximate cause of the injury." *Id.* at 34. The third-party plaintiffs based their claim on a Florida statute, which "direct[ed] the Department of Transportation to adopt a system of traffic control devices and pedestrian control devices for use on streets and highways surrounding all schools, public or private; to compile and publish a manual containing the specifications and requirements, and to transfer such manual to the governing body of each county and municipality; and that each county and municipality in the state shall install and maintain such traffic and pedestrian control devices in conformity with such uniform system." *Ibid.* (cleaned up). The state statute thus "imposed on the County a duty to install and maintain such protective traffic devices on streets or roads surrounding schools located in the County outside of municipalities, and imposed a duty on municipalities to install the same on streets surrounding schools located within municipalities." *Ibid.*

At the same time, the court (citing *Cowart*) noted that, "in Dade County, by ordinance under the Home Rule Charter, the County has undertaken, by master plan, the control of traffic both in the unincorporated and incorporated areas of the County." *Ibid.* The question in *Lewis*, then, was whether "the duties imposed by the State statute on municipalities to install and maintain the required traffic control and protective devices in streets surrounding schools in municipalities has been shifted, in

Dade County, from the municipalities to the County." *Ibid.* Answering that question, the court held as follows:

> It would appear that they have. That undertaking by the County was held to be proper legislative action by the County, acting under its Charter under the so-called Home Rule Amendment to the Florida Constitution adopted in 1956. That Dade legislation did not purport to and did not operate to eliminate the mandatory requirement of the statute (Section 316.1895, Florida Statutes (1975)) for installation of such traffic control and protective devices on streets surrounding schools in municipalities, but only to shunt such duty from the municipalities to the County.

*Ibid.* The Third DCA thus affirmed the trial court's dismissal of the municipal defendants—even as it reversed the lower court's decision to dismiss the county.

For two reasons, though, *Lewis* doesn't save our Defendants here. For one thing, there was no mention in *Lewis* of the kind of jurisdiction-shifting Transfer Road Agreement we have here—a road agreement that, on its face, "shunts" responsibility over the road at issue in our case from the County to the Village. For another, the Defendants' reliance on *Lewis* runs into the same problem they had with *Covart*: the apparent lack of any County-wide requirement. It's one thing, in other words, to say that, in a case where the state legislature has *required* municipalities to put up certain signs and lights at school crossings (*Lewis*), the County's Charter has the effect of foisting onto the County any obligation the city might've had under that law. But it's another to say that, where neither the state legislature nor the County has imposed *any land-dedication requirement at all*, the Village's Planning Director has the power to make up (and then enforce) that non-existent requirement. Put simply, it may be that the County *could* impose the land-dedication requirement it wants Megladon to abide by here. And, *if it did* impose that requirement, the Village would probably have to enforce it. But what happens when the Village's Planning Director decides to follow—by mistake (say, by a misreading of the relevant statutory framework)—a land-dedication requirement that *doesn't appear to exist*? *Lewis* tells us nothing about that scenario—which (the Plaintiff plausibly alleges) is the scenario we have here.

*Second*, the Defendants look to Chapter 2 of the County Code for their view that the County has "exclusive" jurisdiction over street widths in the Village. *See* MTD at 7. Pursuant to the legislative power vested in them by the County Charter, the Board of County Commissioners tasked the Traffic and Transportation Department (now the Department of Transportation and Public Works) with (as relevant here) the following:

> The Traffic and Transportation Department is hereby empowered and shall have the duty and responsibility to perform, under the administrative direction and supervision of the County Manager, and in accordance with policies adopted by the Board of County Commissioners, the following functions: . . . The Department shall have exclusive jurisdiction in respect to all matters of *traffic engineering* within the territorial areas of Miami-Dade County, subject only to the jurisdiction of the state road department in respect to state highways.

Miami-Dade Cnty. Code § 2-95.1(d) ("the Ordinance") (emphasis added). The Ordinance then defines "traffic engineering" as "that phase of engineering which deals with the *planning and geometric design* of streets, highways, roads, alleys, or other places used for travel or parking of motor vehicles, and abutting lands, and with traffic operation thereon[.]" *Ibid.* (emphasis added). In the Defendants' view, this provision, along with the provision that states "all traffic engineering services shall be performed by the traffic and transportation department, and such department shall have exclusive jurisdiction over all traffic control devices in both the incorporated and unincorporated areas of the county," *id.* § 2-96.1, shows that "the County's jurisdiction over traffic engineering within its territorial limits is exclusive," MTD at 7. We disagree.

It's one thing to have exclusive jurisdiction over the "planning" or designing" of streets. It's quite another to say that the jurisdiction to plan or design something encompasses the power to *alter* its configuration long *after* it's been constructed. The plan or design of a thing, after all, necessarily *precedes* its construction. In other words, the act of planning—or designing—a thing connotes the sketching-out process that occurs *before* the thing is built. That's why Merriam-Webster's Unabridged Dictionary defines "planning" as "the act or process of making or carrying out plans specifically, the

establishment of goals, policies, and procedures for a social or economic unit[.]" *Planning*, MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY, https://unabridged.merriam-webster.com/unabridged/planning (last visited Mar. 1, 2023).[6] Similarly, Merriam-Webster's defines "design" as "the process of selecting the means and contriving the elements, steps, and procedures for producing what will adequately satisfy some need[.]" *Design*, MERRIAM-WEBSTER'S. And that, by the way, is *precisely* how the law distinguishes (for instance) between a product's design and its manufacture. *See, e.g.*, *Harduvel v. Gen. Dynamics Corp.*, 878 F.2d 1311, 1317 (11th Cir. 1989) ("This distinction between aberrational defects and defects occurring throughout an entire line of products is frequently used in tort law to separate defects of manufacture from those of design. . . . Stated another way, the distinction is between an *unintended* configuration, and an *intended* configuration that may produce unintended and unwanted results." (emphasis added & cleaned up)); *Citizens Prop. Ins. Corp. v. Simkar LLC*, 813 F. Supp. 2d 1356, 1363 (M.D. Fla. 2011) (Moody, J.) ("[A] manufacturing defect requires (1) a product that does not conform to its intended design such that it (2) fails to perform as safely as the *intended* design would have performed." (emphasis added & cleaned up)).

It may be, then, that the County retains exclusive jurisdiction to "plan" and "design" all streets *in the first instance*. But that doesn't mean the County retains the far broader power to confiscate parcels of private property that were carved out *long before* the County's designs were ever promulgated. And that's the situation we have here. The Plaintiff has produced property records dating back to the 1950s—all showing that the Plaintiff's property lines were drawn up many decades ago (and that

---

[6] We, of course, construe the words of a statute in accordance with their plain meaning. *See, e.g.*, *Edison v. Douberly*, 604 F.3d 1307, 1309 (11th Cir. 2010); *see also Savage Servs. Corp. v. United States*, 25 F.4th 925, 933 (11th Cir. 2022) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)). And dictionaries are a good—if imperfect—source of a word or phrase's public meaning. *See Watkins v. Session*, 2022 WL 16745386, at *6 (S.D. Fla. Nov. 7, 2022) (Altman, J.) ("[A dictionary] tells us a great deal about what these words meant, in common usage[.]").

they've remained relatively undisturbed since). *See generally* SAC Exs. 1–2. Nothing in the Ordinance, in short, seems to give the County the power to do what it here proposes—to redraw property lines that were *planned* and *designed* more than half-a-century ago. And we don't have the power to add to the words the legislature elected to use in the Ordinance. *See* SCALIA & GARNER 93 ("Nothing is to be added to what the text states or reasonably implies (*casus omissus pro omisso habendus est*.")); *cf. Britt v. IEC Corp.*, 2021 WL 4147714, at *6 (S.D. Fla. Sept. 13, 2021) (Altman, J.), *reconsideration denied*, 2022 WL 3370216 (S.D. Fla. Aug. 16, 2022) ("[W]e have no need to guess as to which 'period' FCC had in mind. That's because the Notice expressly tells us that the relevant period is the 'period during which these regulations are in effect.' If FCC had wanted to, it could have easily said that the waiver applied to 'any claims arising during a period in which the regulations were in effect.' But it didn't say that." (cleaned up)).

Now, as with so many of the points we're about to make, the Defendants may one day produce evidence for their view that our reading of this Ordinance—in the context of the reticulated web of Village and County rules we're dealing with here—is mistaken. At this early stage of the case, though—and without the benefit of any such evidence—we hold that, especially when viewed in the light most favorable to the Plaintiff, nothing in the Ordinance precludes the Village from granting a variance from the County's design specifications (whatever those happen to be)[7] to an *already-extant* (if non-conforming) plot of land.

*Third*, the Defendants point to the County's Development Master Plan ("CDMP") for their position that, under County law, the Plaintiff *must* dedicate a 7.5-foot strip of its land. *See* MTD at 7 ("The County's Comprehensive Development Master Plan . . . *requires* the County to maintain a minimum rights of way established by the Public Works Manual and to require dedication to meet

---

[7] We say "whatever those happen to be" because, as we're about to see, the Defendants have failed to show that the County has promulgated a rule applying *any such* width requirement to the kind of property we have here.

those standards." (errors in original, cleaned up, & emphasis added)). It's true that, in its Traffic Circulation Section, the CDMP makes clear that "the traffic circulation needs and the goal in this Subelement are presented for the entire County, including the 34 municipalities."[8] CDMP, Traffic Circulation Subelement, Introduction at II-9. And the Traffic Circulation Subelement has this to say about rights-of-way: "The County shall continue to maintain and enforce the minimum right-of-way requirements as established in the Public Works Manual and in Chapter 33, Zoning, Code of Miami-Dade County[.]" *Id.*, Objective TC-2A at II-14. The Subelement also provides that "[t]he County shall require the dedication of the appropriate share of all necessary rights-of-way from all developments at the time of development[.]" *Id.*, Objective TC-2B at II-14. But the CDMP is just a set of aspirational "general guidelines and principles"; it doesn't have the force of law, and "it is not a substitute for land development regulations." CDMP, Statement of Legislative Intent § A(3). Instead, by the CDMP's own terms, the "policies contained in the CDMP *must be implemented* through the County's land development regulations[.]" *Id.* § (A)(4) (emphasis added). The CDMP thus cannot, standing alone, support the Defendants' contention that the County *mandated* the land dedication at issue here.

*Fourth*, the Defendants rely on Chapter 33 of the County Code for two propositions: that "the County Code sets forth widths for specific right-of-way segments," and that "those widths apply in both the incorporated and unincorporated areas." MTD at 8 n.1. But, as the Defendants concede (*see ibid.*), Chapter 33 only establishes "[t]he minimum right-of-way widths for streets, roads and public ways for the *unincorporated* area of the County[.]" Miami-Dade Cnty. Code § 33-133 (emphasis added). Chapter 33 thus does not govern—and has nothing to do with—streets in incorporated municipalities (like the Village). Trying to parry this conclusion, the Defendants refer us back to Objective TC-2A of the CDMP (*see* MTD at 8 n.1), which (as a reminder) says: "The County shall continue to maintain and enforce the minimum right-of-way requirements as established in the Public Works Manual *and*

---

[8] The CDMP is divided, first, into "Subelements" and, second, into "Objectives."

*in Chapter 33*, Zoning, Code of Miami-Dade County[.]" (emphasis added). As we've explained, however, this policy "Objective" isn't law and doesn't have the force of law. To effectuate this "Objective," then, the County had to pass an ordinance that, in fact, applied Chapter 33's "minimum right-of-way requirements" to the County's *incorporated* areas. But the County has pointed to no such *law* in its briefing, so Objective TC-2A gets us no closer to dismissal.

*Fifth*, the Defendants cite the Public Works Manual ("PWM") for their view that standards of "all public works through the County" are "applicable in **both the incorporated and unincorporated areas of the County**." MTD at 8 (citing Miami-Dade Cnty. Code § 28-2) (emphasis in original). And (it's true) the County Code *does* provide that the Public Works Department shall "[p]romulgate, establish, and enforce minimum standards for public works construction by the publication of a public works manual. . . . These standards shall be applicable within the unincorporated area *and all incorporated areas*." Miami-Dade County Code § 2-100(d) (emphasis added). But the Defendants never tell us *what* those standards might be or even *how* they might apply to our case. *See generally* MTD. In fact, the Defendants never cite *any specific provision* of the PWM at all. They've thus forfeited (at least for now) any contention that the PWM supports their arguments here. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court sua sponte [only] in extraordinary circumstances."); *see also Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue [forfeits] it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed [forfeited].").[9]

---

[9] The Plaintiff, by contrast, *did* append an excerpt of Part 1 of the PWM. *See generally* SAC Ex. 7 ("Public Works Manual Part 1") [ECF No. 77-7]. But that excerpt doesn't require 50-foot rights-of-way for streets in incorporated municipalities.

*Sixth*, the Defendants reference § 28-14 of the County Code. *See* MTD at 8 ("In relevant part, Section 28-14 imposes design standards for streets ***within the incorporated and unincorporated areas***[.]" (emphasis in original)). Chapter 28[10]—which *does* "apply to and [shall] be enforced in both the incorporated and unincorporated areas of the County," Miami-Dade Cnty. Code § 28-3(a)— provides:

> Street right-of-way widths shall be shown on the master plan or in Chapter 33 of this Code and where not so shown shall be not less than as follows: . . . Minor, for apartments and residences—Fifty (50) to sixty (60) feet right-of-way as may be determined in uniform standards prescribed by the County's manual of public works construction . . . unless because of unusual conditions the plat division determines that a lesser right-of-way width is justified.

*Id.* § 28-14(B)(14).

Three problems with this. *One*, as we've seen, the Defendants have pointed us to no such "uniform standards" in the PWM, so we're not entirely sure that this fifty-foot requirement has ever been so "determined." *Two*, the Defendants haven't shown us any "master plan." So, we have no way of knowing whether any such "master plan" even requires a land dedication in cases like ours. *Three*, Chapter 28 doesn't appear to apply to the Plaintiff's parcel in any event. A "right-of-way" under Chapter 28 is "a strip of ground dedicated by the *subdivider*, deeded by the owner, for public use." *Id.* § 28-1(g)(11) (emphasis added). A "subdivider" is defined as an "individual, firm, association, syndicate, copartnership, corporation, trust, or any other legal entity commencing proceedings under this chapter to effect *a subdivision of land*[.]" *Id.* § 28-1(h) (emphasis added). Indeed, the whole of Chapter 28 is titled "Subdivisions," and the Chapter defines a subdivision as "the division of land for any use so as to create one (1) or more lots, sites, tracts or parcels[.]" *Id.* § 28-1(i). It's worth noting, too, that the Chapter's express purpose is to "regulate[ ] the *subdivision of land* in both the incorporated and unincorporated areas of the County." *Id.* § 28-2 (emphasis added). But it's undisputed that our

---

[10] Section 28-14 is just one of Chapter 28's twenty sections.

Plaintiff has *no intention* of subdividing its land, *see* SAC ¶¶ 2–4, and that it's thus not a "subdivider" to whom any part of Section 28-14 would even apply. Section 28-14, in sum, cannot advance the Defendants' position here.

*Seventh*, the Defendants cite Miami-Dade County Code § 28-11, which sets out certain enforcement mechanisms for the regulations in Chapter 28. *See* MTD at 9 ("Section 28-11 prohibits any building permit—whether issued by the County or the municipality—for construction on property that violates the County's subdivision requirements[.]"). Section 28-11 says that "[n]o building permit shall be issued for construction of any improvements on a parcel that was not legally created in compliance with *these* regulations[.]" Miami-Dade Cnty. Code § 28-11 (emphasis added). But our parcel was "created" many decades ago—long before *either* § 28-11 *or* (even) the Miami-Dade County Home Rule Charter was promulgated. *Compare* SAC Ex. 2 ("Pre-1958 Deeds") [ECF No. 77-2] at 1 (deed records for the Plaintiff's parcel dating back to October 24, 1955), *with* Miami-Dade Cnty. Code § 28 n.1 (showing that § 28-11 wasn't promulgated until February 1, 1977) *and* Miami-Dade Cnty. Home Rule Charter 48 (showing an adoption date of May 21, 1957). It thus doesn't make sense to say that the Plaintiff's parcel was "created" in a way that infringed on any of *these* regulations because those regulations didn't exist at the time it was created.[11]

In any event, and for two additional reasons, § 28-11 doesn't apply to our parcel. *One*, as we've seen, Chapter 28 deals only with subdivisions, and our Plaintiff isn't interested in subdividing its land. *Two*, § 28-11 in particular applies only where "[t]he tentative plat has been approved by the Plat Committee and is current" and "[a] letter signed by the property owner has been submitted to the Supervisor, Platting Section, requesting the construction of models prior to final plat recording." Miami-Dade Cnty. Code § 28-11(b)(1), (4). Our Plaintiff, however, is legally exempt from platting

---

[11] To "create" means "to bring into existence: make out of nothing and for the first time[.]" *Create*, MERRIAM-WEBSTER'S.

under § 28-4(4) because its plot was conveyed "prior to January 1, 1958[.]" *Id.* § 28-4(4); *see also* SAC ¶ 44 ("Megladon's homesite parcel is exempt from County platting jurisdiction under the plain language of § 28-4(4) because, as is evident from readily available recorded warranty deed information in the County's officials records, the parcel of land comprising the homesite has not changed since before incorporation of the County.").

*Eighth*, the Defendants point to § 28-12 of the County Code. *See* MTD at 9. But that Section provides only that all cities (and the County) "shall withhold all public improvement of whatsoever nature . . . from all subdivisions which have not been approved, and from all areas dedicated to the public which have not been accepted, in the manner prescribed herein." Miami-Dade Cnty. Code § 28-12. Again, since it's undisputed that our Plaintiff has no interest in subdividing the land, this provision is neither here nor there.

*Ninth* (and finally), the Defendants point to Chapter 30 of the Village Code, which provides that "all required county, regional, state or federal agency approvals shall be obtained prior to the submission of any application for site plan review." MTD at 11 (citing Pinecrest Code Ch. 30, art. III, div. 3.2(a)). In the County's view, "the Village is required to account for compliance with County approvals that are needed for development." *Ibid.* As we've seen, however, the Defendants have failed to offer up a single County (or other) rule that would require the dedication in question here. There's thus no evidence that the Plaintiff failed to obtain any of the "approvals" Chapter 30 of the Village Code seems concerned with.

***

Because the Defendants have failed to show that the County had exclusive jurisdiction over the right-of-way at issue here—and since they haven't identified a single rule that would've rendered

the Village Planning Director impotent to vary from any such rule—we reject the Defendants'
contention that the Plaintiff has failed to state a claim against the Village.[12]

## II.     The Plaintiff's Claims Are Ripe

The Defendants offer three arguments for their view that the Plaintiff's claims are unripe. We
reject them all.

*First*, they say that Director Olmsted—and, by extension, the Village—wasn't authorized to
make any decision with respect to the dedication because he was simply abiding by a County
requirement. *See* MTD at 12 ("[A]llegations in the Complaint indicat[e] that Plaintiff was advised that
this was a ***County requirement*** that could be waived, and that Plaintiff should seek to be excused
from the condition by the ***County***." (emphasis in original)). As we've explained, however, we find no
basis for this argument in any of the nine legal sources the Defendants have cited for us. *See supra*
Section 1. More importantly, this argument appears to ignore the unambiguous terms of the Transfer
Road Agreement.

*Second*, the Defendants claim that Olmsted never actually came to a final decision on the
dedication requirement. *See* MTD at 13 ("Exhibit 5 to the Complaint does not support Plaintiff's
contention that the Planning Director, via an email, refused to further process Plaintiff's application
unless Plaintiff showed the dedication on its site plan."). This argument strains credulity. As we've
highlighted, on May 14, 2020, Director Olmsted sent Fossi an email, which (in pertinent part) read as
follows:

> [T]he Village can review your application for a building permit, *provided* the site plan
> and all required building setbacks, lot coverages, green space calculations, etc., are
> indicated for the property excluding the right of way to be dedicated . . . *Prior* to
> issuance of a building permit, an affidavit, similar to the attached affidavit, *will need* to
> be completed, signed, and submitted to the Village of Pinecrest. The affidavit includes
> the owners' consent to dedication of the right-of-way and their acknowledgment that
> a certificate of occupancy *will not be issued until dedication of the right-of-way is complete.*

---

[12] For similar reasons—and as we explained in note 3, *supra*—we reject the Defendants' view that the
Plaintiff has, in Counts I–III, sued the wrong party, *see* MTD at 7.

SAC ¶ 64 (emphases added). Especially when we view this communication (from the Village's Planning Director no less) in the light most favorable to the Plaintiff, we don't think we're going out on a limb by saying that it sounds a lot like a final decision. Director Olmsted made clear that the Village would issue the permit *provided* the Plaintiff acceded to the dedication. *See ibid.* "Provided" in this context means "with the provision or condition (that); it being provided, stipulated, or arranged (that)." *Provided*, OXFORD ENGLISH DICTIONARY ONLINE, https://www.oed.com/view/Entry/153449 (last visited Mar. 1, 2023);[13] *accord Provided*, MERRIAM-WEBSTER'S (defining "provided" as "on condition that, with the understanding, if only"). And, in case there was any doubt, Olmsted clarified that Megladon would "*need*" to consent (in writing) to the dedication "*prior* to" the issuance of any permit, and he was pellucid that the permit "*will not* be issued *until dedication of the right-of-way is complete*." SAC ¶ 64 (emphases added). The word "will"—like the word "shall"—indicates the imposition of a *mandatory* condition. *See Hewitt v. Helms*, 459 U.S. 460, 471 (1983) ("[T]he Commonwealth has gone beyond simple procedural guidelines. It has used language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed[.]"); *Will*, OXFORD ENGLISH DICTIONARY ONLINE ("An utterance of the auxiliary verb 'will'; (also) a command, promise, or determination expressed by such an utterance."); *Will*, MERRIAM-WEBSTER'S (defining "will" as "used to express a command, exhortation, or injunction"); SCALIA & GARNER 112 ("Mandatory words impose a duty; permission words grant discretion.").

And Olmsted's unequivocal use of the phrase "will need" in relation to the dedication requirement puts to bed the Defendants' bordering-on-frivolity contention that "the response to [the architect's] email was not a refusal to continue processing the application absent a showing of dedication." MTD at 13. So too with the Defendants' separate claim that "there is no allegation in the

---

[13] "In later use more generally," the dictionary goes on, "provided" means "on the condition, supposition, or understanding (that)." *Provided*, OXFORD ENGLISH DICTIONARY ONLINE.

Complaint indicating that the Village actually denied the permit for failure to comply with the condition or that the Village otherwise stopped processing the permit," *ibid.*, which ignores the elements of the four counts the Plaintiff has advanced here. In Count I, after all, the Plaintiff must allege only that "a prohibited exaction [wa]s actually imposed *or* . . . [was] required in writing as a final condition of approval for the requested use of real property." FLA. STAT. § 70.45(2) (emphasis added). As the statute's use of the disjunctive makes plain, the Plaintiff *doesn't* need to prove (for Count I) that its permit was *actually* denied—it only has to show that the Village made the dedication a "final condition of approval[.]" *Ibid.*; *see also* SCALIA & GARNER 116 ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives."). And the same goes for Counts II–IV—all tied, as we'll soon see, to the unconstitutional-conditions doctrine, which requires the Plaintiff to aver, not the *denial* of a permit, but the imposition of an unconstitutional *condition*. *See Koontz*, 570 U.S. at 606 ("[W]e have recognized that regardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right, the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them."). Whatever his actual intentions, in short, Olmsted's email—fairly read—evinces a final decision.

   *Third*, the Defendants note that the Plaintiff could have continued appealing Olmsted's decision all the way up to the County level, and they suggest that Megladon's failure to follow this chain to its terminus renders the SAC's claims unripe. *See* MTD at 14–15 ("Because Plaintiff never pursued a final written decisions [sic] from these final arbiters—the zoning board and the Village Council—the condition was never imposed as [a] final condition of approval as required by Florida Statutes."). But the Supreme Court has made clear that the unconstitutional-conditions doctrine isn't subject to an exhaustion requirement. *See Pakdel v. City & Cnty. of San Francisco*, 141 S. Ct. 2226, 2231 (2021) ("Whatever policy virtues this doctrine might have, 'administrative exhaustion of state

remedies' is not a prerequisite for a takings claim when the government has reached a conclusive position." (citing *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2167 (2019))). Indeed, in *Pakdel*, the Court held that the Fifth Amendment's finality requirement is "relatively modest." *Id.* at 2230. To assert a plausible unconstitutional-conditions claim, therefore, a plaintiff need only allege that there's "no question . . . about how the 'regulations at issue [apply] to the particular land in question.'" *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 739 (1997) (quoting *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 191 (1985)). The question, in other words, is whether "the government has adopted its final position" on the application of the relevant regulations. *Pakdel*, 141 S. Ct. at 2231.

In saying all this, the Court in *Pakdel* cited approvingly to Judge Bea's dissenting opinion below, which had explained that the "'finality requirement looks only to whether the *initial decisionmaker* has arrived at a definitive position on the issue.'" *Id.* at 2229 (emphasis added & cleaned up) (quoting *Pakdel v. City & Cnty. of San Francisco*, 952 F.3d 1157, 1170 (9th Cir. 2020) (Bea, J., dissenting)). In the end, then, the Court was clear: "[A]dministrative 'exhaustion of state remedies' is *not* a prerequisite for a takings claim when the government has reached a conclusive position." *Id.* at 2231 (emphasis added) (quoting *Knick*, 139 S. Ct. at 2167).

Towards the end of *Pakdel*, though, the Court *did* throw our Defendants a lifeline:

> To be sure, we have indicated that a plaintiff's failure to properly pursue administrative procedures may render a claim unripe if avenues still remain for the government to clarify or change its decision. *See, e.g.*, *Williamson Cnty.*, 473 U.S. at 192–194 ("The Commission's refusal to approve the preliminary plat . . . leaves open the possibility that [the plaintiff] may develop the subdivision according to the plat after obtaining the variances"); *Knick*, 139 S. Ct., at 2169 ("[T]he developer [in *Williamson County*] still had an opportunity to seek a variance from the appeals board"); *cf. Palazzolo v. Rhode Island*, 533 U.S. 606, 624–625 (2001) (dismissing accusations that the plaintiff was "employing a hide the ball strategy" when "submission of [a] proposal would not have clarified the extent of development permitted . . . , which is the inquiry required under our ripeness decisions").

*Ibid.* (cleaned up). But this reference to *Williamson County* doesn't help our Defendants here (at least not for now). In *Williamson County*, after all, the Court was concerned only with whether the plaintiff could seek a variance from the *initial* decisionmaker. Here's what the *Williamson County* Court had to say about that:

> While it appears that the State provides procedures by which an aggrieved property owner may seek a declaratory judgment regarding the validity of zoning and planning actions taken by county authorities, respondent would not be required to resort to those procedures before bringing its § 1983 action, because those procedures clearly are remedial. *Similarly, respondent would not be required to appeal the Commission's rejection of the preliminary plat to the Board of Zoning Appeals*, because the Board was empowered, at most, to review that rejection, not to participate in the Commission's decisionmaking.
>
> Resort to those procedures would result in a judgment whether the Commission's actions violated any of respondent's rights. In contrast, resort to the procedure for obtaining variances would result in a conclusive determination *by the Commission* whether *it would allow respondent* to develop the subdivision in the manner respondent proposed. The Commission's refusal to approve the preliminary plat does not determine that issue; it prevents respondent from developing its subdivision without obtaining the necessary variances, but leaves open the possibility that respondent may develop the subdivision according to its plat after obtaining the variances. In short, the Commission's denial of approval does not conclusively determine whether respondent will be denied all reasonable beneficial use of its property, and therefore is not a final, reviewable decision.

*Williamson Cnty.*, 473 U.S. at 193–94 (emphases added & cleaned up). As this block quote makes plain, the Court in *Williamson County* didn't require the plaintiff to ask a *second* governmental entity (the Board of Zoning Appeals) for variances from the *initial* decisionmaker's position. It held only that, to ripen his claim, the plaintiff had to ask the initial reviewer (the Commission) for those variances. And that's consistent with what happened in *Pakdel*, where the Court *didn't* require the plaintiff, before filing in federal court, to seek relief from anyone beyond the *initial* decisionmaker (the City of San Francisco).

The Court, in short, was trying to balance two competing (but important) interests—preventing plaintiffs from prematurely filing suit *before* the city has reached a final decision (on the one hand), while preventing local governments from pushing their citizens into a never-ending labyrinth of costly appeals (on the other). In striking that balance, the Court appears to have arrived at an

understandable bright line: A plaintiff in Megladon's position must pursue any available variances from the initial-level reviewer (in this case, from the Village), but he need not then exhaust (as the County seems to prefer) an endless stream of second- and third- or even fourth-level reviews.

The Defendants' insistence that the Plaintiff seek a variance from a second-level reviewer (the County) is thus flatly inconsistent with *Williamson County* (especially in light of *Pakdel*). At the same time, as we've suggested, the Plaintiff *does* appear to have an obligation to "pursue administrative procedures" with the initial-level decision-maker (the Village) "if avenues still remain for [the Village] to clarify or change its decision." *Pakdel*, 141 S. Ct. at 2231. And, to their credit, our Defendants *do* point to a provision of the Village Code that (in their view) allowed the Plaintiff to seek a variance from Director Olmsted's decision. *See* MTD at 14 (citing Pinecrest Village Code Ch. 30, Div. 3.2(e)). But that ordinance provides only that "the [Village] administrative official or his or her designee may grant a variance for *setback requirements*[.]" Pinecrest Village Code Ch. 30, art. III, div. 3.2(e) (emphasis added). And it's not at all clear to us that setbacks and land dedications have anything to do with each other. The Village Code defines a setback requirement as "[t]he required minimum horizontal distance between the front, rear or side lines of a lot and the front, rear and side lines of a building, or, in the case of open structures, to the face of the structural columns; including those structures specifically permitted to extend beyond the height of the building." *Id.* at Ch. 30, art. IX, div. 9.2. These setback requirements, in essence, prevent landowners from building within a certain set distance of the boundary line. *See, e.g.*, *id.* at Ch. 30, art. IV, div. 4.2(b)(5)(g) (providing that the "[r]equired [s]etback" for a "[p]rincipal one-story structure" in residential districts zoned as "EU-1" is 50 feet in the front and 25 feet in the rear). In the world of setbacks, in other words, the property owner retains ownership over the set-back parcel; he just isn't allowed to build on it. A land dedication, by contrast, requires the landowner to transfer (forfeit, really) a portion of his land to the government *forever*. In the world of land dedications, the landowner cannot build on the land *precisely because* he no longer owns it.

It may be, of course, that (in the jargon of Village government) land dedications and setback requirements are actually synonymous. If this is true, then the Village may be able (in discovery) to adduce evidence for its position that the land dedication at issue here is precisely what the Village meant by a setback requirement. But, at this point in the litigation, it's produced no evidence for this proposition. In any event, when we construe the allegations of the complaint "in a light most favorable" to Megladon, *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997)—and, in particular, when we give the relevant provision of the Village Code its fairest and most ordinary meaning, SCALIA & GARNER 69 ("Words are to be understood in their ordinary, everyday meanings.")—we cannot agree that the Plaintiff had *any* recourse to ask the Village for a variance from Director Olmsted's final *land-dedication* decision. Since the Defendants have pointed us to no *other* provision of the Village Code—and because, under *Pakdel* and *Williamson County*, the Plaintiff had no obligation to seek a variance from a second- or -third or -fourth-level governmental reviewer—we **DENY** this second aspect of the MTD.[14]

---

[14] We emphasize one more time the apparent finality of Olmsted's position. Recall, in this respect, that, on October 1, 2020, Megladon "transmitted a pre-suit notice of proposed action compliant with § 70.45(3), Fla. Stat.," in which it "explain[ed] why Megladon believes the exaction is prohibited, and provid[ed] an initial estimate of the damages." SAC ¶ 79. Far from wavering on this issue, the Village responded on December 29, 2020, "declining to withdraw or otherwise modify its demand for a right of way dedication." *Id.* ¶ 134. At this early phase of the case, the Village's steadfast refusal to negotiate in the face of a pre-suit demand letter satisfies the finality requirement. As the Court in *Pakdel* explained, the finality requirement "ensures that a plaintiff has actually 'been injured by the Government's action' and is not prematurely suing over a hypothetical harm." *Pakdel*, 141 S. Ct. at 2230 (quoting *Horne v. Dep't of Agric.*, 569 U.S. 513, 525 (2013)). "Along the same lines," the Court went on, "because a plaintiff who asserts a regulatory taking must prove that the government 'regulation has gone too far,' the court must first 'kno[w] how far the regulation goes.'" *Ibid.* (cleaned up) (quoting *MacDonald, Sommer & Frates v. Yolo Cnty.*, 477 U.S. 340, 348 (1986)). "Once the government is committed to a position, however, these potential ambiguities evaporate and the dispute is ripe for judicial resolution." *Ibid.* When we draw all reasonable inferences in the Plaintiff's favor, the Village's written communications leave no "potential ambiguities" about whether (or to what extent) it would require the land dedication. The Plaintiff has thus plausibly alleged—at this early phase of the case—*both* that it's "actually been injured by the Government's action," *Horne*, 569 U.S. at 525, *and* that we "kno[w] how far the regulation goes," *MacDonald*, 477 U.S. at 348.

### III.    Count I is Timely

But the Plaintiff isn't out of the woods just yet. As the Defendants see things, "[i]f Plaintiff's claim is ripe, then Count I is time-barred because the Planning Director's first written comment regarding the dedication requirement was on April 3, and the presuit notice is, therefore, untimely." MTD at 19. Again, we disagree.

Count I (recall) alleges a violation of FLA. STAT. § 70.45, which (as relevant here) requires that, "[a]t least 90 days before filing an action under this section, but no later than 180 days after imposition of the prohibited exaction, the property owner shall provide to the relevant governmental entity written notice of the proposed action." FLA. STAT. § 70.45(3). Because the Plaintiff gave pre-suit notice on October 1, 2020, that notice (and, by extension, Count I) would be untimely if the claim ripened on April 3, 2020, when Director Olmsted entered his first set of comments into the Plan Review System. *See* SAC ¶ 73. That's because from April 3, 2020 to October 1, 2020 is 181 days (or one day too late). By the same token, if the Plaintiff's claim ripened on May 14, 2020—when Director Olmsted responded to Fossi's clarification email, *see* Fossi Emails at 1—then Count I would be timely, because May 14 is just 140 days before October 1. In the Defendants' view, the Village made its final decision (if it made any final decision at all) on April 3, 2020, because "the April 3 Comment does not differ in any material sense from the Village Planning Director's email [of May 14, 2020]." MTD at 18–19. But, when we draw all reasonable inferences in the Plaintiff's favor, that's a bit difficult to square with the facts. That's because the Plaintiff characterizes the April 3, 2020 comment as "an invitation for Megladon to comment in response to" Olmsted's communication. SAC ¶ 73. That characterization wouldn't be entitled to much weight if it were unreasonable. But, on careful examination, the Plaintiff's characterization *is* reasonable. Far from standing as the final word on the subject, after all, the April 3, 2020 comment was the impetus for a months-long series of communications, negotiations, and clarifications between Director Olmsted and our Plaintiff.

As we've highlighted, on April 30, 2020, Megladon's architect (Fossi) emailed Olmsted "to clarify the revision for Zoning comment #1 as it affects [Megladon's] design." Fossi Emails at 3. Instead of rejecting Fossi's request for clarification on the ground that he had already reached a final decision, Olmsted met with Fossi "over the phone" later that day. *Id.* at 2. The following day (May 1, 2020), Fossi sent Olmsted a second email, summarizing their telephone conversation from the day before and asking Fossi to "confirm that we have understood correctly as per our call." *Ibid.* When Fossi didn't receive a response to this email, she followed up with Olmsted twice: once on May 6, 2020, "to request confirmation on the conversation highlights from our phone call from the 30th"; and a second time on May 13, 2020, requesting "confirmation on the conversation highlights[.]" *Ibid.* And, on May 14, 2020, Olmsted answered Fossi's email with the written communication the Plaintiff now characterizes as his *final* decision. *Id.* at 1. So, there's much to commend the Plaintiff's view that the April 3, 2020 comment was just an invitation to negotiate—and not, as the Defendants contend, a final decision.

Pushing back against all this, the Defendants advance an interesting argument. It's true, they say, that (as a general matter) we must draw all reasonable inferences in the Plaintiff's favor. But that isn't the case, they insist, when we're dealing with a statute that waives sovereign immunity. *See* MTD at 14 ("Statutes that waive sovereign immunity must be strictly construed in favor of the government."). And the statute in question here—§ 70.45—unquestionably worked a waiver of sovereign immunity. *See* FLA. STAT. § 70.45(6) (noting that "the state, for itself and its agencies or political subdivisions, waives sovereign immunity for causes of action based upon the application of this section"). Here, again, the Defendants miss their mark. The canon they're relying on mandates only that a *statute* waiving sovereign immunity "be construed narrowly in favor of the government." *Heritage at Pompano Hous. Partners, L.P. v. City of Pompano Beach*, 2021 WL 8875658, at *4 (S.D. Fla. Dec. 15, 2021) (Smith, J.) (citing *Hardee Cnty. v. FINR II, Inc.*, 211 So. 3d 1162, 1165 (Fla. 2017)). The canon

ensures that "[a] statute does not waive sovereign immunity—and a [ ] statute does not eliminate state sovereign immunity—unless that disposition is unequivocally clear." SCALIA & GARNER 281. But (and here's the rub) the canon *doesn't* allow us to flip the script on the generally-applicable pleading standard in a way that resolves all reasonable *factual* inferences in *the Defendants'* favor. In other words, on questions about the *statute's* meaning and the scope and extent of its application, all inferences must (we concede) be drawn in the government's favor. But we're not quibbling here about the *statute's* meaning—or the scope and application of its provisions. We all agree that the *law* in question requires a putative plaintiff to serve a pre-suit notice letter on a potential defendant no more than 180 days after the imposition of the allegedly wrongful condition.[15] The question here, instead, is whether the *facts* the Plaintiff has alleged bring the Plaintiff's notice letter within that 180-day window. And the rule in favor of strictly circumscribing the outer boundaries of sovereign-immunity waivers has nothing to say about how we construe the well-pled *factual* allegations in the Plaintiff's complaint.

Again, we're not saying the Plaintiff is right that the April 3 communication was an invitation to negotiate—only that the Plaintiff's *factual* characterization of that communication is reasonable. It

---

[15] At the January 2023 hearing, Megladon insisted (for the first time) that the 180-day clock hasn't even started yet because, given this lawsuit, the Village's condition has never actually been "imposed." *See* MTD Hr'g Tr. 8:19–22 ("[T]he timing provision in Section 3 which says at least 90 days before filing an action under the section, but no later than 180 days after imposition of the prohibited exaction. The exaction here has not actually been imposed . . . ."). For three reasons, we disagree. *One,* Megladon has forfeited this argument by never presenting it in the Response. *See, e.g., Campbell,* 26 F.4th at 873; *Hamilton,* 680 F.3d at 1319; *In re Egidi,* 571 F.3d at 1163 (11th Cir. 2009). *Two,* to "impose" means to "give or bestow (as a name or title) authoritatively or officially," as in to "impose a tax" or to "impose a duty[.]" *Impose,* MERRIAM-WEBSTER'S. Just as a tax can be imposed, even if the tax is never paid, the Village's condition was imposed, even though the Plaintiff hasn't agreed to play along. Otherwise, we'd be left with the counter-intuitive scenario in which a tax evader can avoid his tax liability by claiming that, since he evaded the tax, the tax was never imposed in the first place. *Three,* if there were any doubt about the meaning (or application) of the word "imposed" as it appears in § 70.45, we'd have to resolve that ambiguity in the Defendants' favor. That's because, again, § 70.45 works a waiver of sovereign immunity—and, as a result, its words must be read strictly in favor of the government. *See United States v. Nordic Vill. Inc.,* 503 U.S. 30, 34 (1992) ("[T]he Government's consent to be sued must be construed strictly in favor of the sovereign and not enlarged beyond what the language requires[.]" (cleaned up)).

may be (in other words) that the evidence, when we get some evidence, will undermine this central contention. But, for now, when we must draw all reasonable *factual* inferences in the Plaintiff's favor, we see little choice but to **DENY** the MTD as to Count I.

## IV.    Counts II & IV State Plausible Claims

Counts II and IV plausibly allege that, in requiring the land dedication at issue here, the Defendants have violated the unconstitutional-conditions doctrine. As a reminder, in Count II, the Plaintiff claims that the Village violated Section 6 of Article 10 of the Florida Constitution, *see* SAC ¶ 125, which states that "[n]o private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner," FLA. CONST. art. X, § 6. And, in Count IV, the Plaintiff alleges that "the Village and County have jointly and impermissibly burdened Megladon's Fifth Amendment right by requiring the uncompensated dedication of land in fee simple as a condition of issuing a discretionary building permit[.]" *Id.* ¶ 156.[16]

Under the unconstitutional-conditions doctrine, "a unit of government may not condition the approval of a land-use permit on the owner's relinquishment of a portion of his property unless there is a nexus and rough proportionality between the government's demand and the effects of the proposed land use." *Koontz*, 570 U.S. at 599. The doctrine recognizes, of course, that "[i]nsisting that landowners internalize the negative externalities of their conduct is a hallmark of responsible land-use policy[.]" *Id.* at 605. But the doctrine prevents the government "from engaging in out-and-out extortion that would thwart the Fifth Amendment right to just compensation." *Id.* at 606 (cleaned up).

---

[16] We analyze claims under the Takings Clause and Article 10, Section 6 of the Florida Constitution under the same legal standard. *See Chmielewski v. City of St. Pete Beach*, 890 F.3d 942, 949 (11th Cir. 2018) ("Article X, § 6(a) of the Florida Constitution provides, 'No private property shall be taken except for a public purpose and with full compensation therefor paid to each owner.' . . . Because Florida follows federal takings law, we can look to cases brought under the Fifth Amendment to inform our analysis." (citing FLA. CONST. art. X, § 6(a))).

The Defendants ask us to dismiss Counts II and IV because (they say) "the Village has not exacted anything from the Plaintiff" and because "the Village gave [Megladon] the option of seeking to be exempt from the condition altogether by obtaining a waiver from the County, which exercises jurisdiction over the requirement." MTD at 20. We've already rejected the second argument (*see supra* Section II), and the first misstates the relevant test. The whole point of the unconstitutional-conditions doctrine is that it "forbids burdening the Constitution's enumerated rights . . . *regardless* of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right[.]" *Koontz*, 570 U.S. at 606 (emphasis added). The doctrine, in other words, specifically applies in situations like ours—where *nothing* has been taken. *See ibid.* ("The principles that undergird our decisions in *Nollan* and *Dolan* do not change depending on whether the government approves a permit on the condition that the applicant turn over property or denies a permit because the applicant refuses to do so.").

And we have little trouble concluding, at this early stage of the case, that the Plaintiff's unconstitutional-conditions claim is plausible. Director Olmsted made clear, after all, that the Village could only "review [Megladon's] application for a building permit, provided the site plan and all required building setbacks, lot coverages, green space calculations, etc., are indicated for the property excluding the right of way to be dedicated," SAC ¶ 64—an unambiguous condition. And we think the Plaintiff has a strong argument that this dedication isn't "rough[ly] proportional" to the impact of Megladon's proposed land use. *Koontz*, 570 U.S. at 605. As we've explained, the parcel has always supported a single-family home, and Megladon plans to do nothing more than build a new "single family residential building[.]" SAC ¶ 4. Nothing in the SAC suggests that the process of subbing out an old single-family home for a new one will "substantially increase traffic congestion" or otherwise "impose costs on the public that dedications of property can offset." *Koontz*, 570 U.S. at 605. Indeed, based on the allegations of the SAC, the Village's land-dedication requirement seems to resemble your prototypical unconstitutional condition: where the government "condition[s] the approval of a land-

use permit on the owner's relinquishment of a portion of his property" without any evident connection "between the government's demand and the effects of the proposed land use." *Id.* at 599. We therefore **DENY** the Defendants' Motion to Dismiss Counts II and IV.

***

After careful review, then, we hereby **ORDER and ADJUDGE** that the Defendants' Motion to Dismiss is **DENIED**. Count III of the SAC is **DISMISSED** as duplicative of Count IV. Counts I, II, and IV shall proceed.

**DONE AND ORDERED** in the Southern District of Florida on March 1, 2023.

_____
**HON. ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:  counsel of record