UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-cv-22819-ALTMAN/Reid

MEGLADON, INC.,

　　　*Plaintiff*,

*v.*

VILLAGE OF PINECREST, *et al.*,

　　　*Defendants.*

_____/

## ORDER

Megladon, Inc., our Plaintiff, is a Florida corporation engaged in developing residential real estate. In 2016, Megladon acquired a parcel of land in the Village of Pinecrest with the intention of building a new single-family house there. After demolishing the existing house that was on the parcel, Megladon applied to the Village for a building permit. Since then, Megladon has found itself caught in a web of bureaucratic delay and administrative uncertainty.

As a condition of receiving the permit, the Village required Megladon to dedicate—*i.e.*, transfer ownership of—the first 7.5 feet from the parcel's northern property line to the Village for use as a public right-of-way. Not wanting to redesign its building plans or apply for a variance, Megladon instead sued the Village, challenging the legality of the dedication requirement under Florida and federal law. Miami-Dade County soon intervened in that action as a defendant, asserting that the *County*—and not the Village—retained jurisdiction over right-of-way dedications.

Megladon and the Defendants have since filed cross-motions for summary judgment. *See* Plaintiff's Partial Motion for Summary Judgment ("Pl.'s MSJ") [ECF No. 172]; Defendants' Motion for Summary Judgment ("Defs.' MSJ") [ECF No. 170]. Both motions seek summary judgment on similar issues, including (and especially) on the extent of the County's jurisdiction over the dedication

requirement, *see* Pl.'s MSJ at 2–7; Defs.' MSJ at 11–17, the ripeness and timeliness of Megladon's claims, *see* Pl.'s MSJ at 7–18; Defs.' MSJ at 9–11, and the constitutionality of the land-dedication requirement, *see* Pl.'s MSJ at 18–24; Defs.' MSJ at 20.

After careful review of the motions, the record, and the governing law, we conclude that Megladon is entitled to judgment as a matter of law on the County's lack of jurisdiction and the ripeness of its claims. But, because there remain genuine factual disputes about the timeliness of Megladon's state-law claim (under FLA. STAT. § 70.45) and the Village's liability (under 42 U.S.C. § 1983), we'll proceed to trial to resolve those issues and to determine the amount (if any) of Megladon's damages. In other words, the Plaintiff's Motion for Partial Summary Judgment [ECF No. 172] is **GRANTED in part** and **DENIED in part**, and the Defendants' Motion for Summary Judgment [ECF No. 170] is **DENIED**.

## THE FACTS[1]

In 1996, the Village of Pinecrest (the "Village") and Miami-Dade County (the "County") executed an interlocal agreement that "transfer[red] and convey[ed]" from the County to the Village the "jurisdiction, ownership and control of all public roads within the corporate limits of the

---

[1] "The facts are described in the light most favorable to [the non-moving party]." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 n.2 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant]."). We accept these facts for summary-judgment purposes *only* and recognize that "[t]hey may not be the actual facts that could be established through live testimony at trial." *Snac Lite, LLC v. Nuts 'N More, LLC*, 2016 WL 6778268, at *1 n.1 (N.D. Ala. Nov. 16, 2016); *see also Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion may not be the actual facts. They are, however, the facts for present purposes[.]" (cleaned up)). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (cleaned up). In adjudicating cross-motions, then, we consider each motion separately and, of course, resolve all reasonable inferences against the movant. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).

Village[.]"² Transfer Road Agreement [ECF No. 171-15] at 2–3. By its own terms, that agreement was "sufficient to accomplish the transfer" under Florida law and included "the transfer of the County's regulatory and proprietary jurisdiction, and the conveyance of all right, title and interest of the County[.]" *Id.* at 3.

Twenty years later, Megladon, Inc., "purchased a parcel of land in a single family residential neighborhood located" at 13100 S.W. 77th Avenue in the Village. Joint Statement of Undisputed Facts ("JSOUF") [ECF No. 133] ¶ 1. The parcel "has frontage on both S.W. 77th Avenue and S.W. 131st Street[,]" *id.* ¶ 2, and "had been developed with a single-family home, which had been torn down to make room" for the new single-family home Megladon intended to build, *id.* ¶ 3. That street (S.W. 131st Street) is "a two-lane roadway without sidewalks," Defendants' Statement of Facts ("Defs.' SOF") [ECF No. 171] ¶ 7 (first citing Deposition of Leandro Ona ("Ona Dep.") [ECF No. 171-2] at 137:12–21; and then citing Plat PB 98-87 Plan [ECF No. 171-5]); *see also* Plaintiff's Response Statement of Facts ("Pl.'s Resp. SOF") [ECF No. 182] ¶ 7 (disputing statement on other grounds), and is somewhere between twenty and thirty-five feet wide, *compare* Defs.' SOF ¶ 6 ("SW 131st Street is currently a 35-foot-wide roadway (first citing Ona Dep. at 137:12–19; and then citing Plat PB 98-87 Plan), *with* Pl.'s Resp. SOF ¶ 6 ("SW 131st Street is approximately 20 feet wide." (first citing Ex. A to Declaration of James Paterson ("Paterson Decl.") [ECF No. 131-9] at 6; and then citing Ex. A to Declaration of Reginald Mesimer ("Mesimer Decl.") [ECF No. 131-8] at 7)).

On August 19, 2019, Valeria Fossi, Megladon's architect, met with Patricia Janisse, a member of the Village's Planning Division, to discuss "Megladon's proposed redevelopment of the Parcel."

² The Transfer Road Agreement refers to the County as "Metropolitan Dade County, a political subdivision of the State of Florida[.]" Transfer Road Agreement [ECF No. 171-15] at 2. In 1997, the County officially changed its name to "Miami-Dade County" following a referendum. *See* Miami-Dade County, Fla., Ordinance 97-212 § 1 (Dec. 2, 1997) ("'Miami-Dade County' is hereby recognized as the official name of Dade County, Florida.").

3

JSOUF ¶ 14. At that meeting, Janisse informed Fossi that, because "the street adjacent to the northern boundary of the [parcel], S.W. 131st Street, was a substandard width, . . . dedication of a portion of the [parcel] may be necessary to proceed with development." Affidavit of Patricia C. Janisse ("Janisse Aff.") [ECF No. 171-18] ¶ 7. In the Village's view, S.W. 131st Street's "35-foot" width, Defs.' SOF ¶ 6 (first citing Ona Dep. at 137:12–19; and then citing Plat PB 98-87 Plan), fell below the 50-foot minimum width "required for a local road," Ona Dep. at 63:2.[3]

Janisse—after consulting with Mark Spanioli, the Village's Public Works Director, *see* Janisse Aff. ¶ 10 ("On September 5, 2019, Mr. Spanioli . . . responded that Megladon would likely have to dedicate half of the required right-of-way (7.5 feet).")—emailed Fossi to confirm that Megladon would be subject to the 7.5-foot dedication requirement, *see* Janisse Aff. at 8 ("[I]t will be necessary to dedicate 7.5 ft. to [the] Village and the lot would then be reduced in area, which would require a smaller building and setbacks would have to be adjusted to comply.").[4] She then directed Fossi to contact Stephen R. Olmsted, the Village's Planning Director, to schedule a "public hearing before the Village Council to dedicate the right of way." *Ibid.* Megladon didn't do that. Instead, on "December 12, 2019, Megladon submitted a building permit application to the Village[,] . . . [which] did not show the 7.5-foot dedication." Defs.' SOF ¶ 19 (citing Janisse Aff. ¶ 9); *see also* Pl.'s Resp. SOF ¶ 19 (disputing statement on other grounds).

---

[3] *But see* Pl.'s Resp. SOF ¶ 4 ("Disputed. Local road is not a defined term. The standard for minor streets to which Defendants cite, concerns '[s]treet right-of-way widths.' A right-of-way is 'a strip of ground dedicated by the subdivider.'" (cleaned up) (first quoting MIAMI-DADE COUNTY, FLA., CODE OF ORDINANCES § 28-14(B)(14); then quoting *id.* § 28-1(i)(11); and then citing Declaration of Andreas Hase ("Hase Decl.") [ECF No. 131-6] ¶ 9)); *id.* ¶ 6 ("Disputed. SW 131st Street is approximately 20 feet wide." (first citing Ex. A to Paterson Decl. at 6; and then citing Ex. A to Mesimer Decl. at 7)).

[4] The exhibit attached to Janisse's Affidavit cuts off some of the body of the email. *See* Janisse Aff. at 8. But the parties reproduce the full text of the excerpt in their Joint Statement of Undisputed Facts. *See* JSOUF ¶ 17.

Before issuing a residential building permit, the Village "examine[s] applications for code compliance," JSOUF ¶ 8, and its Planning Division "performs [a] zoning review[,]" *id.* ¶ 9. Although the decision "to grant or deny residential building permits" rests with the Village's Planning Director, *id.* ¶ 7, Planning Division staff may "post comments [about an application] to an online Plan Review System ('PRS') for consideration by senior staff, including the Village Planning Director, and applicants[,]" *id.* ¶ 10. The PRS process allows "a conversation between the property owner and the Village regarding a pending application." *Id.* ¶ 12. Through this process, "Village staff identify issues they think warrant further discussion or revision of a pending application." *Id.* ¶ 11. On December 24, 2019, Janisse posted the following comment on the PRS:

> No review having Public Works Director to research possible road dedication as this property has not made a road dedication to SW 131 Street—if a dedication is required the building will need to be revised to respect the new property line and process of a road dedication will be required[.]

Plaintiff's Amended Statement of Facts ("Pl.'s SOF") [ECF No. 169] ¶ 21 (quoting Ex. 14 to Deposition of Stephen Olmsted ("Olmsted Dep.") [ECF No. 131-2] at 431–32 (errors in original)).

Soon after Janisse posted that comment, Megladon "requested a meeting with the 'Village Manager, Building and Planning Department, Zoning Department and Public Works Department' to discuss Janisse's comment concerning dedication." JSOUF ¶ 18 (quoting Declaration of Peter Weintraub ("Weintraub Decl.") [ECF No. 131-10] ¶ 3). In preparation for that meeting, Olmsted expressed to Village Manager Yocelyn Galiano, Village Public Works Director David Mendez, and Village Attorneys Mitchell Bierman and Chad Friedman that the "issue in this particular case [was] . . . whether or not additional right-of-way will need to be dedicated and, if dedication is required, the impacts on required setbacks from the new property line." *Id.* ¶ 20 (quoting Ex. 2 to Olmsted Dep. at 1). Galiano responded that, "[i]f [the frontage of S.W. 77th Avenue] is substandard, then we would require dedication to correct that issue[.]" *Id.* ¶ 21 (quoting Ex. 2 to Olmsted Dep. at 369).

Before meeting with Megladon, Olmsted also contacted Miami-Dade County Chief of Platting and Traffic Review Raul Pino to inform him about the proceedings with Megladon. Olmsted told Pino that "[t]he Village also requires a minimum of 50 feet of right-of-way for local roads, consistent with County requirements, and it has always been the Village's policy to require dedication of right-of-way in instances where existing right of way is substandard." *Id.* ¶ 23 (quoting Ex. 9 to Olmsted Dep. at 415). According to Olmsted, "the Village has always believed that the County . . . retain[s] jurisdiction over local roads and rights-of-way within the areas of the County that have been incorporated into cities, such as the Village." Verified Statement of Stephen R. Olmsted ("Olmsted Statement") [ECF No. 171-19] ¶ 14. Pino confirmed that "the County requires 50-60 feet of right of way." *Id.* ¶ 17.

On February 13, 2020, Megladon and its attorney, Peter Weintraub, met with Olmsted, Mendez, and Friedman. Friedman explained to them that it was "typical of the Village to request a 50-foot right of way for local roads[.]" *Id.* ¶ 28 (quoting Weintraub Decl. ¶ 6). The Village also informed Megladon that it wouldn't have to "apply for a waiver of plat" if it dedicated the requested 7.5-foot strip of its property to the Village[,]" and that it "could apply for a variance from the Village's setback requirements after making the dedication." *Ibid.* (citing Weintraub Decl. ¶ 6). Megladon "objected" to those conditions. *See* Weintraub Decl. ¶ 6.

The dedication issue remained in limbo for the next month—and, by late March, Olmsted had not reached a decision. *Id.* ¶¶ 10–11 ("On March 26, 2020, Village Planning Director Olmsted emailed Megladon and [Weintraub] and said: 'The question of platting and right-of-way dedication has not yet been resolved. . . . Plans have been resubmitted and we will provide a zoning review. However, this issue regarding platting and dedication of right-of-way will need to be resolved.'" (quoting Ex. D to Weintraub Decl. at 18)). But, on April 3, 2020, Olmsted posted a new comment on the PRS, which stated in relevant part:

PLEASE PROVIDE A WRITTEN RESPONSE TO EACH OF THE REVIEW
COMMENTS NOTED BELOW INCLUDING A NOTE INDICATING WHERE
THE REVISION OR INFORMATION IS AVAILABLE FOR REVIEW IN THE
REVISED PLAN SET. PLEASE ATTACH THIS SHEET TO THE FRONT
SHEET OF EACH SUBMITTED SET OF PLANS.

1. Additional right-of-way (7.5 feet) adjacent to SW 131 Street is required to be
   dedicated to the Village of Pinecrest. Please adjust the proposed northern property
   line 7.5 feet to the south and revise all setback, lot coverage, impervious coverage,
   green space, and building area information. . . .

2. Dedication of right-of-way to the Village of Pinecrest requires acceptance by the
   Village Council and can be completed prior to issuance of a certificate of
   occupancy. Coordination with the Village Attorney will be required. . . .

PRS at 17. Seeing that post, Fossi reached out to Janisse and Olmsted "to discuss" the comments.

Declaration of Valeria Fossi ("Fossi Decl.") [ECF No. 168-3] ¶ 10. And, on April 30, Fossi had a

virtual meeting with Olmsted and Janisse, at which she and her project manager, Viviana Conley,

"pushed back against the Village's dedication proposal and sought clarification about what the Village

wanted Megladon to dedicate, the mechanics of dedication, and the reasons for the dedication." *Id.* ¶

11. Olmsted says he took the meeting simply to explain how Megladon could "complete the dedication

and what was needed in order to proceed with the review process if they were going to comply with

the dedication." Olmsted Statement ¶ 31.

After Fossi asked Olmsted to "confirm [her] understanding of the call," Olmsted emailed her

on May 14:

With regard to the existing survey of the property, the right-of-way will need to be
dedicated to the Village of Pinecrest but the process is expected to take some time to
complete. In the meantime, the Village can review your application for a building
permit, provided the site plan and all required building setbacks, lot coverages, green
space calculations, etc., are indicated for the property excluding the right-of-way to be
dedicated. On the site plan that will be submitted for building permits, please
crosshatch and indicate the portion that is the area of right-of-way to be excluded from
the property and dedicated to the Village of Pinecrest.

Prior to issuance of a building permit, an affidavit, similar to the attached affidavit, will
need to be completed, signed, and submitted to the Village of Pinecrest. The affidavit
includes the owners' consent to dedication of the right-of-way and their

> acknowledgment that a certificate of occupancy will not be issued until dedication of
> the right-of-way is complete. . . .

Ex. H to Defs.' SOF ("May 14 Email") [ECF No. 171-8] at 1.

Megladon never submitted "the proposed affidavit consenting to the dedication" and "did not transfer title over any portion of the Parcel to the Village." JSOUF ¶ 30; *accord* Hase Decl. ¶¶ 16–17 ("Megladon refused to dedicate the 7.5-foot strip of its property demanded by the Village and refused to execute the proposed affidavit consenting to the dedication. . . . Megladon has not transferred title over any portion of the Parcel to the Village."). Instead, on October 1, 2020, Megladon served the Village a pre-suit notice letter, informing the Village that it intended to bring an action under FLA. STAT. § 70.45 challenging the dedication requirement. *See* Pre-suit Notice Letter [ECF No. 131-11] at 1–3. Pursuant to that section, "[a]t least 90 days before filing an action . . . , but no later than 180 days after imposition of the prohibited exaction, the property owner shall provide to the relevant governmental entity written notice of the proposed action." FLA. STAT. § 70.45(3) (2020).[5] In its letter, Megladon identified Olmsted's May 14 email as the event that imposed the prohibited exaction. *See* Pre-suit Notice Letter at 1 ("Specifically, the attached May 14, 2020 email from Village Planning Director Stephen R. Olmsted required in wring a land dedication . . . absent which no certificate of occupancy will be granted.").

In response to Megladon's letter, Village and County officials held a meeting with Megladon's counsel on November 4 in an attempt to clarify which sovereign had jurisdiction over the right-of-way dedication. *See* Declaration of Amy Brigham Boulris ("Boulris Decl.") [ECF No. 131-7] ¶ 6 ("Specifically, on November 4, 2020, I met by Zoom with Village Planning Director Olmsted, Village counsel Friedman and Gonzalez, County Chief of Platting and Traffic Review Pino, County Plat Committee Coordinator Rodriguez, and County attorney Kerbel."). According to Megladon's counsel,

---

[5] Unless we say otherwise, all citations to FLA. STAT. § 70.45 are to the 2020 version of that section.

"[n]o resolution concerning the subject land dedication condition was reached during this . . . meeting." *Id.* ¶ 9. That same day, Olmsted posted a new comment on the PRS, now informing Megalodon that the right-of-way "is required to be dedicated to the Village of Pinecrest pursuant to *the requirements of Miami-Dade County*[.]" PRS at 10 (emphasis added). Olmsted then directed Megladon to "confirm with Miami-Dade County the width of right-of-way required to be dedicated or seek and obtain a variance from the requirements from Miami-Dade County." *Id.* at 11. Megladon did not seek a variance from the County. *See* Olmsted Dep. at 319:7 ("I don't believe they have."). Nor did they pursue further avenues of review by the Village Council or the Zoning Board. *See* Olmsted Decl. ¶¶ 41–42 ("Megladon could have appealed the administrative determination concerning dedication to the Village Council. It did not do so. . . . Additionally, Megladon could have applied to the zoning board for a variance from the setback requirements, which would have been impacted by the dedication.").

On December 29, 2020, the Village responded to Megladon's pre-suit notice, refusing to change its position. The Village explained:

> The dedication is required to correct an existing deficiency on S.W. 131st Street. Specifically, the current right of way available for the road is insufficient to allow proper drainage of the existing road. The owners north of the Property dedicated 35 feet of right-of-way when those properties were developed in 1978. The development of those properties required a roadway because the driveways for the property were designed to face the then-non-existent SW 131st Street. Accordingly, to accommodate those driveways, the owners of those properties dedicated their proportionate share of the road right-of-way, which was only part of the right-of-way needed for a properly functioning road. Similarly, Megladon is proposing to construct a driveway that leads to and from S.W. 131st Street, a road that was predominantly established to serve the properties whose driveways face it. . . . [T]he additional right-of-way is needed to have a road that adequately functions and that road is needed in part to serve Megladon's driveway.

Ex. N to Declaration of Timothy J. McGinn ("Notice Resp.") [ECF No. 131-12] at 5–6. The Village, once again, asserted that "Megladon must, like its neighbors before it, dedicate the right-of-way for the road that is needed to accommodate its development." *Id.* at 6.

With the specter of litigation looming, the Village and the County sought to shore up their position on who exactly had jurisdiction over the right-of-way abutting Megladon's parcel. On March 1, 2021, Village Manager Galiano reached out to Jimmy Morales, the County's Public Works Director, requesting "something in writing from . . . Miami-Dade County confirming that [the County] has jurisdiction over the right-of-way widths." Ex. T to Defs.' SOF ("Kerbel Email") [ECF No. 171-20] at 5–6. Morales forwarded the email to Frank Guyamier, Morales's deputy director, who responded to Morales with an attachment of the Transfer Road Agreement. *Id.* at 4. Guyamier explained to Morales that, given the Transfer Road Agreement, "SW 131 Street and SW 77 Ave is a City of Pinecrest maintained road and its jurisdiction regarding right of way width must falls [sic] under the City of Pinecrest. The only elements excluded are traffic operations which is [sic] still under Miami Dade County's jurisdiction." *Id.* at 4. Morales then conveyed the news to Galiano, telling her that it "[l]ooks like the County transferred jurisdiction to Pinecrest in 1996. The [right-of-way] is all yours." *Ibid.* Galiano remarked that "[t]his has not been the position of the County in the past." *Id.* at 3. Apparently, it isn't the position of the County now, either.

## PROCEDURAL HISTORY

On July 27, 2021, Megladon sued the Village in Florida state court, alleging claims under FLA. STAT. § 70.45, Article X, Section 6 of the Florida Constitution, and the Fifth Amendment to the U.S. Constitution. *See* State Court Compl. [ECF No. 1-1] ¶¶ 50–71. The Village quickly removed the case to federal court. *See* Notice of Removal [ECF No. 1]. On April 11, 2022, the County filed a Motion to Intervene, asserting that it (and not the Village) had "exclusive jurisdiction over all matters of traffic engineering in Miami-Dade County," including "the required right-of-way width" Megladon was being required to dedicate. Mot. to Intervene [ECF No. 40] ¶¶ 4, 20. We granted that motion, allowing the County to intervene as a defendant. *See* Paperless Order Granting Mot. to Intervene [ECF No. 67].

Once the County had been joined to this action, Megladon filed a Second Amended Complaint—the operative complaint here—reasserting its claims against the Village under FLA. STAT. § 70.45, *see* Second Amnd. Compl. ("SAC") [ECF No. 77] ¶¶ 125–35 (Count I), the Florida Constitution, *see id.* ¶¶ 136–47 (Count II), and 42 U.S.C. § 1983, *see id.* ¶¶ 148–54 (Count III). Specifically, Megladon asserts that the dedication requirement amounts to a prohibited exaction and unconstitutional condition because the "condition lacks the essential nexus and/or rough proportionality to the impacts of Megladon's proposed development required for constitutional validity." *Id.* at 1–2. Megladon also brought a second § 1983 claim against both the Village and the County—alleging (again) that "the Village's demanded land dedication constitutes an unconstitutional condition" under the Fifth Amendment. *Id.* at 38.

The Defendants moved to dismiss Megladon's Second Amended Complaint. *See* Motion to Dismiss ("MTD") [ECF No. 82]. The main thrust of the Defendants' Motion to Dismiss was that Megladon had no claim against the Village because, in their view, only the County has "the final decision regarding the amount or configuration of the roadway dedication at issue." *Id.* at 12. The Defendants also argued that none of the claims were ripe because "neither the Village nor the County ever reached a final decision regarding the dedication," *id.* at 18, and because, even if they had, Megladon's § 70.45 claim would be "time-barred because [Olmsted's] first written comment regarding the dedication requirement was on April 3"—thus rendering Megladon's service of pre-suit notice on October 1st one day too late, *id.* at 19. Finally, the Defendants claimed that the dedication requirement could not constitute a prohibited exaction or unconstitutional condition as a matter of law. *See id.* at 19–21.

We denied the Defendants' Motion to Dismiss. In our view, Megladon had plausibly alleged that the Village, not the County, had authority over the right-of-way abutting the property. *See Megladon v. Vill. of Pinecrest*, 661 F. Supp. 3d 1214, 1224 (S.D. Fla. 2023) (Altman, J.). Looking to the plain terms

of the Transfer Road Agreement, we determined that the County had "officially transferr[ed] . . . all municipal roads within the boundaries of the Village of Pinecrest," including "the transfer of the County's regulatory and proprietary jurisdiction, and the conveyance of all right, title, and interest of the County, subject to any easements reserved for public utilities owned and operated by the County." *Id.* at 1223–24 (quoting Transfer Road Agreement ¶¶ 2–3). And, after reviewing *nine* provisions of the County and Village Codes the Defendants offered "for their view that the County required the Village to abide by its land-dedication requirements[ and] that the Village had no authority to alter (or vary from) those requirements," *id.* at 1225, we concluded that none of those provisions established, as a matter of law, "that the County had exclusive jurisdiction over the right-of-way," *id.* at 1232.

Next, we considered whether Megladon's claims were ripe for adjudication. An unconstitutional-conditions claim ripens (we explained) once "'the government has adopted its final position' on the application of the relevant regulations." *Id.* at 1234 (quoting *Pakdel v. City & Cnty. of S.F.*, 594 U.S. 474, 480 (2021)). The Defendants offered three reasons for their view that Megladon's claims weren't ripe—each of which we rejected. *First*, they argued that there was no decision for Megladon to challenge since "Director Olmsted—and, by extension, the Village—wasn't authorized to make any decision with respect to the dedication because he was simply abiding by a County requirement." *Id.* at 1232 (citing MTD at 12). We disagreed, noting that the Defendants had failed to provide any "basis for this argument in any of the nine legal sources [they] cited" and explaining that the Defendants had given us no reason to depart from "the unambiguous terms of the Transfer Road Agreement." *Ibid.*

*Second*, the Defendants said that the claims weren't ripe because "Olmsted never actually came to a final decision on the dedication requirement." *Ibid.* (citing MTD at 13). To us, "[t]his argument strain[ed] credulity." *Ibid.* Based on Olmsted's use of mandatory, unequivocal language in his May 14 email to Megladon, *see id.* at 1233 ("Olmsted's unequivocal use of the phrase 'will need' in relation to

12

the dedication requirement puts to bed the Defendants' bordering-on-frivolity contention that 'the response to [the architect's] email was not a refusal to continue processing the application absent a showing of dedication.'" (quoting MTD at 13)), we found it plausible to believe that Olmsted's email constituted a final decision.

*Third*, the Defendants asserted that the claims were unripe because Megladon had not appealed the Village's decision to the County. Unpersuaded, we explained that "[t]he Defendants' insistence that the Plaintiff seek a variance from a second-level reviewer (the County) is . . . flatly inconsistent" with the Supreme Court's holdings in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), and *Pakdel*, 594 U.S. at 474, which held that the "finality requirement looks only to whether the initial decisionmaker has arrived at a definitive position on the issue[,]" *Megladon*, 661 F. Supp. 3d at 1234 (quoting *Pakdel*, 594 U.S. at 478). So, while we left open the possibility that the Defendants "may be able (in discovery) to adduce evidence for [their] position that" Megladon could have, but did not, pursue available variances from the Village—*i.e.*, the initial decisionmaker—their failure to do so in the Motion to Dismiss foreclosed this argument in the meantime. *Id.* at 1236.

We then turned to the Defendants' alternative position that, had Count I ripened at all, it would have ripened with Olmsted's April 3 PRS comment, making Megladon's pre-suit notice untimely. Her's how we framed this issue:

> Count I (recall) alleges a violation of Fla. Stat. § 70.45, which (as relevant here) requires that, "[a]t least 90 days before filing an action under this section, but no later than 180 days after imposition of the prohibited exaction, the property owner shall provide to the relevant governmental entity written notice of the proposed action." Because the Plaintiff gave pre-suit notice on October 1, 2020, that notice (and, by extension, Count I) would be untimely if the claim ripened on April 3, 2020, when Director Olmsted entered his first set of comments into the Plan Review System. That's because from April 3, 2020 to October 1, 2020 is 181 days (or one day too late). By the same token, if the Plaintiff's claim ripened on May 14, 2020—when Director Olmsted responded to Fossi's clarification email—then Count I would be timely, because May 14 is just 140 days before October 1. In the Defendants' view, the Village made its final decision (if it made any final decision at all) on April 3, 2020, because "the April 3 Comment

13

does not differ in any material sense from the Village Planning Director's email [of May 14, 2020]."

*Id.* at 1237 (first quoting FLA. STAT § 70.45(3); then citing SAC ¶ 73; then citing Ex. 5 to SAC [ECF No. 77-5] at 1; and then quoting MTD at 18–19). Megladon, however, had alleged that the April 3 comment was not the kind of "final decision" that would ripen its claims, but merely "'an invitation for Megladon to comment in response to' Olmsted's communication." *Ibid.* (quoting SAC ¶ 73). So, given our obligation at the motion-to-dismiss stage to take all allegations in the light most favorable to the plaintiff, *see Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016), we were satisfied that Megladon's "factual" characterization of that comment plausibly brought "the Plaintiff's notice letter within that 180-day window," *Megladon*, 661 F. Supp. 3d at 1238–39.

Lastly, we reached the merits of Megladon's unconstitutional-conditions claims. Under the unconstitutional-conditions doctrine, "a unit of government may not condition the approval of a land-use permit on the owner's relinquishment of a portion of his property unless there is a nexus and rough proportionality between the government's demand and the effects of the proposed land use." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 599 (2013). We had "little trouble concluding" that Megladon's unconstitutional-conditions claims were plausible. *Megladon*, 661 F. Supp. 3d at 1240. "[B]ased on the allegations of the SAC," we observed that "the Village's land-dedication requirement seems to resemble your prototypical unconstitutional condition: where the government 'condition[s] the approval of a land-use permit on the owner's relinquishment of a portion of his property' without any evident connection 'between the government's demand and the effects of the proposed land use.'" *Ibid.* (quoting *Koontz*, 570 U.S. at 605). And that was enough to state an unconstitutional-conditions claim. Having thus rejected each of the Defendants' arguments for dismissal, we denied their motion.

The parties then proceeded to discovery. After the close of discovery, Megladon filed a Motion to Strike [ECF No. 206] three paragraphs from the Verified Statement of Alicia Gonzalez [ECF No. 179-2], an attorney for the Village, arguing that the information she provided there contradicted

14

interrogatory responses the Village never supplemented, *see* Motion to Strike at 2–3. We referred that motion to U.S. Magistrate Judge Lisette M. Reid for an order. *See* Order of Referral [ECF No. 208]. After review, Magistrate Judge Reid denied Megladon's motion, concluding that "the Village's failure to supplement its earlier response . . . was substantially justified" and "[did] not prejudice" Megladon. Order on Mot. to Strike [ECF No. 211] at 6. Megladon has since filed an objection to Magistrate Judge Reid's Order, which is currently pending and ripe for review. *See* Objection [ECF No. 212]; Defendants' Objection Response [ECF No. 216].

The parties then filed cross-motions for summary judgment. *See* Pl.'s MSJ; Defs.' MSJ. Both parties request summary judgment on whether the County has authority over the land-dedication requirement, *see* Pl.'s MSJ at 2–7; Defs.' MSJ at 11–17, whether Megladon's claims are ripe and timely, *see* Pl.'s MSJ at 7–18; Defs.' MSJ at 9–11, and whether the dedication requirement is an unlawful prohibited exaction or unconstitutional condition, *see* Pl.'s MSJ at 18–24; Defs.' MSJ at 20. Additionally, the Defendants have moved for summary judgment on the issue of whether Megladon can even use its unconstitutional-conditions claim to challenge the County's assertion of jurisdiction over public-works dedications in the first place. *See* Defs.' MSJ at 6. We'll consider those motions here.

**THE LAW**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Ibid.*

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, then, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *See Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (Ungaro, J.). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994))).

## ANALYSIS

Both parties move for summary judgment on (1) whether the County has jurisdiction over the dedication requirement, *see* Pl.'s MSJ at 2–7; Defs.' MSJ at 11–17; (2) whether Megladon's claims are ripe and timely, *see* Pl.'s MSJ at 7–18; Defs.' MSJ at 9–11; and (3) whether the dedication requirement violates the Fifth Amendment and FLA. STAT. § 70.45, *see* Pl.'s MSJ at 18–24; Defs.' MSJ at 20. The Defendants also seek judgment on whether Megladon can even "use its takings claim to challenge the County's assertion of jurisdiction over public works dedications." Defs.' MSJ at 6 (cleaned up). We'll address that threshold question first before taking up the remaining issues in turn.

### I.     Megladon's "Challenge" to the County's Jurisdiction

As a threshold matter, the Defendants assert that Megladon "cannot use its Takings claim to challenge the County's assertion of jurisdiction over public works dedications." *Ibid.* (cleaned up). In their view, "[i]f Megladon wanted a judicial determination that it did not have to seek relief from the County," then it should have sought a writ of mandamus "commanding the Village to issue a building permit" or "a declaratory judgment to rid itself of the development process that was being imposed." *Id.* at 8 (cleaned up). And, since "Megladon has not sought available relief from the entity that has asserted that its general regulations impose the [dedication] condition"—*i.e.*, from the County—Megladon's constitutional claim (the Defendants insist) "is not ripe." *Id.* at 8–9.

Let's reflect on how we got here. Originally, Megladon sued the Village—and *only* the Village—alleging that its dedication requirement "constitute[d] an unconstitutional condition in violation of the Fifth Amendment to the United States Constitution." State Court Compl. at 15. Because the Village responded that "the Plaintiff is subject to the County's regulations governing the required right-of-way width, and the Plaintiff is obligated to apply to the County for relief from the applicable regulations[,]" the County soon sought to intervene "in this action to defend the enforceability of its regulations." Mot. to Intervene ¶¶ 20–22 (citing Village's First Motion to Dismiss [ECF No. 9]). We

allowed the County to intervene as a *defendant*, recognizing that its asserted "defenses present questions of law and fact that are virtually identical to the defenses Pinecrest advanced[.]" Paperless Order Granting Mot. to Intervene.

Based on that decision, Megladon amended its complaint, now jointly pleading an unconstitutional-conditions claim under the Fifth Amendment against *both* the Village and the County. *See* SAC ¶¶ 155–65 (Count IV). Megladon, however, never retreated from its initial position that it was "[t]he *Village's* actions in refusing to process and effectively denying Megladon's residential building permit application [that] improperly burdened Megladon's [constitutional] rights[.]" SAC ¶ 110 (emphasis added).[6] Accordingly, Megladon again asks us to "[d]etermine that the Village's

---

[6] The Second Amended Complaint also pleads a Fifth Amendment claim against only the Village. *See* SAC ¶¶ 148–54 (Count III). Because (in our prior order) we read Count IV as not "conced[ing] that the County has jurisdiction," Tr. of Jan. 20, 2023, Hearing [ECF No. 154] at 10:17–18, and merely reiterating Count III's claims against the Village, *see Megladon*, 661 F. Supp. 3d at 1221 n.1 ("Count III's cause of action is identical to the part of Count IV that's directed at the Village[.]"), we dismissed Count III as duplicative, *see ibid.* We (obviously) wouldn't have done that if there were any substantive differences between the claims Megladon pled against the Village in Counts III and IV. When we discussed this issue at our January 20, 2023, Hearing, the Plaintiff never argued otherwise. Here's that exchange:

| | |
|---|---|
| MR. MCGINN: | . . . Count 3 presumes the County did not have jurisdiction, which is what we contend is the correct reading of the County's jurisdiction; Count 4 is pled in the alternative. If the Court concludes the County has jurisdiction -- |
| THE COURT: | But you can still do that with Count 4. I mean, Count 4 doesn't concede that the County has jurisdiction, it's just I order[ed] them to be intervened, and so you're pleading in the alternative that the Village is responsible and if the Village is not responsible the County is responsible, and so I'm suing you both in Count 4. But we don't really need Count 3, right? |
| MR. MCGINN: | I mean, we pled in the alternative by distinguishing among the counts. I hear what Your Honor is saying. |
| THE COURT: | I get it. Okay. Anything to add to that? |
| MS. GONZALEZ: | No, Your Honor. |

demanded land dedication constitutes an unconstitutional condition" and to "[o]rder the Village to promptly process and approve Megladon's application[.]" *Id.* at 38.

Now, compare that to Megladon's requested relief as to the County: Since Megladon *doesn't* believe that the County has jurisdiction at all, *see, e.g.*, SAC ¶ 121 ("Megladon has declined invitations to apply to the County Public Works Department for an exception or waiver because of the legal inconsistency of doing so[.]"), it's only asking that we "[d]etermine that the County has jointly acted with the Village in furtherance of maintaining and *falsely* justifying the demanded land dedication as a condition of development approval under [the County's] alleged concurrent jurisdiction or retained jurisdiction" and "[e]njoin the County from interfering with the processing of Megladon's permit application[.]" *Ibid.* (emphasis added). But those considerations are downstream of (and potentially mooted by) our adjudication of Megladon's *primary* claim that "the Village [is] the entity responsible for the alleged unconstitutional condition[.]" *Id.* ¶ 17; *cf. Scott v. Jones*, 492 F.2d 130, 130–31 (5th Cir. 1974) ("[A]ny relief which this court might grant would be ineffective since the Dallas County Jail officials have no authority over the state prison in Huntsville. Accordingly, this case has been rendered moot[.]").[7]

As an intervening defendant, the County "ought not be allowed to hijack [this] litigation" by reframing Megladon's claims. *Sierra Club, Inc. v. EPA*, 358 F.3d 516, 518 (7th Cir. 2004). But the Defendants' Motion for Summary Judgment does just that by characterizing this suit as "contesting

---

Tr. of Jan. 20, 2023, Hearing at 10:9–11:1. Because Count IV simply "plead[s] in the alternative that the Village is responsible and if the Village is not responsible[,] the County is responsible[,]" *id.* at 10:17–21; *see also* SAC ¶ 17 ("[T]his Second Amended Complaint sues the Village as the entity responsible for the alleged unconstitutional condition, and in the alternative (*should this Court later determine that the County has any relevant jurisdiction*) sues the Village and County jointly for the unconstitutional condition violation[.]" (emphasis added)), Megladon has unambiguously continued to assert that only the Village has jurisdiction.

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

the development process itself, not the dedication." Defs.' MSJ at 8. The County has asserted no counterclaims and pleads only as an affirmative defense that, because it allegedly has "exclusive jurisdiction over minimum roadway widths[,] . . . Megladon's request to waive the required dedication on its parcel should have been directed to the County[.]" County's Answer [ECF No. 145] at 13. But pleading an affirmative defense does not somehow reformulate a plaintiff's claim into something it's not. *See Effects Assocs., Inc. v. Cohen*, 817 F.2d 72, 74 (9th Cir. 1987) ("[T]he existence of a meritorious defense does not change the nature of plaintiff's claim."); *see also In re Engle Cases*, 2012 WL 12904784, at *3 (M.D. Fla. Feb. 23, 2012) (Toomey, Mag. J.) ("[A] plaintiff must be allowed to choose the theory under which his case is tried." (cleaned up)).

Even so, the Defendants insist that, "[b]ecause the County required dedication as a condition of a permit, the question for the Court then becomes whether the lawsuit is ripe[.]" Defs.' MSJ at 8. But that begs the question whether the County *did*, in fact, validly require the dedication—and (as of now) that's far from clear. *See Megladon*, 661 F. Supp. 3d at 1232 ("Because the Defendants have failed to show that the County had exclusive jurisdiction over the right-of-way at issue here—and since they haven't identified a single rule that would've rendered the Village Planning Director impotent to vary from any such rule—we reject the Defendants' contention that the Plaintiff has failed to state a claim against the Village.").[8]

---

[8] The Defendants' position would essentially inject a *Catch-22* into most public-law litigation. *See* JOSEPH HELLER, CATCH-22, at 46 (1961) ("Orr would be crazy to fly more missions and sane if he didn't, but if he was sane he had to fly them. If he flew them he was crazy and didn't have to; but if he didn't want to he was sane and had to."). That is, we could only determine whether a plaintiff's claims against an intervening defendant were ripe by looking to the merits of that claim, but we *couldn't* reach the merits without first determining whether those claims were ripe. But that cannot be the law. *See Elend v. Basham*, 471 F.3d 1199, 1204 (11th Cir. 2006) ("[R]ipeness present[s] the threshold jurisdictional question of whether a court may consider the merits of a dispute." (cleaned up)). A governmental entity could thus defeat any lawsuit by simply inviting some *other* governmental entity to intervene and assert that the intervenor has sole jurisdiction over the matter. We'll decline this "poorly disguised invitation to a wild goose chase." Plaintiff's Response to Defs.' MSJ ("Pl.'s MSJ Resp.") [ECF No. 183] at 15.

The Defendants, therefore, are wrong to say that Megladon (necessarily) "cannot ripen its Takings claim by simply ignoring the County's assertion that its requirement applies[,]" Defs.' MSJ at 8, since that assertion is only pled and briefed as a *defense* to Megladon's "cause of action against the Village as the maker of the dedication demand," Plaintiff's Response to Defs.' MSJ ("Pl.'s MSJ Resp.") [ECF No. 183] at 8. If—as Megladon maintains—the County has no jurisdiction over the dedication, *see, e.g.*, Pl.'s MSJ at 1 ("[T]he County has no jurisdiction over Megladon's application to build a single-family home on its private property in the Village[.]"), then the County's ripeness defense is irrelevant, *see Megladon*, 661 F. Supp. 3d at 1235 ("A plaintiff in Megladon's position must pursue any available variances from the initial-level reviewer . . . , but he need not then exhaust (as the County seems to prefer) an endless stream of second- and third- or even fourth-level reviews."); *see also Pakdel*, 594 U.S. at 479 ("Once the government is committed to a [final] position . . . potential ambiguities evaporate and the dispute is ripe for judicial resolution."). So, before proceeding any further, we must determine whether either party has established, as a matter of law, that the County has jurisdiction over the dedication requirement.

## II.    The County's Jurisdiction over the Dedication Requirement

The parties hotly dispute whether the County has the authority to impose a dedication requirement on Megladon's parcel at all. *See* Pl.'s MSJ at 3 ("Defendants . . . continue to assert the County has jurisdiction over Megladon's permit application by virtue of its supposed jurisdiction over the road abutting Megladon's parcel. Defendants are still wrong."); Defs.' MSJ at 15 ("[T]he County has exclusive jurisdiction to set standard right-of-way configurations throughout the entire County."). In denying the Defendants' Motion to Dismiss, we observed that the terms of the Transfer Road Agreement plausibly "support[ed] the Plaintiff's view that the Village had jurisdiction over the land dedication at issue here." *Megladon*, 661 F. Supp. 3d at 1225. And, although the Defendants "point[ed] to nine provisions of the County and Village Codes [to support] their view that the County required

the Village to abide by its land-dedication requirements [and] that the Village had no authority to alter (or vary from) those requirements[,]" *ibid.* (cleaned up), we found that *none* of those showed "that the County had exclusive jurisdiction over the right-of-way at issue" or otherwise "rendered the Village Planning Director impotent to vary from any such rule," *id.* at 1232.

Since there remained several outstanding questions surrounding the validity of the Transfer Road Agreement, we invited the parties "to answer these . . . at summary judgment." *Id.* at 1225.[9] Both sides now place the Transfer Road Agreement at the center of their motions. *See* Pl.'s MSJ at 3 ("The County transferred 'jurisdiction, ownership and control of all public roads within the corporate limits of the Village' to the Village (excepting four roads that do not abut Megladon's parcel) in a Transfer Road Agreement dated November 8, 1996." (quoting Transfer Road Agreement ¶ 2)); Defs.' MSJ at 15 ("The Road Transfer Agreement upon which Megladon relies failed to transfer the County's exclusive regulatory jurisdiction."). Additionally, the Defendants have (once again) identified several provisions of the "County's Charter, Comprehensive Development Master Plan ('the Master Plan'), County Code, and Public Works Manual," Defs.' MSJ at 12, that they believe "work in concert to demonstrate that the County has exclusive jurisdiction to set standard right-of-way configurations throughout the entire County[,]" *id.* at 15.

Because our determination about the legitimate "power of a municipality [presents] a mixed question of law and fact," *City of Coral Gables v. Burgin*, 143 So. 2d 859, 861–62 (Fla. 1962) (citing *Miami Shores Vill. v. Cowart*, 108 So. 2d 468 (1958)), we may only grant Megladon summary judgment on this issue if, "viewing the facts in the light most favorable to the [Defendants]," the County lacks

---

[9] *See Megladon*, 661 F. Supp. 3d at 1224–25 ("Why, after all, would the County and the Village take the time to memorialize a four-page agreement (spanning some nine paragraphs) that was illusory and irrelevant as soon as it was executed? Why, too, would the County Manager have determined—in an email copying some of his employees—that the Transfer Road Agreement (far from representing a meaningless irrelevancy) worked a wholesale alteration in the parties' respective jurisdictions over *this* dispute?").

jurisdiction over the parcel "as a matter of law[,]" *Shelton v. Price Waterhouse Coopers, LLP*, 2014 WL 2581348, at *4 (M.D. Fla. May 2, 2014) (Whittemore, J.) (cleaned up); *see also Dermer v. Miami-Dade County*, 2008 WL 1140988, at *4 (S.D. Fla. Jan. 25, 2008) (Gold, J.) (observing that deciding whether "ordinances are unconstitutional and whether they violate Miami-Dade County's Home Rule Charter . . . is especially appropriate to be decided on a Motion for Summary Judgment")—and vice versa as to the Defendants' motion. In doing so, we'll look *both* to Florida law *and* to any operative Village or County policies that have the binding force of law. *See, e.g.*, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988) ("[S]tate law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business.").

According to Megladon, the County "cannot have jurisdiction over Megladon's building permit application incident to its [purported] jurisdiction over the road" because the County, through the Transfer Road Agreement, transferred jurisdiction over "the road abutting Megladon's parcel [ ] to the Village." Pl.'s MSJ at 3–4 (citing Transfer Road Agreement ¶ 2). We agree.

By its plain terms, the Transfer Road Agreement conveys "regulatory and proprietary jurisdiction," "ownership, and control of all public roads within the corporate limits of the Village" to the Village. Transfer Road Agreement ¶¶ 2–3. Florida law explicitly allows for the transfer of public roads between jurisdictions, so long as the transfer is made "by mutual agreement of the affected governmental entities." FLA. STAT. § 335.0415(3). Before the Transfer Road Agreement's execution, the County and the Village "entered into" an interlocal agreement—which was "approved by the Village Council . . . and the Board of County Commissioners"—for "all municipal roads within the boundaries of the Village [to] be officially transferred to the Village by separate agreement executed by the County Manager or designee on behalf of the County, and the Mayor on behalf of the Village[.]" Transfer Road Agreement at 1. The Transfer Road Agreement officially executed that transfer. *See id.*

¶ 3 ("[T]his Agreement shall be sufficient to accomplish the transfer of Public Roads from the County road system to the Village road system pursuant to [FLA. STAT. § 335.0415(3)]."). Accordingly, the Transfer Road Agreement "plainly suggests that . . . the Village is the *only* entity with authority to regulate the Village roads," *Megladon*, 661 F. Supp. 3d at 1224, *and* that it was validly adopted pursuant to Florida law, *see* FLA. STAT. § 335.0415(2) ("Notwithstanding any provision of law to the contrary, any change of the jurisdiction of a public road subsequent to July 1, 1995, shall be governed by the provisions set out herein."); *see also* Transfer Road Agreement at 1 ("This Agreement [was] entered into this 8th day of November, 1996[.]").

The Defendants nonetheless say that the Transfer Road Agreement "only transferred *proprietary* jurisdiction" to the Village—and they insist that it did not transfer "*regulatory* jurisdiction[.]" Defendants' Response to Pl.'s MSJ ("Defs.' MSJ Resp.") [ECF No. 181] at 7. In their view, "[p]roprietary jurisdiction refers to the ownership, control, and maintenance of right[s]-of-way[,]" while "[r]egulatory jurisdiction refers to the ability to set standards for traffic, traffic control, and other minimum planning and engineering standards." *Ibid.*

Wherever the Defendants got that distinction, it certainly wasn't from the text of the statute. Section 335.0415 doesn't delineate between transfers of "proprietary" and "regulatory" jurisdiction. It simply governs "*any* change of the jurisdiction of a public road." FLA. STAT. § 335.0415(3) (emphasis added). Nor do the Defendants provide any textual basis for their view that "jurisdiction in this context relates [only] to [the] operation and maintenance of roadways." Defs.' MSJ Resp. at 8 (citing FLA. STAT. § 335.0415(1)). If that were true, then the statute's coverage of the "jurisdiction of public roads *and* the responsibility for operation and maintenance within the right-of-way of any road" would be superfluous. FLA. STAT. § 335.0415(1); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012) ("No[ ] [word or provision] should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.").

Plus, reading a distinction between types of jurisdiction into the statute would require us to contravene the text's clear statement that "[p]ublic roads"—without limitation—"may be transferred between jurisdictions . . . by mutual agreement[.]" FLA. STAT. § 335.0415(3); *see also* SCALIA & GARNER at 93 ("Nothing is to be added to what the text states or reasonably implies . . . . That is, a matter not covered is to be treated as not covered."). We won't be doing that.

Unable to find a textual hook in § 335.0415, the Defendants direct us to "[t]he County Code's own adopted definitions," which "defin[e] what roadways the County controls in its proprietary capacity." Defs.' MSJ Resp. at 7. The County Code, the Defendants explain, "defines 'County-owned' rights of way as '[(i)] property in which the County has a property interest, such as fee simple ownership or an easement, and (ii) property that the County maintains regardless of ownership, such as rights-of-way that are in incorporated areas but are maintained by the County." *Ibid.* (quoting MIAMI-DADE COUNTY, FLA., CODE OF ORDINANCES § 2-99(3)). But how the County defines the scope of jurisdiction is irrelevant, since § 335.0415 governs "any *change* of the jurisdiction of a public road," "[*n*]otwithstanding any provision of law to the contrary[.]" FLA. STAT. § 335.0415(2) (emphases added); *see also* SCALIA & GARNER at 127 ("[T]he catch-all *notwithstanding* is a fail-safe way of ensuring that the clause it introduces will absolutely, positively prevail."). And (as we've said) § 335.0415 isn't limited to transfers of proprietary jurisdiction.

Failing to undermine the Transfer Road Agreement on its own terms, the Defendants pivot to professing that it is "unenforceable." Defs.' MSJ Resp. at 9. In their view, "[t]he County retains jurisdiction over all traffic engineering by virtue of the Home Rule Charter and the County Code, which codifies ordinances adopted by the Board of County Commissioners." *Id.* at 7. Because neither the Charter nor an ordinance can be "superseded by a resolution or [by] mere agreement," the Defendants claim, the Transfer Road Agreement cannot "strip the County of its regulatory power." *Id.* at 7–8 (citing *Wallace v. Leahy*, 496 So. 2d 970, 971 (Fla. 3d DCA 1986)). So (they say) to the extent

that the Agreement purports to "transfer[ ] away the County's regulatory traffic engineering authority, that agreement [is] . . . unenforceable." *Id.* at 8 (first citing *P.C.B. P'ship v. City of Largo*, 549 So. 2d 738, 741 (Fla. 2d DCA 1989); and then citing *Chung v. Sarasota County*, 686 So. 2d 1358, 1360 (Fla. 2d DCA 1996)).

But this argument necessarily assumes that the County's purported jurisdiction over "traffic engineering" *also* gives the County jurisdiction over the right-of-way dedication on Megladon's parcel. Defs.' MSJ Resp. at 7. To bridge this logical gap, the Defendants identify *eleven* provisions of "[t]he County's Charter, [Master Plan], County Code, and Public Works Manual," which (they say) "provide the systematic web" governing the "roadway network within the County." Defs.' MSJ at 12 (cleaned up). Unfortunately, all those provisions (whether viewed separately or together) fail to establish the County's jurisdiction over the parcel at issue here.

The Defendants first cite to the County Charter, which grants "the Board of County Commissioners . . . the powers to '[p]rovide and regulate arterial, toll, and other roads, bridges, tunnels, and related facilities; eliminate grade crossings; provide and regulate parking facilities; and develop and enforce master plans for the control of traffic and parking.'" *Id.* at 12–13 (quoting MIAMI-DADE COUNTY, FLA., CHARTER § 1.01(A)(1)). The Charter also instructs the County to "[p]repare and enforce comprehensive plans for the development of the County," *id.* § 1.01(A)(5), "[a]dopt and enforce uniform building and related technical codes and regulations for both the incorporated and unincorporated areas of the county," *id.* § 1.01(A)(13), and "[s]et reasonable minimum standards for all governmental units in the county for the performance of any service or function[,]" *id.* § 1.01(A)(18).

Relying on the Florida Supreme Court's decision in *Cowart*, the Defendants claim that the Charter implements "the County's authority to implement a uniform plan of regulation for . . . the control of traffic[.]" Defs.' MTD at 12 (citing *Cowart*, 108 So. 2d at 472). But this just rehashes an

argument we've already rejected. In denying the Defendants' Motion to Dismiss—which also relied on § 1.01(A) and *Cowart* to make this same point, *see* MTD at 6–7—we explained:

> *Cowart* has very little to do with our case. The court there held only that "the Home Rule Charter and county ordinances adopted thereunder shall *in cases of conflict* supersede all municipal charters and city ordinances, except in those instances where the charter of Dade County specifically provides otherwise[.]" But that just begs the question of whether, on the central issue we face here—*viz.*, whether the County requires dedications of a certain width on streets within the Village—there exists some County regulation that conflicts with a Village ordinance. . . . [T]he Defendants have pointed us to no such conflict—and, as a result, *Cowart* seems to have little bearing on our facts.

*Megladon*, 661 F. Supp. 3d at 1225–26 (cleaned up) (quoting *Cowart*, 108 So. 2d at 472).

We needn't dwell on the Defendants' § 1.01(A) argument, since they don't even try to engage with our distinction of *Cowart* or alter their interpretation from the one we rejected. *See Cifuentes v. Regions Bank*, 2013 WL 5593046, at *2 (S.D. Fla. Oct. 10, 2013) (Moreno, J.) ("Because the Court has already been briefed, held arguments regarding, and rejected[,] the majority of Defendant's arguments in its Motion to Dismiss, this Order will not rehash the rationale for doing so. The Court's reasoning remains the same."). And although we gave the Defendants another chance to identify some conflict between County and Village policy—or to highlight some other provision "impos[ing] the land-dedication requirement it wants Megladon to abide by here[,]" *Megladon*, 661 F. Supp. 3d at 1227—the Defendants haven't done that.

The Defendants next point to three provisions of the County's Master Plan, which purportedly "require[ ] the County to maintain . . . minimum rights-of-way and [ ] require dedications to meet those standards." Defs.' MSJ at 13. *First*, "Objective TC-2 of the Traffic Circulation Subelement provides that 'the rights-of-way and corridors needed for existing and future transportation facilities will be designated and reserved.'" *Ibid.* (quoting Traffic Circulation Subelement [ECF No. 89-2] at 7). *Second*, "Policy TC-2B further provides that '[t]he County shall require the dedication of appropriate share of all necessary rights-of-way from all developments at the time of development.'" *Ibid.* (quoting Traffic

Circulation Subelement at 7). *Third*, "Policy TC-2A of the Traffic Circulation Subelement requires that the County 'maintain and enforce the minimum right-of-way requirements established in the Public Works Manual . . . to ensure Countywide continuity of the thoroughfare system.'" *Ibid.* (quoting Traffic Circulation Subelement at 7).

In our MTD Order, we observed that, by the Master Plan's "own terms," the Master Plan "doesn't have the force of law, and . . . 'is not a substitute for land development regulations'"—but instead "must be implemented through the County's land development regulations." *Megladon*, 661 F. Supp. 3d at 1229 (quoting Statement of Legislative Intent [ECF No. 89-1] § A(3)–(4)). The Defendants now argue that the "requirements [of the Master Plan] cannot be ignored or negated" because Florida law creates a private cause of action to challenge "a development order inconsistent with its Master Plan[.]" Defs.' MSJ at 13 (first citing Growth Policy Act, 1999 Fla. Sess. L. Ch. 99-378 (Fla. 1999) (codified at FLA. STAT. §§ 163.2511–163.2520); and then citing FLA. STAT. § 163.3215). We're not sure why these statues are relevant here.

The Growth Policy Act allows a "local government [to] designate a geographic area or areas within its jurisdiction as an urban infill and redevelopment area for the purpose of targeting economic development[.]" FLA. STAT. § 163.2517(1). To do so, the government "must amend its comprehensive land use plan . . . to delineate the boundaries of the urban infill and redevelopment area[.]" *Id.* § 163.2517(4). We have no idea what a municipality's ability to designate urban-redevelopment areas has to do with Megladon's parcel. The Defendants certainly don't explain the relevance of the Growth Policy Act to the County's purported control over rights-of-way. *See* Defs.' MSJ at 13 (referencing the Growth Policy Act in passing); *cf. Transam. Leasing, Inc. v. Inst. of London Underwriters*, 430 F.3d 1326, 1331 n.4 (11th Cir. 2005) ("[A] passing reference to an issue in a brief [i]s insufficient to properly raise that issue." (cleaned up)). So, they haven't established that this statute can form the basis for the County's authority.

The Defendants' reference to FLA. STAT. § 163.3215 fares no better. That section allows an "aggrieved or adversely affected party [to] maintain a de novo action for declaratory, injunctive, or other relief against any local government to challenge any decision of such local government granting or denying an application for, or to prevent such local government from taking any action on, a development order . . . on the basis that the development order materially alters the use or density or intensity of use on a particular piece of property, rendering it not consistent with the comprehensive plan adopted under this part." FLA. STAT. § 163.3215(3). But neither Objective TC-2 nor Policy TC-2A provides any substantive standards regarding the "use or density or intensity of use [of] a particular piece of property," *ibid.*, with which a development order—*viz.*, an "order [deciding] an application for a development permit[,]" *id.* § 163.3161(15)—could be inconsistent, *see* Traffic Circulation Subelement at 7 ("[T]he rights-of-way and corridors needed for existing and future transportation facilities will be designated and reserved. . . . The County shall require the dedication of appropriate share of all necessary rights-of-way from all developments at the time of development."); *see also Conservancy of Sw. Fla., Inc. v. Collie County*, 352 So. 3d 481, 490 (Fla. 2d DCA 2022) ("[T]he Consistency Statute only provides a private cause of action to challenge a development order that 'materially alters the use or density or intensity of use on a particular piece of property which is not consistent with the comprehensive plan.'" (quoting *Heine v. Lee County*, 221 So. 3d 1254, 1257 (Fla. 2d DCA 2017))). And, once again, we're left without any legal authority for the view that the County has the power to issue a "development order" with respect to Megladon's parcel in the first place. FLA. STAT. § 163.3215(3). Because the Master Plan "cannot, standing alone, support the Defendants' contention that the County *mandated* the land dedication at issue," *Megladon*, 661 F. Supp. 3d at 1227; *see also* Statement of Legislative Intent § A(3) ("[The] policies contained in the [Master Plan] must be implemented through the County's land development regulations[.]"), we must look elsewhere for that authority.

29

Policy TC-2A, which directs the County to "maintain and enforce [ ] minimum right-of-way requirements," *is* tethered to the specific "requirements established in the Public Works Manual." Traffic Circulation Subelement at 7. And the Defendants have since come forward with the specific provision of the Manual "governing the construction of a local road in a residential area without parking": Section R8-1. Defs.' SOF ¶ 42 (first citing Ona Dep at 130:8–17; and then citing Public Works Manual [ECF No. 171-13] at 32). This section sets "the standards for a 50-foot, 2-lane road with a swale and a sidewalk where required." *Id.* ¶ 43 (citing Public Works Manual at 32). But the Public Works Manual (and the standards set there), is limited only to "public works construction." MIAMI-DADE COUNTY, FLA., CODE OF ORDINANCES § 2-100(d). We must therefore determine whether Megladon's proposed construction of a single-family home constitutes a "public work" under the Code.

The Code defines a "work" as "any activity or result of such activity as set forth in Section 2-103.1, or the area or site of such activity." *Id.* § 2-99(c)(9) (cleaned up). Section 2-103.1 doesn't provide a clear list of activities that qualify as a "public work," *id.* § 2-103.1, but the term's ordinary meaning refers to "[s]tructures (such as roads or dams) built by the government for public use and paid for by public funds," *Public works*, BLACK'S LAW DICTIONARY (10th ed., 2014); *see also Demeter Land Co. v. Fla. Pub. Serv. Co.*, 128 So. 402, 406 (Fla. 1930) ("The term 'public works' has been defined as 'all fixed works, constructed for public use, as railways, docks, canals, water-works, roads, etc.'" (cleaned up)). The type of activities described in § 2-103.1 conform to this understanding: Section 2-103.1(b)(1) governs the permitting process for "construction work" on "any County-owned rights-of-way" "relating to . . . [u]tilities or other public works, except mailboxes . . . [and] [p]aving or drainage on private property in the areas used for vehicle driveways or parking." MIAMI-DADE COUNTY, FLA., CODE OF ORDINANCES § 2-103.1(b)(1); *see also id.* § 2-99(c)(1) ("'Construction work' means the installation, maintenance, repair, modification, or removal of any building, structure, pavement,

drainage, or equipment, including the planning and design for any such work."). And § 2-103.1(b)(2) requires a permit for "construction work related to any utilities or public works on any arterial, collector, section line, or half-section line road, or on any other road, bridge, tunnel, canal, or related facility that is situated partially or entirely within the incorporated areas of the County, regardless of ownership, that the Department deems necessary for appropriate traffic movement on the County's roadway network." *Id.* § 2-103.1(b)(2).

Putting aside the circularity of the Defendants' assumption that S.W. 131st Street is, in fact, a "County-owned" road, *id.* § 2-103.1(b)(1), Megladon doesn't seek to undertake construction *on* the road, *see On, Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/on (defining "on" as "a function word [used] to indicate position in contact with and supported by the top surface of" something) (last visited May 28, 2025); *see also* JSOUF ¶ 5 ("Megladon did not propose to build on existing public right of way."). And, unlike the development of a "road, bridge, tunnel, [or] canal," MIAMI-DADE COUNTY, FLA., CODE OF ORDINANCES § 2-103.1(b)(2), Megladon's *private* development of its parcel doesn't constitute a project for "public use and paid for by public funds," *Public works*, BLACK'S LAW DICTIONARY; *see also* SCALIA & GARNER at 195 ("Associated words bear on one another's meaning[.]"). Moreover, the Defendants have provided no evidence that S.W. 131st Street is a road that the County's Department of Transportation and Public Works ("DTPW") has deemed "necessary for appropriate traffic movement on the County's roadway network." MIAMI-DADE COUNTY, FLA., CODE OF ORDINANCES § 2-103.1(b)(2).[10]

---

[10] We may take judicial notice of the County's publicly available "list of roadways that the Department of Transportation and Public Works . . . has deemed necessary for the appropriate traffic movement on the County's roadway network." *Local Roadways Permitting Authority*, MIAMI-DADE COUNTY, https://www.miamidade.gov/global/transportation/public-works/roadways-permitting-authority.page (last visited May 21, 2025); *see also Setai Hotel Acquisition, LLC v. Miami Beach Luxury Rentals, Inc.*, 2017 WL 3503371, at *7 (S.D. Fla. Aug. 15, 2017) (Scola, J.) (recognizing that a court may take "judicial notice of information publically [sic] available from an official government website"). The list notably does not include S.W. 131st Street or any other roads in the Village of Pinecrest. *See*

The Defendants also point to four provisions of the County Code which, in their view, "vest[ ] the [DTPW] . . . with exclusive jurisdiction over traffic engineering in the County." Defs.' MSJ at 13 (cleaned up) (citing MIAMI-DADE COUNTY, FLA., CODE OF ORDINANCES §§ 2-95.1, -96.1, -99(c)(7)); *see also id.* at 14 ("Also built into DTPW's traffic engineering authority is a specific variance process by application to the DTPW Director[.]" (citing MIAMI-DADE COUNTY, FLA., CODE OF ORDINANCES § 2-100(d)). But jurisdiction over traffic *engineering*—defined in the Code as "that phase of engineering which deals with the planning and geometric design of streets, . . . and abutting lands, and with traffic operation thereon," MIAMI-DADE COUNTY, FLA., CODE OF ORDINANCES § 2-95.1(d)—still doesn't give the County "the power to *alter* [a street's] configuration long *after* it's been constructed[,]" *Megladon*, 661 F. Supp. 3d at 1228. As we explained the last time around:

> The plan or design of a thing, after all, necessarily *precedes* its construction. In other words, the act of planning—or designing—a thing connotes the sketching-out process that occurs *before* the thing is built. That's why Merriam-Webster's Unabridged Dictionary defines 'planning' as 'the act or process of making or carrying out plans specifically, the establishment of goals, policies, and procedures for a social or economic unit[.]' Similarly, Merriam-Webster's defines "design" as "the process of selecting the means and contriving the elements, steps, and procedures for producing what will adequately satisfy some need[.]" . . . It may be, then, that the County retains exclusive jurisdiction to 'plan' and 'design' all streets *in the first instance*. But that doesn't mean the County retains the far broader power to confiscate parcels of private property that were carved out *long before* the County's designs were ever promulgated.

*Ibid.* (cleaned up). And, as before, "that's the situation we have here." *Ibid.*

Next, the Defendants point to § 28-14 of the County Code, which provides that "[s]treet right-of-way widths shall be as shown on the master plan . . . and where not so shown shall be not less than . . . Fifty (50) to sixty (60) feet right-of-way as may be determined in uniform standards prescribed by the County's manual of public works construction." MIAMI-DADE COUNTY, FLA., CODE OF ORDINANCES § 28-14(b)(14). When read in the context of the Code, however, § 28-14 provides no

---

*List of Roadways*, MIAMI-DADE COUNTY, https://www.miamidade.gov/transit/library/list-of-roadways.pdf (last visited May 21, 2025).

indication that the County can require a land dedication from Megladon to effectuate conformity with that standard.

Chapter 28 covers "subdivision," which is defined to include both the division of land into multiple parcels and the "dedication of a road, highway, street, alley, easement through or on a tract of land regardless of area." *Id.* § 28-1(k)(1)–(2). The specific section on which the Defendants rely, § 28-14, promulgates "[d]esign standards" for streets. But, as we've said, we are well past the "design" phase of the streets abutting Megladon's parcel. *See Megladon*, 661 F. Supp. 3d at 1228–29 (cleaned up); *see also* SCALIA & GARNER at 221 ("The title and headings are permissible indicators of meaning."). Because Megladon doesn't intend to construct a new street, it's irrelevant that such a construction would have to be done "in accordance with requirements indicated in the County's manual of public works." MIAMI-DADE COUNTY, FLA., CODE OF ORDINANCES § 28-15(b)(1).

Megladon also isn't a subdivider—*viz.*, a "legal entity commencing proceedings under [Chapter 28] to effect a subdivision of land hereunder for himself or for another." *Id.* § 28-1(j). It's undisputed that "Megladon did not propose to subdivide the Parcel." JSOUF ¶ 6. In fact, Megladon is wholly exempt from the platting requirements set out in Chapter 28. *See ibid.*; MIAMI-DADE COUNTY, FLA., CODE OF ORDINANCES § 28-4 (outlining exemptions to platting). Since Megladon isn't proposing a subdivision, we don't much care that the County may require that a "proposed subdivision" "conform in principle with [the] master plan." *Id.* § 28-14(a).

The Defendants counter that "Megladon mistakenly conflates" its exemption from platting "with an exemption from the infrastructure design standards set forth in section 28-14[,] . . . which apply to any development permit that requires dedication." Defs.' MSJ at 15. Even if we were to ignore the fact that Megladon isn't a covered subdivider—which is dispositive in itself—this argument would *still* fail, because the Defendants haven't identified a single provision of the Code that requires, as a condition of development, the dedication of a right-of-way for roadway expansion. The County

certainly knew how to do this, since Chapter 28 does, in fact, require such a dedication "[w]henever any drainage way, stream, or surface drainage course is located or planned in any area that is being subdivided[.]" MIAMI-DADE COUNTY, FLA., CODE OF ORDINANCES § 28-13(c). But the County promulgated no comparable dedication requirement to address the width of existing streets, *see generally id.* § 28, and we won't be amending the Code to add that in, *see* SCALIA & GARNER at 101 ("The expression of one thing implies the exclusion of others.").

Despite their attempt to construct a "systematic web" of regulations supporting the County's jurisdiction over Megladon's permit, Defs.' MSJ at 12, the Defendants have (again) failed to thread together a legal basis for that assertion. Whatever jurisdiction over "traffic engineering" the County believes it retained following the Transfer Road Agreement, Defs.' MSJ Resp. at 7, that authority is not implicated here. The decision to impose the land-dedication requirement on Megladon was thus wholly the Village's. In short, Megladon has established, as a matter of law, that the Transfer Road Agreement validly assigned to the Village jurisdiction over the streets abutting Megladon's parcel— and over any rights-of-way along those streets.

* * *

The County has no authority to demand that the Village require a road dedication from Megladon before Megladon can receive a building permit. We therefore **GRANT** the Plaintiff's Motion for Partial Summary Judgment and **DENY** the Defendants' Motion for Summary Judgment on this issue. And, since the County no longer has any role to play in this case, we'll exercise our discretion under Rule 21 and **DISMISS** the County from this action. *See* FED. R. CIV. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party."); *see also Daker v. Head*, 730 F. App'x 765, 768 (11th Cir. 2018) (recognizing a district court's "authority under Rule

34

21 [to] *sua sponte* . . . dismiss improper defendants"). We'll therefore consider the parties' motions only insofar as they implicate the Village from here on.[11]

### III.    The Timing of Megladon's Claims against the Village

The parties also seek summary judgment on the ripeness of Megladon's claims and the timeliness of the prohibited-exaction claim Megladon has pled in Count I. *See* Defs.' MSJ at 9–11, 19; Pl.'s MSJ at 7–17.

#### a.    The Ripeness of Megladon's Claims

The parties dispute whether Megladon's claims challenging the land-dedication requirement are ripe for adjudication. Because the issue of ripeness presents a "threshold jurisdictional question," we may only proceed to the merits of these claims if we're satisfied that they're ripe for judicial review. *Elend v. Basham*, 471 F.3d 1199, 1205 (11th Cir. 2006).

"When a plaintiff is challenging a governmental act, the issues are ripe for judicial review if 'a plaintiff . . . show[s] he has sustained, or is in immediate danger of sustaining, a direct injury as the result of that act.'" *Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1335, 1349 (quoting *Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991)). In the specific context of unconstitutional-conditions claims, a plaintiff's claim ripens once the government "has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." *Williamson County*, 473 U.S. at 191; *see also Alachua Land Invs., LLC v. City of Gainesville*, 107 So. 3d 1154, 1158–59 (Fla. 1st DCA 2013) (adopting federal ripeness standard). The "finality requirement is relatively modest," as "nothing more than *de facto* finality is necessary." *Pakdel*, 594 U.S.

---

[11] As we noted above, also pending before us is Megladon's Objection to Magistrate Judge Reid's Order for Sanctions. Megladon appealed that order after Magistrate Judge Reid denied Megladon's request to strike three paragraphs from the Affidavit of Alicia Gonzalez. According to Megladon, that evidence "could taint the Court's determination of whether Megladon's claim against the County is ripe." Objection at 2. Because we're dismissing the County from this case, no such determination is necessary. Accordingly, Megladon's Objection [ECF No. 212] is **DENIED as moot**.

at 478–79. Similarly, FLA. STAT. § 70.45 allows a plaintiff to bring a claim challenging a prohibited exaction "when a prohibited exaction is actually imposed or when it is required in writing as a final condition of approval for the requested use of real property." FLA. STAT. § 70.45(2).

Megladon's claims are ripe for adjudication because the Village has made a final decision—from which it has never departed—that Megladon would have to comply with the dedication requirement to receive its permit. On May 14, 2020, Director Olmsted, the official to whom the Village "has delegated authority . . . to grant or deny residential building permits," JSOUF ¶ 7; *accord* Olmsted Dep. at 229:13–232:11, emailed Fossi to confirm that "the right-of-way *will* need to be dedicated to the Village of Pinecrest" and explained that Megladon's "certificate of occupancy *will not* be issued until dedication of the right-of-way is complete." May 14 Email at 1 (emphases added).[12] By that point, Olmsted and his staff had already made it clear to Megladon that the right-of-way would be 7.5 feet, *see* PRS at 17; Ex. 2 to Janisse Aff. at 8 (telling Megladon, on September 5, 2019, that "it will be necessary to dedicate 7.5 ft. to Village and the lot would then be reduced in area"), which Megladon would be required to account for on its new site plan, *see* May 14 Email at 1 ("On the site plan that will be submitted for building permits, please crosshatch and indicate the portion that is the area of right-of-way to be excluded from the property and dedicated to the Village of Pinecrest."). As we explained in a prior order, *see Megladon*, 661 F. Supp. 3d at 1232–34, Olmsted's use of "language of an unmistakably mandatory character" leaves no doubt that the Village had reached a final decision as to

---

[12] This is not to say that May 14, 2020, was necessarily the *first* time the Village apprised Megladon of its final decision to impose the dedication requirement. As we discuss in Section III.B, *infra*, it's far from clear, on this record, when *exactly* that occurred. Even so, the remaining factual dispute about *when* Megladon's § 70.45 claim accrued isn't material to the issue of ripeness, which only requires Megladon to show that the Village had reached its "final" position *at some point* before this judgment. *See Williamson County*, 473 U.S. at 191; *see also Henley v. Herring*, 779 F.2d 1553, 1555 (11th Cir. 1986) ("Since ripeness is 'peculiarly a question of timing,'" it's assessed "at the date of the judgement"—*viz.*, "when the district court ruled" (quoting *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 139–40 (1974))).

"how [Megladon would] be allowed to develop its property," *Hewitt v. Helms*, 459 U.S. 460, 471 (1983); *Williamson County*, 473 U.S. at 190; *see also* SCALIA & GARNER at 112 ("Mandatory words impose a duty; permissive words grant discretion."). The same is true for Megladon's statutory claim. Olmsted's May 14 email also made plain that, "[p]rior to issuance of a building permit," Megladon "will need to" submit an affidavit to the Village "consent[ing] to dedication of the right-of-way." May 14 Email at 1. Facing that mandatory (and written) condition for approval, Megladon "had actually 'been injured by the Government's action'" under the plain text of § 70.45. *Pakdel*, 594 U.S. at 479 (quoting *Horne v. Dep't of Agric.*, 569 U.S. 513, 525 (2013)). Both claims, in short, were ripe as of the May 14 email.

Parrying, the Defendants return to their argument that "Olmsted's determination was not . . . final" because Megladon "could still appeal to the Village Council or seek review from the Planning Board." Defs.' MSJ Resp. at 11 (citing Olmsted Statement ¶¶ 38–44). But the Supreme Court made clear in *Pakdel* that "administrative exhaustion of state remedies is not a prerequisite for a takings claim when the government has reached a conclusive position," since "the finality requirement looks only to whether *the initial decisionmaker* has arrived at a definitive position on the issue." 594 U.S. at 478 (emphasis added & cleaned up); *see also Williamson County*, 473 U.S. at 192–93 (explaining that *finality* "is concerned with whether *the initial decisionmaker* has arrived at a definitive position on the issue that inflicts an actual, concrete injury," while *exhaustion* "generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate" (emphasis added)). Even so, "a plaintiff's failure to properly pursue administrative procedures may render a claim unripe if avenues still remain for the government to clarify or change its decision." *Pakdel*, 594 U.S. at 480 (first citing *Williamson County*, 473 U.S. at 192–94; then citing *Knick v. Twp. of Scott*, 588 U.S. 180, 187–88 (2019); and then citing *Palazzolo v. Rhode Island*, 533 U.S. 606, 624–625 (2001)).

The Defendants offer two such "avenues." *First*, they say that Megladon could have appealed Olmsted's decision to the Village Council. *See* Defs.' MSJ at 11. True, the Village Council is authorized to "[h]ear and decide appeals with regard to administrative interpretations or decisions." VILL. OF PINECREST, FLA., CODE OF ORDINANCES ch. 30, art. 2, div. 2.1(*l*). But satisfying the finality requirement doesn't require an applicant to pursue an *appeal* of the initial denial to *a different decisionmaker*—even one within the same jurisdiction. *See Williamson County*, 473 U.S. at 193 (explaining that an applicant "would not be required to appeal the [County] Commission's rejection of the preliminary plat to the [County] Board of Zoning Appeals, because the Board was empowered, at most, to review that rejection, not to participate in the Commission's decisionmaking"). So, that doesn't help the Defendants.

*Second*, the Defendants maintain that Megladon could have "[sought] review from the Planning Board." Defs.' MSJ at 11. We're not entirely sure what the "Planning Board" is, as the Defendants never tell us. *See generally* Defs.' MSJ; Defs.' MSJ Resp.; Defendants' Reply ("Defs.' Reply") [ECF No. 191]; Defs.' SOF. We'll assume—at least for purposes of Megladon's Motion—that the Defendants are referring to the Village's *Zoning* Board. *See Am. Bankers*, 408 F.3d at 1331 (noting that, on cross-motions for summary judgment, we must "resolv[e] all reasonable doubts about the facts in favor of the non-moving party"). Under *Williamson County*, a decision is not final if an applicant fails to pursue a relevant variance from the initial decisionmaker. *See* 473 U.S. at 193 ("[R]esort to the procedure for obtaining variances would result in a conclusive determination by the Commission whether it would allow respondent to develop the subdivision in the manner respondent proposed."). And the Village Code does authorize the Zoning Board to grant variances "for setback lines." VILL. OF PINECREST, FLA., CODE OF ORDINANCES ch. 30, art. 3, div. 3.5(b)(1). But, as we explained in our MTD Order, a "setback requirement"—which sets a "minimum horizontal distance" from the borders of the lot on which the landowner cannot build, *id.* at ch. 30, art. 9, div. 9.2—is not the same thing as a *dedication*

requirement that forces the landowner to *permanently forfeit* a portion of his land to the government, *see Megladon*, 661 F. Supp. 3d at 1236. We left open the possibility that the Village would be able to "adduce evidence for its position that the land dedication at issue here is precisely what the Village meant by a setback requirement." *Ibid.* The Village hasn't done that.

Instead, the record makes clear that the setback requirements are distinct from, and downstream of, the dedication itself. *See* Ex. 2 to Olmsted Dep. at 1 (considering "whether or not additional right-of-way will need to be dedicated and, *if dedication is required*, the impacts on required setbacks from the new property line" (emphasis added)). The Village's only other evidence mentioning the setback requirement comes from a single paragraph in Olmsted's Verified Statement: "Megladon," the Village says, "could have applied to the zoning board for a variance from the setback requirements, which would have been impacted by the dedication." Olmsted Statement ¶ 42. Obviously, the distance from a building to the property line would be "impacted" by a right-of-way dedication—precisely *because* the Village would be taking the right-of-way and then redrawing the property line. But Olmsted's recognition of this truism doesn't suggest that the Zoning Board could have given Megladon a variance to avoid that taking and redrawing in the first instance. And the Defendants have offered no other evidence, nor identified any provisions of the Village Code, establishing that the Zoning Board had the authority to waive the dedication requirement itself. They have thus failed to create any dispute of material fact on this issue. *See Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) ("The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." (cleaned up)); *cf. Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1576 (11th Cir. 1989) (concluding that a decision is "final" where "there are no variances available under the applicable local law which could change the zoning classification of the property").

The Village also argues that these claims cannot be ripe given its later communications with Megladon—specifically, a November 4, 2020, comment in the PRS, in which the Village directed Megladon to "confirm with Miami-Dade County the width of right-of-way required to be dedicated or seek and obtain a variance from the requirement from Miami-Dade County." PRS at 10–11. In the Defendants' view, "[n]o interpretation of that comment could be deemed a final decision as it does not even specify the width of the dedication that will be required." Defs.' MSJ at 11 (emphasis omitted). A few problems here.

*First*, the November 4 comment *itself* doesn't have to communicate a final decision since the dedication requirement had already been imposed on Megladon as a condition precedent to receiving its permit. *See* May 14 Email at 1; *cf. Knick*, 588 U.S. at 192 ("The government's post-taking actions . . . cannot nullify the property owner's existing Fifth Amendment right."). *Second*, any uncertainty as to the County's position about the required width is irrelevant, since the County doesn't have jurisdiction over the right-of-way. *See Pakdel*, 594 U.S. at 478 ("[T]he finality requirement looks only to whether the *initial decisionmaker* has arrived at a definitive position on the issue." (emphasis added & cleaned up)); *see also S. Grande View Dev. Co. v. City of Alabaster*, 1 F.4th 1299, 1306 (11th Cir. 2021) (noting that a claim ripens when "*the government entity charged with implementing the regulations* has reached a final decision" (emphasis added & cleaned up)).

True, "[a] court cannot determine whether a regulation goes 'too far' unless it knows how far the regulation goes." *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348 (1986) (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). Here, however, we *know* that the only sovereign with jurisdiction over Megladon's parcel had already decided (in no uncertain terms) that an "[a]dditional right-of-way (7.5 feet) adjacent to SW 131 Street is required to be dedicated." PRS at 17. The Village cannot prevail by hiding behind the County, since the latter has no role in "conclusively determin[ing]

whether [Megladon] will be denied all reasonable beneficial use of its property[.]" *Williamson County*, 473 U.S. at 194.

Even if we were to credit the Village's mistaken belief that Megladon was required to consult the County about the width of the dedication, *see* Defs.' MSJ at 11; *but see Pakdel*, 594 U.S. at 480 ("[A]dministrative missteps do not defeat ripeness once the government has adopted its final position." (citing *Williamson County*, 473 U.S. at 192–93)), that wouldn't change our result. To determine whether "a regulation has gone too far," we must know "what use, if any, may be made of the affected property." *MacDonald*, 477 U.S. at 350 (cleaned up). Irrespective of the width of the right-of-way the County might have required Megladon to dedicate, there's no "uncertainty as to the land's permitted use" absent *some* dedication, *Palazzolo*, 533 U.S. at 622. That is, without the dedication, Megladon would not have been able to build its home. While "the County's input" might have changed the conditions for compliance—by, for instance, ordering Megladon to dedicate *more* land, *see* Defs.' SOF ¶¶ 43–44—it would not have abrogated the Village's "final and authoritative determination [as to] *the type and intensity of development* legally permitted on the subject property"—here, none absent a dedication, *MacDonald*, 477 U.S. at 348 (emphasis added). It's that "definitive position on the issue [that has] inflict[ed] an actual, concrete injury' . . . [by] requiring [Megladon] to choose between surrendering possession of [its] property or facing the wrath of the government." *Pakdel*, 594 U.S. at 478–79 (quoting *Williamson County*, 473 U.S. at 193).

And the Village has never departed from that final position. In response to Megladon's pre-suit notice on December 29, 2020, the Village—as it had many times before—reaffirmed that "Megladon *must* . . . dedicate the right-of-way for the road that is needed to accommodate its development." Notice Resp. at 6 (emphasis added). Given the Village's consistent, unwavering commitment to having Megladon comply with the dedication requirement, Megladon's suit is not

premised on "a hypothetical harm"—but rather on the "definitive position" the Village has stood behind throughout the permitting process. *Pakdel*, 594 U.S. at 478–79 (cleaned up).

Taking the evidence in the light most favorable to the Defendants, we conclude that Megladon has established, as a matter of law, that the Village reached "a final, definitive position" that Megladon would have to comply with the dedication requirement before it could receive a building permit. *Williamson County*, 473 U.S. at 191. Since each of Megladon's claims is ripe for adjudication, we **GRANT** Megladon's Motion for Partial Summary Judgment and **DENY** the Defendants' Motion for Summary Judgment on the issue of ripeness.

### b. The Timeliness of Megladon's § 70.45 Claim

As we've said, Megladon has established that the dedication was "a final condition of approval for the requested use of real property." FLA. STAT. § 70.45(2). But we can't say exactly *when* the Village first imposed that condition. Although this question has no bearing on the *ripeness* of Megladon's § 70.45 claim—*i.e.*, whether the condition inflicted "an actual, concrete injury," *Pakdel*, 594 U.S. at 479 (quoting *Williamson County*, 473 U.S. at 193)—it is material to our evaluation of whether Megladon complied with the timing requirements of § 70.45(3).

As a condition precedent to filing a § 70.45 claim, a property owner must "provide to the relevant governmental entity written notice of the proposed action" "[a]t least 90 days before filing an action under this section, but no later than 180 days after imposition of the prohibited exaction[.]" FLA. STAT. § 70.45(3). Megladon served pre-suit notice on the Village on October 1, 2020, *see* JSOUF ¶ 31, and first filed this action on July 21, 2021, *see generally* State Court Compl.—thus complying with § 70.45(3)'s 90-day waiting period. So, the timeliness of this claim turns on whether the Village "imposed" the "prohibited exaction" within 180 days of October 1, 2020. To answer that question, we must first define those terms.

In our MTD Order, we defined "impose" to mean "to 'give or bestow (as a name or title) authoritatively or officially,' as in to 'impose a tax' or to 'impose a duty[.]'" *Megladon*, 661 F. Supp. 3d at 1238 n.15 (quoting *Impose*, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/impose). Based on that definition, we rejected Megladon's argument that "the 180-day clock hasn't even started yet because, given this lawsuit, the Village's condition has never actually been 'imposed[,]'" reasoning that, "[j]ust as a tax can be imposed, even if the tax is never paid, the Village's condition was imposed, even though the Plaintiff hasn't agreed to play along." *Ibid.*

Now renewing this issue, Megladon highlights that the Florida Legislature passed a "'clarifying' amendment" to § 70.45 in 2021, defining "'imposition' to 'refer[ ] to the time at which the property owner must comply with the prohibited exaction or condition of approval.'" Pl.'s MSJ at 10 n.15 (quoting FLA. STAT. § 70.45(1)(c) (2021)). But, as Megladon concedes, this statutory definition is not included in the "version of the statute applicable in this case[.]" *Ibid.*; *see, e.g.*, *Old Port Cove Holdings, Inc. v. Old Port Cove Condo. Ass'n One*, 986 So. 2d 1279, 1284 (Fla. 2008) ("In the absence of clear legislative intent to the contrary, a law is presumed to operate prospectively."). We'll thus continue to interpret § 70.45 based on the plain text of its 2020 version—*viz.*, the text that's applicable here. *See Nesbitt v. Candler County*, 945 F.3d 1355, 1362 (11th Cir. 2020) ("[W]e should not, cannot, and do not use legislative history to get around the plain meaning of a statute's text." (cleaned up)).

Megladon says that the 180-day period is triggered only upon "the latter accrual event of actual imposition," and that our understanding of "impose" "inadvertently collapses Section 70.45(2)'s two distinct statutory accrual points—when a prohibited exaction is imposed and when it is required in writing as a final condition of approval—into a single event[.]" Pl.'s MSJ at 10 n.15. We disagree. As the statute makes clear, the 180-day clock is triggered upon the "imposition of the prohibited exaction." FLA. STAT. § 70.45(3) (2020). The statute defines "prohibited exaction" as "any condition imposed by a governmental entity on a property owner's proposed use of real property" that lacks an

essential nexus and proportionality. *Id.* § 70.45(1)(c). At first blush, that definition doesn't help us much because substituting it into § 70.45(3) only tells us that a plaintiff must serve notice within 180 days after the "*imposition* of" "any [prohibited] condition *imposed*" on the property. *Id.* § 70.45(1), (3) (emphases added). By viewing these provisions in the context of the entire section, however, we can eliminate this apparent circularity. *See* SCALIA & GARNER at 170 ("The text must be construed as a whole."). Section 70.45(2) provides that an "action may not be brought until a prohibited exaction"— that is, an unlawful "condition imposed" on the property—is *either* "actually imposed *or* required in writing as a final condition of approval." FLA. STAT. § 70.45(1) (emphasis added). But, under the statutory definition of "prohibited exaction," for there to be a "prohibited exaction" at all, there first must be a "condition imposed" on the property. *Id.* § 70.45(1)(c). So, for each of the provisions of subsections (1), (2), and (3) to have effect, a condition must be sufficiently "imposed," such that there exists a prohibited exaction to challenge, *either* when that condition is "actually imposed" *or* when it's "required in writing." *Id.* § 70.45(2); *see also* SCALIA & GARNER at 180 ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory.").

Contrary to Megladon's protestations, this understanding actually comports with Megladon's preferred definition of "impose"—*viz.*, "to establish *or* apply by authority," Pl.'s MSJ at 10 n.15 (quoting *Impose*, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/impose (emphasis added))—as it reflects that a prohibited exaction may be imposed either when it's *applied* (*i.e.*, "actually imposed" on the land) or when it's *established* (*i.e.*, "required in writing"). That is, because the statute makes clear that the clock begins to run upon the "imposition of the prohibited exaction," FLA. STAT. § 70.45(3), Megladon's preferred rule (which would trigger the statutory window only upon "actual imposition") renders the word "actual" superfluous, Pl.'s MSJ at 10 n.15 (quoting FLA. STAT. § 70.45(3)). Our reading, by contrast, doesn't "reduce . . . the . . . accrual events of Section 70.45(2) to surplusage[,]" *ibid.* (cleaned up), since it recognizes that time accrues upon the occurrence of *either*

event. Plus, it avoids the surplusage that would result from giving "imposed" and *actually* imposed" identical meanings. *Cf.* SCALIA & GARNER at 170 ("No[ ] [word] should needlessly be given an interpretation that causes it . . . to have no consequence."). Based on the plain text and structure of § 70.45, we thus conclude that the 180-day period to serve pre-suit notice began to run when the Village first "required in writing" the dedication "as a final condition of approval" for Megladon's building permit. FLA. STAT. § 70.45(2).

And a reasonable jury, considering all the summary-judgment evidence, could disagree as to when *exactly* that was. In Megladon's view, the Village made its final written decision on May 14, 2020—140 days before Megladon tendered pre-suit notice—when Olmsted emailed Fossi that "the right-of-way will need to be dedicated to the Village of Pinecrest[.]" May 14 Email at 1. As we've explained, Olmsted's email expressed the Village's final position on the dedication requirement. *See ante*, at 35–42. But that doesn't necessarily mean that May 14 was the first time the Village expressed this position. According to the Defendants, *if* the Village ever imposed a final condition, then it first imposed that condition in writing not on May 14, but on April 3, 2020—181 days before Megladon sued—when Olmsted posted the following on the PRS:

> PLEASE PROVIDE A WRITTEN RESPONSE TO EACH OF THE REVIEW COMMENTS NOTED BELOW INCLUDING A NOTE INDICATING WHERE THE REVISION OR INFORMATION IS AVAILABLE FOR REVIEW IN THE REVISED PLAN SET. PLEASE ATTACH THIS SHEET TO THE FRONT SHEET OF EACH SUBMITTED SET OF PLANS.
>
> 1. Additional right-of-way (7.5 feet) adjacent to SW 131 Street is required to be dedicated to the Village of Pinecrest. Please adjust the proposed northern property line 7.5 feet to the south and revise all setback, lot coverage, impervious coverage, green space, and building area information. . . .
>
> 2. Dedication of right-of-way to the Village of Pinecrest requires acceptance by the Village Council and can be completed prior to issuance of a certificate of occupancy. Coordination with the Village Attorney will be required. . . .

PRS at 17.

The parties offer conflicting evidence about the extent to which *this* comment likewise represented the Village's "final" position. Megladon contends that Olmsted's April 3 comment was not a "decision" that Megladon would have to comply with the dedication requirement but merely an invitation for further "communications, negotiations, and clarifications." Pl.'s MSJ at 11 (cleaned up). And Megladon has submitted competent evidence to substantiate this view. For starters, the April 3 comment—unlike the May 14 email—invites Megladon to "provide a written response" to the comment. PRS at 17; *cf.* May 14 Email (including no such language). Megladon has also produced evidence indicating that the PRS is not a forum for publishing final decisions, but rather a place for mere "conversation between the property owner and the Village[.]" Notice Resp. at 3; *accord* JSOUF ¶ 12. And, indeed, even after Olmsted posted the April 3 comment, Megladon and the Village continued their dialogue about the dedication requirement. *See* Fossi Decl. ¶¶ 9–11 ("Olmsted asked Megladon to provide a written response and invited Megladon to schedule a meeting with the Village to review and discuss the Village's comments. . . . During our meeting, Ms. Conley and I pushed back against the Village's dedication proposal and sought clarification about what the Village wanted Megladon to dedicate, the mechanics of dedication, and the reasons for the dedication (to widen S.W. 131st Street, according to Mr. Olmsted)."). Taking this evidence in the light most favorable to Megladon, we think a reasonable jury could infer from the contents of the April 3 comment, the nature of the PRS process, and the Village's continuing engagement with Megladon that the Village did not issue Megladon a written, final decision on the dedication requirement on April 3.

But the Defendants have *also* introduced competent evidence to support the opposite inference. At the end of the April 3 comment, for instance, the Village invited Megladon "to schedule a meeting with staff of the Building and Planning Department to review and discuss the provided review comments *before resubmittal*," PRS at 19 (emphasis added)—an option Megladon never pursued, *see* Olmsted Statement ¶ 34 ("In fact, a building permit could not be issued to Megladon because it

never submitted a complete building permit application."). Moreover, contrary to Megladon's characterization of the PRS system, Olmsted explains that the comments are generally not disputed before the Building and Planning Department, but rather "appeal[ed] [for an] administrative determination to the Village Council[.]" Olmsted Statement ¶ 28. And, as Olmsted saw it, his continued communications with Megladon merely provided Megladon with "clarification on how to comply with the comment"—not an avenue for Megladon to seek reconsideration. *Id.* ¶ 29. So, taking those facts in the light most favorable to the Defendants, we think a jury could reasonably infer that the April 3 comment *was* a final decision.

"If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Tr. v. Fid. & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)). We think that's the case here. Each party has submitted evidence that would allow a reasonable jury to draw competing inferences about the date on which the Village made its final decision. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) ("[I]f a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment." (cleaned up)). And, because "the drawing of legitimate inferences from the facts are jury functions, not those of a judge," *Butler v. Gualtiere*, 41 F.4th 1329, 1334 (11th Cir. 2022) (quoting *Anderson*, 477 U.S. at 255), we'll allow this issue to be resolved at trial.

One more thing. Megladon claims that, even if the Village made its final decision on April 3, its pre-suit notice is still timely because "Megladon did not see or have notice of Olmsted's comment" until April 6—or 178 days before it gave pre-suit notice. Pl.'s MSJ at 13 (citing Pl.'s SOF ¶¶ 33–34). Not so. As a statute waiving sovereign immunity, § 70.45 "must be strictly construed, with any ambiguity concerning the scope of the [statute] resolved in favor of the government[.]" *City of Jacksonville v. Smith*, 159 So. 3d 888, 894 (Fla. 1st DCA 2015). We needn't even resort to a strict

construction of § 70.45, though, since no reasonable reading of that statute supports Megladon's interpretation. Section 70.45(3) states that a property owner must provide pre-suit notice "no later than 180 days after imposition of the prohibited exaction"—full stop. FLA. STAT. § 70.45(3). Although the Florida Legislature certainly knows how to condition accrual upon actual notice, *see, e.g.*, *id.* § 766.106(4) ("Upon receiving notice of termination of negotiations in an extended period, the claimant shall have 60 days or the remainder of the period of the statute of limitations, whichever is greater, within which to file suit."); *id.* § 627.70131(7)(a) ("Within 60 days after an insurer receives notice of an initial, reopened, or supplemental property insurance claim from a policyholder, the insurer shall pay or deny such claim or a portion of the claim unless the failure to pay is caused by factors beyond the control of the insurer."), it elected not to do so here, *cf.* SCALIA & GARNER at 93 ("Nothing is to be added to what the text states or reasonably implies[.]"). We decline to rewrite § 70.45 to save Megladon's (potentially) untimely filing. Instead, we'll **DENY** both parties' motions on the timeliness of Count I and proceed to trial on that issue.

## IV.    The Merits

Finally, we reach the merits of Megladon's claims.[13] Both parties move for summary judgment on the constitutionality of the Village's dedication requirement. *See* Pl.'s MSJ at 18–24; Defs.' MSJ at

---

[13] Even though we cannot determine at summary judgment whether Megladon's § 70.45 claim is timely, we can still consider the merits of that claim and resolve any outstanding legal issues before trial, since a pre-suit-notice requirement isn't jurisdictional. *See Hosp. Corp. of Am. v. Lindberg*, 571 So. 2d 446, 448 (Fla. 1990) ("While such a condition precedent to suit is necessary in order to maintain a cause of action, the failure to do so does not divest the trial court of subject matter jurisdiction."). Because we apply the same standard to determine whether an action is a "prohibited exaction" under § 70.45 as we do in determining whether it is an "unconstitutional condition," *compare* FLA. STAT. § 70.45(4) ("For each claim filed under this section, the governmental entity has the burden of proving that the exaction has an essential nexus to a legitimate public purpose and is roughly proportionate to the impacts of the proposed use that the governmental entity is seeking to avoid, minimize, or mitigate."), *with Koontz*, 570 U.S at 606 ("[T]he government . . . may not leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts."), for the sake of simplicity, we'll limit our discussion to the latter.

21. The parties agree that we apply the *Nollan/Dolan/Koontz* Test in answering this question. *See* Pl.'s MSJ at 19; Defs.' MSJ at 21; *see also* Joint Notice of Withdrawal [ECF No. 224] at 2 ("This notice is specifically withdrawing the argument that laws of general application are not subject to the *Nollan/Dolan* standard of review."). But they dispute exactly how the Village may be liable if we find the dedication requirement unlawful. *See* Defs.' MSJ at 17–19; Pl.'s MSJ Resp. at 16–20. We'll thus begin by assessing whether the dedication requirement amounts to an unconstitutional condition before considering Megladon's available remedies.

### a.  The Constitutionality of Megladon's Claims

The Fifth Amendment safeguards the "right to just compensation for property the government takes when owners apply for land-use permits." *Koontz*, 570 U.S at 605 (cleaned up). Under the unconstitutional-conditions doctrine, "a unit of government may not condition the approval of a land-use permit on the owner's relinquishment of a portion of his property unless there is a nexus and rough proportionality between the government's demand and the effects of the proposed land use." *Id.* at 599; *accord Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987); *Dolan v. City of Tigard*, 512 U.S. 374 (1994). This rule seeks to balance "two realities of the permitting process"—that "applicants are especially vulnerable to . . . coercion . . . because the government often has broad discretion to deny a permit that is worth far more than property it would like to take" and that "many proposed land uses threaten to impose costs on the public that dedications of property can offset"— by allowing "permitting authorities to insist that applicants bear the full costs of their proposals while still forbidding the government from engaging in 'out-and-out . . . extortion' that would thwart the Fifth Amendment right to just compensation." *Koontz*, 570 U.S at 605–06 (quoting *Dolan*, 512 U.S. at 387). In other words, "the government may choose whether and how a permit applicant is required to mitigate the impacts of a proposed development, but it may not leverage its legitimate interest in

mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts." *Id.* at 606.

Here, the Defendants assert that the right-of-way dedication is necessary to "mitigate[ ] the impact of [Megladon's] development" because the development will "create[ ] more traffic" on the road. Defs.' MSJ Resp. at 18 (citing Ona Dep. at 149:7–150:9). In their view, the "Plaintiff's development demonstrably puts cars on SW 131st Street because [the] Plaintiff's property is one of six properties that access their property directly from a driveway on this road and that gain access to the entire County road system through this road." *Ibid.* (citing Ex. A to Defs.' Resp SOF ("Defs.' Amnd. ROG Ans.") [ECF No. 179-1] ¶ 10).

The Supreme Court, on multiple occasions, has endorsed the view that, "if a proposed development will 'substantially increase traffic congestion,' the government may condition the building permit on the owner's willingness 'to deed over the land needed to widen a public road.'" *Sheetz v. County of El Dorado*, 601 U.S. 267, 274–75 (2024) (quoting *Koontz*, 570 U.S. at 605). Megladon disagrees that its project would result in significant traffic increases. As Megladon sees it, the development would result in "no net increase in traffic trips" because it merely intends to construct "one single family home where one previously existed." Pl.'s MSJ at 21. It's undisputed that, before Megladon's purchase of the property, "the Parcel had been developed with a single-family home, which had been torn down to make room for construction of a new home [by Megladon]."[14] JSOUF ¶ 3; *see also* Ex. A to Defs.' SOF ("Survey") [ECF No. 171-1] at 2 (showing previous home). And the Defendants' cited evidence offers no reason to believe that Megladon's development "would

---

[14] In fact, "[t]he single-family home that previously stood on Megladon's Parcel had two driveways exiting onto S.W. 131st Street and one driveway exiting onto S.W. 77th Avenue," while "Megladon's proposed redevelopment would reduce the number of driveway connections, with a single driveway exiting onto S.W. 131st Street and one driveway exiting onto S.W. 77th Avenue." Pl.'s SOF ¶ 55 (citing Hase Decl. ¶ 5); *see also* Defs.' Resp. SOF ¶ 55 ("Undisputed.").

exacerbate" the traffic problem beyond the contributions of the parcel's prior use. *Knight v. Metro. Gov't of Nashville & Davidson Cnty.*, 67 F.4th 816, 825 (6th Cir. 2023). Neither Ona's testimony that "safety requirements that come into play when you have vehicles riding on the road, when you have pedestrians or you have bicycles" faced with increased traffic, Ona Dep. at 149:21–23, nor the Defendants' observation that Megladon intends to build on "one of a total six lots that have driveway access onto S.W. 131st Street," Defs.' Amnd. ROG Ans. ¶ 10, tell us anything about how replacing one single-family home with another will "increase traffic on the streets," *Dolan*, 512 U.S. at 395.

Perhaps recognizing this gap in their evidence, the Defendants reframe the comparative analysis. In their view, the increase in harm should not be measured against the traffic caused by the prior single-family home but rather against the traffic caused by the *current* undeveloped state of the parcel. *See* Defs.' MSJ Resp. at 19 n.4. From that viewpoint, they say, "denial of a permit . . . *would* prevent additional burdens on 131st Street and the rest of the County road system," *ibid.* (emphasis added), because, unlike at present, all six lots "that have direct access to and from that roadway" would be occupied, Defs.' Amnd. ROG Ans. ¶ 10. Although the Defendants provide no legal authority to support this framing, we think it makes sense to assess the marginal cost of Megladon's proposal based on the parcel's undeveloped state, since that was the condition of the parcel at the time "the initial decisionmaker . . . arrived at a definitive position on the issue." *Williamson County*, 473 U.S. at 193; *see also* JSOUF ¶ 3 (noting that the previous home "had been torn down"); *cf. Garneau v. City of Seattle*, 147 F.3d 802, 814 (9th Cir. 1998) (O'Scannlain, J., concurring in part and dissenting in part) (noting that an exaction must be proportional to its "marginal costs").

But we needn't resolve this question here because the Defendants fail to meet their burden of showing that their required condition bears a "'rough proportionality' to the development's impact on the land-use interest" under either framing. *Sheetz*, 601 U.S. at 275–76 (quoting *Dolan*, 512 U.S. at 391). Megladon says that the dedication is not proportional to the marginal increase in traffic "because the

trips generated by one single family home are . . . de minimis[.]" Pl.'s MSJ at 21 (citing Pl.'s SOF ¶¶ 6, 74). As evidence for that claim, Megladon directs us to the report of its roadway-design expert, Reginald Mesimer. *See* Ex. A to Mesimer Decl. ("Mesimer Rpt.") [ECF No. 131-8]. Mesimer conducted a study in which he observed that "109 vehicles utilized SW 131st Street and over 12,600 vehicles utilized SW 77th Avenue" during a 24-hour period. *Id.* at 6. He explained that, under "the 10th Edition of the Trip Generation Manual, published by the Institute of Transportation Engineers [ ], the daily trips generated by a single-family detached home is 9.44 (10 rounded) trips per day." *Ibid.* From these figures, Mesimer concluded that, "[e]ven if Megladon's proposed development net increased density[,] . . . the additional hypothetical trips, pretending there was never a dwelling unit on the parcel before, are negligible compared to the overall level of service, functionality, and background trips." *Id.* at 3.

The Defendants purport to dispute Mesimer's findings. *Compare* Pl.'s SOF ¶ 6 ("Even if there had previously been no single-family home on the Parcel, the addition of one new single-family home to the neighborhood would have factually and legally de minimis traffic impact." (first citing Mesimer Rpt. at 3–4; and then citing Olmsted Dep. at 189:9–24)), *with* Defs.' Resp. SOF ¶ 6 ("Disputed." (first citing Defs.' Amnd. ROG Ans. ¶ 10; and then citing Ona Dep. at 148:27–150:9)). But the evidence —even when viewed in the light most favorable to the Defendants—does not create a genuine dispute about Mesimer's conclusions. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993) ("For issues on which the non-movant would bear the burden of proof at trial, . . . [and] the movant put on evidence affirmatively negating the material fact[,] . . . the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated."); *see also United States v. Four Parcels of Real Prop. in Green & Tuscaloosa Cntys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) ("If the nonmoving party fails to 'make a sufficient showing on an essential

element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." (quoting *Celotex*, 477 U.S. at 323)).

Although "[n]o precise mathematical calculation is required, [the government] must make some effort to quantify its findings in support of the dedication . . . beyond the conclusory statement that it could offset some of the traffic demand generated." *Dolan*, 512 U.S. at 395. The Defendants' evidence (the same as before) doesn't do that. It describes the problem only in the most general terms and provides no reason to infer that the harms it's identified are anything but "negligible." Mesimer Rpt. at 3; *cf.* Ona Dep. at 149:14–15 ("People need to get from point A to B; we need to build the roads."); Defs.' Amnd. ROG Ans. ¶ 10 ("These six lots exclusively impact the roadway because they are the only lots that have direct access to and from that roadway."). So, we have no reason to believe that the Village isn't requiring Megladon to "give up more than is necessary to mitigate harms resulting from [the] new development[.]" *Sheetz*, 601 U.S. at 276.

What's worse, the Defendants provide no evidence that they made an "*individualized* determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Dolan*, 512 U.S. at 391 (emphasis added). On the contrary, the Defendants confess that the dedication is "proportionate to what every other property owner along that roadway segment (and in the entire county) must dedicate to maintain a working roadway system." Defs.' MSJ Resp. at 18; *accord* Defs.' Amnd. ROG Ans. ¶ 10; *see also* Notice Resp. at 5 ("Megladon must, like its neighbors before it, dedicate the right-of-way for the road that is needed to accommodate its development."). That won't do. As Justice Gorsuch cogently observed just last Term:

> The Takings Clause . . . is no "poor relation to other constitutional rights." And the government rarely mitigates a constitutional problem by multiplying it. A governmentally imposed condition on the freedom of speech, the right to assemble, or the right to confront one's accuser, for example, is no more permissible when enforced against a large "class" of persons than it is when enforced against a "particular" group. If takings claims must receive "like treatment," whether the government owes just compensation for taking your property cannot depend on whether it has taken your neighbors' property too.

*Sheetz*, 601 U.S. at 283 (Gorsuch, J., concurring) (internal quotation omitted). This principle has been long established in Florida law as well. In *Lee County v. New Testament Baptist Church of Fort Myers, Fla., Inc.*, the Second District Court of Appeal held that a policy requiring "all property owners whose property abuts certain streets to give to the county the land necessary to meet the minimum right-of-way requirements established by the county . . . , *regardless of the size of the landowner's proposed development or the amount of traffic that development will generate*[,] . . . does not comply with the rational nexus test because it does not require any reasonable connection between the requirement that land be given to the county and the amount of increased traffic, if any, generated by the proposed development." 507 So. 2d 626, 629 (Fla. 2d DCA 1987) (emphasis added). We'll apply that rule here.

Absent "any individualized determination" as to the relationship between the dedication and Megladon's development, *Dolan*, 512 U.S. at 393, we're left only with Megladon's expert evidence that the impact of Megladon's development is "negligible." Mesimer Rpt. at 3. Because the Defendants have failed to introduce any evidence from which a reasonable jury could find that the dedication requirement is proportional to this *de minimis* harm, *cf. Koontz*, 570 U.S. at 605 (acknowledging that a dedication may be proper "[w]here a building proposal would *substantially* increase traffic congestion" (emphasis added)); *Amoco Oil Co. v. Vill. of Schaumburg*, 661 N.E.2d 380, 391 (Ill. Ct. App. 1995) (concluding that an exaction "on the basis of a *de minimis* increase in street traffic" didn't satisfy the "rough proportionality test for the Federal Constitution"), *cert. denied*, 519 U.S. 976 (1996), we conclude that the dedication requirement is an unconstitutional condition as a matter of law.

In a final effort to save their position, the Defendants contend that this dedication cannot amount to an unconstitutional condition because they offered Megladon "at least one alternative that would satisfy the essential nexus and rough proportionality test"—namely, "the option of seeking an exemption from the condition altogether by obtaining a variance from the County, which exercises jurisdiction over the requirement." Defs.' MSJ at 21 (quoting *Koontz*, 570 U.S. at 611). Those who have

been with us this far should be able to see two glaring problems with this one: the County *doesn't* have jurisdiction over the dedication, *see ante*, at 21–35, and Megladon *wasn't* required to pursue a variance from the County before challenging the dedication, *see ante*, at 35–42; *see also Megladon*, 661 F. Supp. 3d at 1235 ("Megladon . . . need not then exhaust (as the County seems to prefer) an endless stream of second- and third- or even fourth-level reviews."). If that weren't enough, the Village actually hasn't *offered* Megladon anything; the mere opportunity to apply for a variance certainly doesn't guarantee that Megladon would eventually receive "the governmental benefit that [it] was denied." *Koontz*, 570 U.S. at 611; *see also Broward County v. Patel*, 641 So. 2d 40, 44 (Fla. 1994) (finding "plain error" where "the fact finder . . . treated the future contingencies [of receiving variances] as though they were certain to occur"). And, on this record, we don't see how it could. *See, e.g.*, Ona Dep. at 198:16–21 ("Q. . . . [W]ould the County likely require some dedication on Megladon's part under -- under any circumstance? . . . A. . . . [Y]eah, yeah.").

Accordingly, we **GRANT** the Plaintiff's Motion for Partial Summary Judgment on the legal issue of whether the Village's dedication requirement is an unconstitutional condition in violation of the Fifth Amendment.

### b.  The Village's Liability

Having found (for summary-judgment purposes) that the Village's dedication requirement is unconstitutional, we now must assess the remedies that are available to Megladon. The Fifth Amendment "mandates a particular remedy—just compensation—only for *takings*." *Koontz*, 570 U.S. at 608. So, where (as here) "there is an excessive demand but no taking, whether money damages are available is not a question of federal constitutional law but of the cause of action—whether state or

federal—on which the landowner relies." *Ibid.* Megladon seeks damages, as well as prospective relief, under two distinct causes of action: FLA. STAT. § 70.45 (Count I); and 42 U.S.C § 1983 (Count IV).[15]

After *Koontz,* the Florida Legislature enacted § 70.45 to provide a state cause of action for damages and declaratory relief "against a prohibited exaction." STAFF OF THE FLA. HOUSE OF REPS., FINAL BILL ANALYSIS, H.B. 421, 2021 Reg. Sess., at 4 (July 7, 2021); *see also* FLA. STAT § 70.45(2) ("In addition to other remedies available in law or equity, a property owner may bring an action in a court of competent jurisdiction under this section to declare a prohibited exaction invalid and recover damages caused by a prohibited exaction."). Under that law, "the governmental entity has the burden of proving that the exaction has an essential nexus to a legitimate public purpose and is roughly proportionate to the impacts of the proposed use that the governmental entity is seeking to avoid, minimize, or mitigate." FLA. STAT. § 70.45(4). As we just found, the Village has failed to do that. *See ante,* at 49–55. *Provided* that Megladon can prove that this claim is ripe, therefore, it would be entitled to declaratory relief and an opportunity to prove any damages "that result[ed] from [the] prohibited exaction." FLA. STAT. § 70.45(4).

---

[15] In Count II, Megladon only seeks declaratory relief that the dedication requirement violates Article X, Section 6 of the Florida Constitution. SAC ¶ 136. "Florida's Declaratory Judgment Act . . . is a procedural mechanism [that] does not confer any substantive rights." *Coccaro v. GEICO Gen. Ins. Co.,* 648 F. App'x 876, 880–81 (11th Cir. 2016). Accordingly, federal courts sitting in diversity "construe claims brought under the Florida Declaratory Judgment Act as seeking relief under the federal Declaratory Judgment Act." *Gettings Prods., Inc. v. Ohio Sec. Ins. Co.,* 2020 WL 6437050, at *1 (M.D. Fla. July 7, 2020) (Mendoza, J.) (first quoting *Nationwide Ins. Co. of Am. v. Fla. Realty One, Inc.,* 2019 WL 5423339, at *2 n.2 (M.D. Fla. Oct. 22, 2019) (Chappell, J.); then citing *Goodbys Creek, LLC v. Arch Ins. Co.,* 2009 WL 10671130, at *2 (M.D. Fla. Aug. 11, 2009) (Howard, J.)). And, because remedies under the federal Declaratory Judgment Act also must be "tied to some other cause of action," *Kornegay v. Beretta USA Corp.,* 614 F. Supp. 3d 1029, 1037 (N.D. Ala. 2022) (cleaned up), Megladon's requested relief in Count II is contingent on whether it can prevail on another claim, *see Eveillard v. Nationstar Mortg. LLC,* 2015 WL 127893, at *9 (S.D Fla. Jan. 8, 2015) (Bloom, J.) ("Declaratory relief is a procedural device which depends on an underlying substantive cause of action and cannot stand on its own." (collecting cases)).

Likewise, Megladon's § 1983 claim seeks damages, injunctive, and declaratory relief. Because the unconstitutional-conditions claim in *Koontz* was brought only under Florida law, the Court declined to "decide whether federal law authorizes plaintiffs to recover damages for unconstitutional conditions claims predicated on the Takings Clause." *Koontz*, 570 U.S. at 610. But that certainly doesn't foreclose the remedy. As one treatise explains:

> While *Koontz* did not establish any remedy at law to recover damages for the unconstitutional conditions violation in that case, 42 U.S.C. § 1983 provides an alternative claim that may allow for the recovery of money damages. The cause of action cannot be for a taking, since no actual taking has occurred, but for a violation of the Fifth Amendment's right, implied by *Koontz*, not have one's property "impermissibly burdened." Section 1983 authorizes suits at law and in equity. Under a 42 U.S.C. § 1983 claim, the remedy might be money damages for loss of use of the property from the time the government demanded the mitigation fee until, should it occur, the state court's finding on remand that *Nollan/Dolan* were violated.

161 AM. JUR. PROOF OF FACTS 233 § 15 (3d ed. 2017) (cleaned up). Fortunately, we needn't wade deeply into this question since "the parties here have litigated on the assumption" that § 1983 allows a plaintiff to recover damages for an unconstitutional-conditions claim based in federal law. *Usme v. CMI Leisure Mgmt., Inc.*, 106 F.4th 1079, 1087 (11th Cir. 2024); *see also Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[F]ailure to make arguments and cite authorities in support of an issue [forfeits] it."); *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) ("[I]t is inappropriate for a court to raise an issue *sua sponte* in most situations.").

But the parties disagree about what exactly Megladon must show to establish the Village's § 1983 liability—specifically,  whether Megladon's § 1983 claim against the Village should be assessed under the *Monell* standard for municipal liability. *See* Defs.' MSJ at 17–19; Pls.' MSJ Resp. at 16–20. It has been blackletter law for nearly fifty years that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Rather, a municipality will be liable only if "'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by

that body's officers' and when constitutional deprivations result from 'governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.'" *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 997 (11th Cir. 1990) (quoting *Monell*, 436 U.S. at 690–91).

Megladon, however, asks us to ignore this "axiomatic" doctrine of public-law litigation. *See Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990) (collecting cases). In its view, no *Monell* analysis is required because the Supreme Court, through "*Lingle* [*v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005)], *Nollan*, *Dolan*, *Koontz*, and their progeny," has "developed a special application of the unconstitutional conditions doctrine to address a core concern about agency leveraging, whether brought about by legislative edict or adjudicative or *ad hoc* administrative action." Pl.'s MSJ Resp. at 16. Megladon would have us carve out a special exception for land-condition cases from the general, and unwavering, rule that "[m]unicipal liability under § 1983 is incurred *only* where" the injurious act is taken "'by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Owens v. Fulton County*, 877 F.2d 947, 949–50 (11th Cir. 1989) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986)). We won't be doing that.

As the Defendants rightly highlight, none of the cases Megladon relies on presented a situation in which the governmental entity's liability was at issue, *either* because the condition was imposed pursuant to an official policy *or* because the plaintiffs didn't challenge the relevant governmental commission's final decision-making authority. *See* Defs.' Reply at 9–10 (first citing *Lingle*, 544 U.S. at 533 (challenging statute); then citing *Nollan*, 483 U.S. at 829 (not challenging decisionmaker's final authority); then citing *Dolan*, 512 U.S. at 378–80 (same); and then citing *Koontz*, 570 U.S. at 600 (same)); *see also Watts v. BellSouth Telecomms., Inc.*, 316 F.3d 1203, 1207 (11th Cir. 2003) ("[J]udicial decisions cannot make law beyond the facts of the cases in which those decisions are announced."). Here, by contrast, we're faced with a decision made by an official who was ostensibly "act[ing] on behalf of the

municipality." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). As it always does, then, *Monell* governs our assessment of whether the municipality can be held responsible for those acts.

"A plaintiff can establish municipal liability under *Monell* in three ways: (1) identifying an official policy; (2) identifying an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of law; or (3) identifying a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights." *Chabad Chayil v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1229 (11th Cir. 2022) (citing *Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 966–68 (11th Cir. 2002)). Because "there is no provision in the Village Comprehensive Plan or the Village Code requiring dedication of land from properties that are being developed with one-single-family home that are not being subdivided," Defs.' SOF ¶ 52; *see* Pl.'s Resp. SOF ¶ 52 ("Undisputed."), we'll consider only the second and third avenues of liability.[16]

---

[16] To prevail on the "official policy" theory of liability, a plaintiff must first "identify[ ] an official policy," *Malone v. Johnson*, 667 F. Supp. 3d 1257, 1273 (N.D. Ga. 2023) (quoting *Chabad Chayil*, 48 F.4th at 1229), such as a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," *Monell*, 436 U.S. at 690. Megladon doesn't cite any provisions of the Village Code requiring dedication—and it even concedes that no part of the Village Code is applicable here. *See* Pl.'s Resp. SOF ¶ 52. Still, Megladon refers in passing to an email between Olmsted and Pino, in which Olmsted told Pino that "[t]he Village also requires a minimum of 50 feet of right-of-way for local roads, consistent with County requirements[.]" Pl.'s SOF ¶ 27 (first citing Ex. 9 to Olmsted Dep.; and then citing JSOUF ¶ 23). But, as Olmsted clarified in his deposition, he wasn't referring to a *written* requirement. *See* Olmsted Dep. at 109:8–110:3 ("Q. Your email says, The Village also requires a minimum of 50 feet right-of-way for local roads. Do you see that? A. Well, understanding that that's the County's requirement, then we -- we try to enforce that. . . . Q. So when you testified earlier that the Village does not have requirements regarding minimum right-of-way, that was not true, was it? . . . . A. No, it is true. I am not aware of specific right-of-way requirements, other than what's in the County code."). Nor could he have been, since "there is no provision in the Village Comprehensive Plan or the Village Code requiring dedication of land from properties that are being developed with one-single-family home that are not being subdivided." Defs.' SOF ¶ 52; *see also* Pl.'s Resp. SOF ¶ 52 ("Undisputed."); *see generally* VILL. OF PINECREST, FLA., CODE OF ORDINANCES. Olmsted's mistaken view, then, is nothing more than a "mere . . . scintilla of evidence" that creates no genuine dispute of fact on this issue. *Anderson*, 477 U.S. at 252.

For a municipality to be liable for its unwritten practices, a plaintiff must "prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law[.]'" *Bannum*, 901 F.2d at 998 (cleaned up) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion)); *see also Mandel v. Doe*, 888 F.2d 783, 792 (11th Cir. 1989) ("[I]n cases involving unconstitutional acts of low-level municipal employees, the plaintiff may prove custom or policy by showing a pattern of unconstitutional acts."). To meet that burden, the plaintiff must establish that "final policymakers have acquiesced in a longstanding practice that constitutes the entity's standard operating procedure." *Hoefling v. City of Miami*, 811 F.3d 1271, 1280 (11th Cir. 2016) (first citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997); and then citing *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1481 n.11 (11th Cir. 1991)). "In other words, a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Brown*, 923 F.2d at 1481.

At the outset, then, we must first determine *who* is the Village's final policymaker with respect to the dedication. *See Morro v. City of Birmingham*, 117 F.3d 508, 518 (11th Cir. 1997) ("[T]he Supreme Court has made plain that the question of whether [a municipal official] is a final policymaker is a legal question for the court, not the jury." (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989))). The Defendants posit that Olmsted cannot be the final policymaker on this subject because his decisions "are subject to review by the Village Council." Defs.' MSJ at 18 (citing Defs.' SOF ¶¶ 52–53). We agree. The Eleventh Circuit has "consistently recognized and given effect to the principle that a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review." *Carter v. City of Melbourne*, 731 F.3d 1161, 1167 (11th Cir. 2013) (citing *Morro*, 117 F.3d at 514). And the Village Code explicitly empowers the Village Council to "[h]ear and decide appeals with regard to administrative

interpretations or decisions" on land development. VILL. OF PINECREST, FLA., CODE OF ORDINANCES ch. 30, art. 2, div. 2.1(*l*). The Village Council therefore "possesses the authority and responsibility for establishing final policy with respect to the issue in question." *Mandel*, 888 F.2d at 793 (cleaned up).[17]

To survive summary judgment on this theory, therefore, Megladon must offer competent evidence from which a reasonably jury could infer *both* that the Village had a "widespread practice" of conditioning permitting on land dedications *and* that the Village Council "must have known about [this practice] but failed to stop it." *Brown*, 923 F.2d at 1481. We think that Megladon has done that here.

For starters, it's undisputed that the County "regularly" requires right-of-way dedications. Miami-Dade County, Fla., Resolution No. R-139-22 (Feb. 1, 2022) [ECF No. 171-21] at 3; *see also* Ona Dep. at 63:1–2 ("Yes, the *normal* dedication required for a local road is 50 feet, okay." (emphasis added)); Defs.' SOF ¶ 14 ("Miami-Dade County routinely accepts dedications of land in incorporated cities to meet right-of-way standards." (first citing Ona Dep. at 222:1–7; and then citing Miami-Dade County, Fla., Resolution Accepting Rights-of-Way (July 7, 2022) [ECF No. 171-6] at 3–4, 13, 22, 30, 39)). In turn, the evidence suggests that the Village Planning Division's rank-and-file *both* believed that the County had implemented widespread dedication requirements *and* routinely implemented them. *See, e.g.*, Olmsted Statement ¶ 37 ("[T]he County has always required dedication to meet their minimum right-of-way widths, and we are required to coordinate with other governmental entities."); *id.* ¶ 15

---

[17] This doesn't alter our earlier conclusion that Olmsted is a final *decisionmaker* for ripeness purposes. The Eleventh Circuit has explicitly warned us not to conflate these two concepts. *See Quinn v. Monroe County*, 330 F.3d 1320, 1328 (11th Cir. 2003) ("The district court's conflation of the 'final policymaker' and 'decisionmaker' inquiries would lead to untenable legal consequences."). And for good reason. Olmsted is not a final policymaker as to dedications because his decisions are "subject to meaningful administrative review" by the Village Council. *Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997). But his decision to impose the dedication remains sufficient to ripen Megladon's claims because Megladon wasn't required, before filing this lawsuit, to appeal to the Village Council, which is "empowered, at most, to review that rejection, not to participate in [Olmsted]'s decisionmaking[.]" *Williamson County*, 473 U.S. at 193.

61

(noting that, in his thirteen years as Planning Director, Olmsted's "practice" has been to go to "the County when there is a question concerning matters over which the County asserts jurisdiction, such as the dedication of right-of-way on substandard roads"); Janisse Decl. ¶ 9 ("I assumed, at the time, that 15 feet of additional right-of-way was needed to bring the existing 35-foot roadway up to a standard 50-foot width, and that half of that right-of-way (7.5 feet) would have to be dedicated by Megladon . . . I assumed this because generally speaking, when the County requires dedication in order to meet standard street widths, the property owners on either side of the street dedicate half of the required width."). We think a reasonable jury could infer—from this evidence of the Planning Department's unwavering insistence on dedication as a condition for the building—that this practice had become the "standard operating procedure" for the Village. *Hoefling*, 811 F.3d at 1280.

So too could a jury find that the Village Council—*i.e.*, the "final decisionmaker"—has "acquiesced" in, if not outrightly endorsed, that practice. *Ibid.* That's because Megladon has adduced evidence for its view that requiring dedication is the standard policy of the Village *as such. See* Ex. 9 to Olmsted Dep. at 1 (noting that it has "always been *the Village's* policy to require dedication of right-of-way in instances where existing right-of-way is substandard" (emphasis added)); Olmsted Dep. at 63:1–3 ("It's *the Village's policy* to require dedication of right-of-way if required by Miami-Dade County, for sure." (emphasis added)); Olmsted Statement ¶ 14 ("[T]he *Village* has always believed that the County does, retain jurisdiction over local roads and rights-of way within the areas of the County that have been incorporated into cities, such as the Village." (emphasis added)); Kerbal Email at 6 ("*Pinecrest* believes that the County has jurisdiction over right-of-way widths in the incorporated and unincorporated areas per the Miami-Dade County public works manual." (emphasis added)). Since the Village Council is the authority empowered to make final policy as to "administrative . . . decisions" on land development, VILL. OF PINECREST, FLA., CODE OF ORDINANCES ch. 30, art. 2, div. 2.1(*l*), we

don't think it's unreasonable to infer that the referenced "Village policy" on that subject refers to the policy *of the Village Council.*

In reply, the Defendants accuse Megladon of trying to "have it both ways: either the Village was enforcing a County requirement, or Olmsted unilaterally imposed a requirement that is not provided for in the Village code." Defs.' Reply at 10. This is a false dichotomy. Although the County, *in fact*, doesn't have jurisdiction over right-of-way dedications in Pinecrest, the Village "always believed" that the County had jurisdiction and enforced the (supposed) dedication requirement accordingly. Olmsted Dep. ¶ 37. That the Village *thought* it was following the orders of the County doesn't shield it from liability for its own unconstitutional practices. *See Cooper v. Dillon*, 403 F.3d 1208, 1223 (11th Cir. 2005) (finding municipality liable where official "was clothed with final policymaking authority for law enforcement matters in [the municipality] and in this capacity he chose to enforce [an unconstitutional state] statute"). It also makes no difference that this practice isn't codified—that's the whole point of allowing *Monell* liability based on a custom. *See Monell*, 436 U.S. at 690–91 (noting that liability attaches "even though such a custom has not received formal approval through the body's official decisionmaking channels").

This is not to say, however, that Megladon has left no triable issue of fact as to the Village's (alleged) complicity in perpetuating this practice. We still know relatively little about the role the Village Council has historically played in the dedication process, and we know virtually nothing about the extent to which it has affirmatively sanctioned prior dedications. It may very well be that Olmsted and his subordinates have flown under the radar in implementing the County's (extra-jurisdictional) will by requiring dedications without triggering the ire or notice of the Village Council. Put another way, the Planning Department's conception of "the Village's policy" might not extend beyond the Planning Department. Olmsted Dep. at 63:1–3. Since both parties have moved for summary judgment on the Village's § 1983 liability, *see* Pl.'s MSJ at 18–24; Defs.' MSJ at 17–19, we must view the evidence "in

the light most favorable to the non-moving party on each motion," *Chavez v. Mercantil Commercebank,*
*N.A.*, 701 F.3d 896, 899 (11th Cir. 2012) (cleaned up); *see also Horowitz v. Allied Marine, Inc.*, 2023 WL
3568113, at *5 (S.D. Fla. May 19, 2023) (Altman, J.) ("In other words, we must consider each motion
on its own merits, resolving all reasonable inferences *against* the party whose motion is under
consideration." (citing *Am. Bankers*, 408 at 1331)). Having applied that standard here, we believe that
these competing inferences about the Village Council's involvement in perpetuating the dedication
requirement create a genuine dispute of fact on the question of whether the Village is liable under a
"custom" theory of *Monell* liability. *See Sconiers*, 946 F.3d at 1263 ("[I]f a reasonable jury could make
more than one inference from the facts, and one of those permissible inferences creates a genuine
issue of material fact, a court cannot grant summary judgment." (cleaned up)).

We can't say the same, however, for Megladon's ratification theory. A "municipality can be
held liable 'on the basis of ratification when a subordinate public official makes an unconstitutional
decision and when that decision is then adopted by someone who does have final policymaking
authority.'" *Hoefling*, 811 F.3d at 1279 (quoting *Matthews v. Columbia County*, 294 F.3d 1294, 1297 (11th
Cir. 2002)). To prevail under this theory, a plaintiff "must demonstrate that local government
policymakers had an opportunity to review the subordinate's decision and agreed with both the
decision and the decision's basis." *Garvie v. City of Ft. Walton Beach*, 366 F.3d 1186, 1189 (11th Cir.
2004) (cleaned up); *see also Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) ("Ratification
of a subordinate's action requires more than acquiescence—it requires affirmative approval of a
particular decision made by a subordinate." (citing *Praprotnik*, 485 U.S. at 130)); *Richardson v. Quitman*
*County*, 912 F. Supp. 2d 1354, 1368 (M.D. Ga. 2012) (noting that the subordinate's "acts [must be]
officially 'sanctioned or ordered' by the municipality through some body or official with 'final
policymaking authority'" (quoting *Praprotnik*, 485 U.S. at 123)).

Megladon has failed to rebut the Defendants' evidence that Megladon never "appealed the administrative determination concerning dedication to the Village Council." Olmsted Statement ¶ 41. Instead, Megladon cites evidence of the Village Manager's position, *see* Pl.'s MSJ Resp. at 18 (citing Ex. 2 to Olmsted Dep. at 369 ("If [SW 77th Ave.] is substandard, then we would require dedication to correct that issue.")), and "the Village's institutional position" in general, Pl.'s MSJ Resp. at 18 (first citing Olmsted Statement ¶¶ 14–15; and then citing Olmsted Dep. at 34:15–36:5, 52:2–63:14); *see, e.g.,* Olmsted Statement ¶ 14 ("I contacted Mr. Pino because Miami-Dade County claims to, and the Village has always believed that the County does, retain jurisdiction over local roads and rights-of way within the areas of the County that have been incorporated into cities, such as the Village[.]"); Olmsted Dep. at 56:20–23 ("'[T]he [Village's] comprehensive plan certainly includes policies that require coordination with other review agencies, intergovernmental coordination, with Miami-Dade County[.]"). But the Village Manager isn't a *final* policymaker on this issue either, since the Village Council has the power to review any "decision" regarding land development. VILL. OF PINECREST, FLA., CODE OF ORDINANCES ch. 30, art. 2, div. 2.1(*l*); *see also Mandel*, 888 F.2d at 792 ("'[D]elegation must be such that the subordinate's discretionary decisions are not constrained by official policies and are not subject to review." (citing *Praprotnik*, 485 U.S. at 125–28)).

And, while evidence of the Village's general approach to land dedications may reasonably suggest an authorized *custom*, it tells us nothing about whether the Village Council—in this particular case—"knew about [Olmsted's] decision[ ], understood the unconstitutional basis for th[at] decision[,] and ratified [it] anyway." *625 Fusion, LLC v. City of Fort Lauderdale*, 526 F. Supp. 3d 1253, 1262 (S.D. Fla. 2021) (Altman, J.); *see also Salvato v. Miley*, 790 F.3d 1286, 1296 (11th Cir. 2015) (noting that the plaintiff must "demonstrate that local government [final] policymakers had an opportunity to review the subordinate's decision" (cleaned up)). On this record, we can only conclude that the Village Council never "officially" did. *Quitman County*, 912 F. Supp. 2d at 1368. So, while Megladon may

continue to pursue municipal liability at trial based on the Village's customs, its ratification theory must end here.

Although Megladon has shown for purposes of summary judgment that the Village's land-dedication requirement is an unconstitutional condition as a matter of law, it would be premature for us to grant Megladon prospective relief or damages against the Village under § 1983 until Megladon has satisfied *Monell*. *See L.A. County v. Humphries*, 562 U.S. 29, 37 (2010) ("*Monell*'s 'policy or custom' requirement applies in § 1983 cases irrespective of whether the relief sought is monetary or prospective."). And, because a genuine dispute of material fact remains regarding the Village Council's role in perpetuating that practice, we'll **DENY** both parties' motions as to the Village's municipal liability under § 1983 and leave that issue for trial as well.

\* \* \*

Two questions of fact thus remain: (1) the date on which the Village made its final decision to impose the dedication; and (2) the extent of the Village Council's involvement in perpetuating the Village's custom of requiring dedication. The first issue is dispositive of Megladon's claim under FLA. STAT. § 70.45, and the second is dispositive of Megladon's claim under § 1983. At trial, the parties may present evidence on these questions of fact. The parties may also offer evidence about the extent of Megladon's alleged damages.

### CONCLUSION

After careful review, therefore, we hereby **ORDER and ADJUDGE** as follows:

1. The Defendants' Motion for Summary Judgment [ECF No. 170] is **DENIED**.

2. The Plaintiff's Motion for Partial Summary Judgment [ECF No. 172] is **GRANTED in part and DENIED in part**.

   a. The Motion is **GRANTED** on Miami-Dade County's lack of authority, the ripeness of the Plaintiff's claims, and the unconstitutionality of the dedication requirement.

   b.   The Motion is **DENIED** on the timeliness of Count I and the Village's liability under

        § 1983.

3.   The Plaintiff's Objection [ECF No. 212] is **DENIED as moot**.

4.   Pursuant to Federal Rule of Civil Procedure 21, Defendant Miami-Dade County is

     **DISMISSED** from this case.

5.   The Clerk shall **REOPEN** this case.

6.   By June 11, 2025, the parties shall submit an Amended Joint Scheduling Report, proposing

     dates for all remaining pre-trial deadlines and trial.

**DONE AND ORDERED** in the Southern District of Florida on May 28, 2025.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**


cc: counsel of record