**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-cv-22819-ALTMAN/Reid**

**MEGLADON, INC.**,

*Plaintiff*,

*v.*

**VILLAGE OF PINECREST**,

*Defendant*.
______________________________________/

## ORDER

After our jury rendered its verdict in this case, *see* Jury Verdict [ECF No. 315], we entered final judgment in favor of the Defendant—the Village of Pinecrest (the "Village")—as to Count I of the Second Amended Complaint (the "SAC") [ECF No. 77]. *See* Final Judgment [ECF No. 325]. We also entered judgment for the Plaintiff, Megladon, Inc. ("Megladon"), as to Counts II and IV of the SAC, awarding Megladon $409,437.50 in damages. *See ibid.*; *see also* Order Denying Renewed Motion for Judgment as a Matter of Law [ECF No. 364]; Order on Costs [ECF No. 365]. Pursuant to 42 U.S.C. § 1988, Megladon now seeks $2,713,258 in attorney's fees and $112,414.70 in non-taxable costs. *See* Verified Motion for Award of Attorney's Fees and Non-Taxable Costs (the "Motion") [ECF No. 349]. After careful review, we **GRANT in part** and **DENY in part** the Motion and award $1,618,381.18 in attorney's fees.

## THE LAW

"Title 42 U.S.C. § 1988 provides that in federal civil rights actions 'the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." *Hensley v. Eckerhart*, 461 U.S. 424, 426 (1983) (quoting § 1988). "The purpose of § 1988 is to ensure effective access to the judicial process for persons with civil rights grievances." *Ibid.* (cleaned

up). "The starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008) (cleaned up). "The product of these two figures is the lodestar and there is a strong presumption that the lodestar is the reasonable sum the attorneys deserve." *Ibid.* (cleaned up). "This 'lodestar' may then be adjusted for the results obtained." *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994). "There is no precise rule or formula for making these attorney's fees reduction determinations," so a "court necessarily has discretion in making this equitable judgment." *Cornelius v. Rollins Ranches, LLC*, 2026 WL 1481196, at *3 (11th Cir. May 27, 2026) (cleaned up); *see also Barker v. WBY, Inc.*, 2025 WL 2427598, at *3 (11th Cir. Aug. 22, 2025) ("Because fee and cost awards are essentially factual in nature, the district court's superior understanding of the litigation places it in the best position to calculate an award.").

## ANALYSIS

Megladon seeks $2,713,258 in attorney's fees "based on 3,588.2 combined hours expended by attorneys and paralegals through June 15, 2026[,] at current 2026 rates or application of a contingent risk multiplier to historic rates." Motion at 3. It also seeks to recover $112,414.70 in non-taxable costs, representing $82,827.65 in "expert fees" and $29,587.05 for "other costs that are 'non-taxable' under Rule 54 and 42 U.S.C. § 1920." *Ibid.* Although it "concedes that it is not the prevailing party in this action," the Village argues that "Megladon's fee application is grossly excessive, especially when compared to the amount sought and the results achieved." Response in Opposition to the Motion (the "Response") [ECF No. 352] at 2; *see also ibid.* ("Megladon seeks recovery of attorneys' fees that are seven times greater than the award it obtained and ignores the fact that it did not prevail on its state law exaction claim. This award is disproportionate on its face and the reason for the disproportionality is clear upon review of Megladon's time."). It thus asks that we reduce the award to $586,145.40—"and possibly even further based on the minimal results achieved." *Id.* at 3.

To that end, the Village offers four main objections to the Motion. *First*, it challenges the rates of the attorney's fees. *Second*, it takes issue with a range of time entries and billing practices. *Third*, the Village requests a reduction of the lodestar on the basis that "the results obtained by Megladon were minimal in comparison to the relief sought." *Id.* at 20. And *fourth*, it contests Megladon's ability to recover the non-taxable costs at issue. We consider each objection in turn.

## I. The Objections to the Attorney's Fees

The Village opens by contending that "Megladon's requested fee award essentially seeks an excessive windfall for Plaintiffs' counsel[.]" *Id.* at 4. It insists that "[t]he hourly rate charged by Megladon's attorneys, paralegals, and support staff are excessive when compared to those in typical civil rights cases and should be reduced[.]" *Id.* at 5. We largely disagree—with a few exceptions.

Megladon seeks to recover fees for nine timekeepers. Six are attorneys: Amy Brigham Boulris, Timothy J. McGinn, Teresa Muniz, Jenelly Perez, Becky N. Saka, and Lawrence Horsburgh. *See* Motion at 4. Two are paralegals: Gina Wilkerson and Patricia Cohen. *See ibid.* And one timekeeper—Frederick Owens—is a "litigation support and electronic exhibit coordinator." *Ibid.* As summarized in the chart below, the Village "objects to all hourly rates proposed by [Megladon]," Response at 7, and counters with the following proposal:

| Name | Position | Hours Billed | Rate Sought by Megladon | Rate Sought by the Village |
|---|---|---|---|---|
| Boulris | Shareholder | 910.2 | $975 | $600 |
| McGinn | Shareholder | 1,320.1 | $850 | $460 |
| Muniz | Associate | 265.5 | $500 | $290 |
| Perez | Associate | 233.9 | $510 | $275 |
| Saka | Associate | 39.8 | $600 | $350 |
| Horsburgh | Counsel | 128.6 | $755 | $350 |
| Wilkerson | Paralegal | 473 | $440 | $150 |
| Cohen | Paralegal | 34.4 | $390 | $125 |
| Owens | Coordinator | 182.7 | $600 | $200 |

"[D]etermining an appropriate 'market rate' for the services of a lawyer is inherently difficult." *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984). "To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Ibid.* "A court, however, is itself an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value." *Loranger*, 10 F.3d at 781 (cleaned up). And, given the importance of this case, the results achieved, and the "skills, experience, and reputation" of the timekeepers, we find that the requested hourly rates here are reasonable.

We'll start with seniority. Boulris "has practiced law for 37 years" and is a "shareholder" at her firm. Motion at 4. McGinn—who graduated from law school in 2009 and served as "first chair at

trial"—is a "shareholder" at his firm," a "seasoned constitutional litigator," and a "frequent speaker on First Amendment issues." *Id.* at 4–5. Horsburgh serves as "of counsel" to his firm, graduated law school in 2010, and has worked on "billion-dollar trials." Exhibit C [ECF No. 349-3] at 14. Our District has awarded fees within this range to attorneys with similar expertise. *See, e.g.*, *CITGO Petroleum Corp. v. Petroleum Logistics Serv. USA, Inc.*, 2022 WL 17716483, at *1 (S.D. Fla. Dec. 15, 2022) (Altman, J.) (adopting an hourly rate of $850 for partners at Willkie Farr & Gallagher LLP and at Jones Day); *Glob. Digital Sols., Inc. v. Grupo Rontan Electro Metalurgica, S.A.*, 2021 WL 7630524, at *2 (S.D. Fla. Aug. 16, 2021) (Middlebrooks, J.) (awarding an hourly rate of $820 for an "excellent" Boies Schiller Flexner LLP attorney); *Circuitronix, LLC v. Shenzhen Kinwong Elec. Co.*, 2020 WL 9458712, at *1 (S.D. Fla. Mar. 17, 2020) (Ungaro, J.) (adopting award of an hourly rate of $889.26 for a Shanghai-based attorney and of $787.50 for a Carlton Fields, P.A. partner); *Finkelstein v. Mount Sinai Med. Ctr. of Fla., Inc.*, 2025 WL 3280340, at *14 (S.D. Fla. Nov. 25, 2025) (Altman, J.) (awarding hourly rate of $850 for partners at LashGoldberg and Kramer Levin Naftalis & Frankel LLP).

We also (mostly) approve of the rates billed by the associates. Saka graduated from law school in 2018, completed an appellate clerkship, and serves "as the primary drafter of appellate briefs and petitions." Exhibit C at 12. Muniz graduated as "salutatorian" of her law-school class in 2022, *id.* at 10, and Perez graduated from law school in 2024, *see id.* at 11. We notice, however, that Perez's rate exceeds Muniz's, even though Perez appears to have fewer years of experience. *See* Exhibit F [ECF No. 349-6]. Megladon never explains this discrepancy. And Exhibit F lists Perez's 2025 rate as $460, lists Muniz's 2025 rate as $435, and *doesn't* list a 2026 rate for Muniz. Because of those irregularities, we'll readjust Muniz's rate to $435 and Perez's to $350. *See Collazo v. Progressive Select Ins. Co.*, 2025 WL 2816883, at *7 (S.D. Fla. Aug. 11, 2025) (Louis, Mag. J.), *report and recommendation adopted*, 2025 WL 2816881 (S.D. Fla. Aug. 26, 2025) ("A rate of $300.00 is consistent with rates for *newly licensed attorneys* previously approved in this Court." (emphasis added)). And we'll note that the associate rates

requested here pale in comparison to rates awarded in recent years to associates at "elite" law firms. *Noto v. Al Muhairi*, 2026 WL 2190551, at *6 (S.D.N.Y. May 13, 2026), *report and recommendation adopted sub nom. Noto v. Muhairi*, 2026 WL 2187335 (S.D.N.Y. July 29, 2026); *see also Oakley v. MSG Networks, Inc.*, 2025 WL 3041936, at *7 (S.D.N.Y. Oct. 31, 2025) (awarding rates of up to $1,135 for King & Spalding LLP associates); *Adstra, LLC v. Kinesso, LLC*, 2025 WL 1070034, at *7 (S.D.N.Y. Apr. 9, 2025) (approving hourly rates of between $554 to $883 for Greenberg Traurig, LLP associates); *Zama Cap. Advisors LP & Zama Cap. Strategy Advisors LP v. Universal Ent. Corp.*, 2025 WL 3525044, at *7 (S.D.N.Y. Dec. 9, 2025) (approving hourly rates for Milbank LLP associates ranging from $716 to $1,168). As emphasized above and below, the changing winds in the South Florida legal market mean that firms here *can*—and *do*—charge top-market rates. Pretending otherwise closes the Court's eyes to the on-the-ground reality of our District. After all, "[t]he reasonable hourly rate is the rate a paying client would be willing to pay." *Moore v. Rubin*, 190 F.4th 138, 142 (2d Cir. 2026).

That brings us to the paralegals and support staff. Here, we'll make some further reductions. Exhibit C makes no mention of Cohen, and the Motion itself contains only bare-boned details of her background, neglecting (among other things) to state the number of years for which Cohen has served in her role. We thus lack sufficient information with which to review Cohen's billing rate. What's more, although Megladon tells us that Owens graduated from law school in 2004, "coordinates ESI handling with clients," and has "over 25 years of experience," Exhibit C at 15, and that Wilkerson "handles all aspects of discovery" and has "more than 20 years of experience," *id.* at 18, it doesn't offer *any* argument (or caselaw) supporting their requested rates. We'll thus reduce Wilkerson's hourly rate to $150, Cohen's to $125, and Owens's to $200. *See, e.g.*, *Global Approach, Inc. v. Scottsdale Insurance Co.*, 2026 WL 3086256, at *4 (S.D. Fla. Sept. 29, 2026) (Hernandez, Mag. J.) (discussing "the $100 to $150 range courts in this District have found appropriate for paralegals"); *see also Oakley*, 2025 WL 3041936, at *7 (awarding an hourly rate of $200 for legal-support professionals).

Other factors the Old Fifth Circuit outlined in its seminal case, *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714 (5th Cir. 1974), support our conclusions. *See Mallory v. Harkness*, 923 F. Supp. 1546, 1555 (S.D. Fla. 1996) (Ryskamp, J.) ("In *Johnson,* the Fifth Circuit Court of Appeals adopted a twelve-factor test taken from the American Bar Association Code of Professional Responsibility, Disciplinary Rule 2–106, for determining a reasonable fee award under Section 1988."). Our case presented novel legal questions that pushed at the boundaries of Supreme Court doctrine and that demanded intensive time commitments and work product. *See Johnson*, 488 F.2d at 718 (5th Cir. 1974) ("Cases of first impression generally require more time and effort on the attorney's part."). Megladon's attorneys, as noted above, have significant litigation experience and have successfully navigated a challenging case—spanning *five* years and culminating in a jury trial—that featured complicated issues involving constitutional law, civil procedure, jurisdiction, statutory interpretation, ripeness, and *Monell* liability. *See, e.g.*, *Megladon, Inc. v. Vill. of Pinecrest*, 2025 WL 1517181 (S.D. Fla. May 28, 2025). Those attorneys incurred significant risks in taking on the case. *See* Motion at 3–4 (explaining that, in April 2022, Gunster reworked the engagement into a "quasi-contingent arrangement" under which any fees beyond "$160,000" would be "contingent on prevailing and securing a payment under applicable fee-shifting statutes"); *Herrera v. APQ Coconut Grove FL, LLC*, 794 F. Supp. 3d 1280, 1296 (S.D. Fla. 2025) (Becerra, J.) ("It has been recognized that civil rights plaintiffs' work is oftentimes undesirable, and that plaintiffs' attorneys are economically impacted by their decision to help the civil rights litigant."). Plus, the outcome achieved at trial scores Megladon a significant victory, contributes to the development of an important and burgeoning area of constitutional law, and has the potential to affect the rights (and lives) of an untold number of citizens across our country. *See City of Riverside v. Rivera*, 477 U.S. 561, 574 (1986) ("Unlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms."); *Villano v.*

*City of Boynton Beach*, 254 F.3d 1302, 1306 (11th Cir. 2001) ("[S]uccessful civil rights actions vindicate a public interest[.]").[1]

Judges across our District have recognized that "the South Florida legal market has changed drastically in the last several years"—and that "Miami in particular has developed into a national legal market" in which "top-end firms will be able to charge national hourly rates[.]" *United States Sugar Corp. v. Com. & Indus. Ins. Co.*, 2023 WL 4953191, at *7 (S.D. Fla. Aug. 3, 2023) (Scola, J.); *see also Mt. Hawley Ins. Co. v. H&M Builders, LLC*, 2026 WL 1470224, at *6 (S.D. Fla. Mar. 29, 2026) (Moore, J.) ("[T]he legal market in South Florida, and in Miami in particular, has continued to change drastically." (cleaned up)); *FTC v. Click Profit, LLC*, 2025 WL 2256563, at *3 (S.D. Fla. June 16, 2025) (Leibowitz, J.) ("[R]ates requested by highly experienced legal counsel in South Florida are not unreasonable in light of new prevailing rates for attorneys in South Florida."); *R.R. v. Motel 6 Operating L.P.*, 2026 WL 2001826, at *1 (S.D. Fla. June 5, 2026) (Middlebrooks, J.) ("[T]he South Florida market has evolved[.]"); *Soc. Life Network, Inc. v. Peak One Opportunity Fund, L.P.*, 2023 WL 5053985, at *6 (S.D. Fla. July 20, 2023) (Reid, Mag. J.), *report and recommendation adopted*, 2023 WL 5036606 (S.D. Fla. Aug. 8, 2023) ("It would be naïve to cling to our old finding of what a maximum reasonable hourly rate

[1] To be clear, we see no issue with using Gunster's 2026 rates. This case took a half decade to litigate, and we cannot say that Megladon caused the bulk of those delays. *See Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1302 (11th Cir. 1988) ("[W]here there is a delay the court should take into account the time value of money and the effects of inflation and generally award compensation at current rates rather than at historic rates."); *see also Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690, 49 L. Ed. 2d 547 (1976) (noting that the "loss" of constitutional "freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). Plus, "trial courts need not, and indeed should not, become green-eyeshade accountants" and should instead aim for "rough justice," not "auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011). In any event, as detailed throughout this Order, we impose reductions where appropriate. And we'll reemphasize both "the public benefit flowing from [Megladon's] victory," *Popham v. City of Kennesaw*, 820 F.2d 1570, 1580 (11th Cir. 1987), and the sophistication of the subject matter at issue. "It takes more time and effort to stalk beasts in the backwoods than it does to shoot fish in a barrel," *Glassroth v. Moore*, 347 F.3d 916, 920 (11th Cir. 2003), and this case—as its name suggests—bears a stronger resemblance to a predatory shark than a barrel-bound fish.

was then given the number of large market firms that have relocated to Miami, the global increase in legal professionals in the market, and the amount of litigation that is filed in our District."). We see no reason to break with that chorus.[2] In sum, then, we award the following rates:[3]

---

[2] Lifting an analogy used by Magistrate Judge Torres back in 2011, the Village argues that "Megladon seeks Ferrari or McClaren rates" but "is only entitled to the rates of a reasonable Ford Fusion." Response at 4; *see also Hermosilla v. Coca-Cola Co.*, 2011 WL 9364952, at *10 (S.D. Fla. July 15, 2011), *subsequently aff'd*, 492 F. App'x 73 (11th Cir. 2012) ("[O]ne can drive from point A to point B in a Ferrari, a BMW, or a Ford Fusion. Which car one chooses is ordinarily a matter of personal style coupled with financial freedom. The successful personal injury or criminal defense lawyer may choose the Ferrari. The average corporate defense lawyer will wisely choose the BMW. But a successful attorney fee applicant can only choose the Ford Fusion."). That analogy proves increasingly obsolete as the legal market in South Florida evolves. In any event, the Village's argument ignores the reality that firms of *any* size can achieve the results of a Ferrari or McClaren. *See LA Int'l Corp. v. Prestige Brands Holdings, Inc.*, 168 F.4th 608, 626 (9th Cir. 2026) ("A firm's small size should not automatically result in its attorneys receiving a reduced hourly rate. A firm's size does not directly bear on the factors we must consider when awarding fees—the lawyers' skill, experience, and reputation."); *McDonald ex rel Prendergast v. Pension Plan of the NYSA-ILA Pension Tr. Fund*, 450 F.3d 91, 98 (2d Cir. 2006) ("We want to caution, however, that district courts should not treat an attorney's status as a solo practitioner as grounds for an automatic reduction in the reasonable hourly rate."). And we commend the performance of Megladon's counsel in achieving a precedent-shaping result at trial.

[3] Because we accept the 2026 rates for select timekeepers (with the reductions explained below) and reduce the rates of all others, we needn't reach the parties' arguments about a potential fee-multiplier calculus. And, since we resolve the hourly-rate question without wading into the parties' dispute over the rates charged by the Village's attorneys, we can **DENY as moot** the Corrected Motion for Judicial Notice [ECF No. 359] and the Motion to Disregard Evidence [ECF No. 360].

| Name | Position | Rate Awarded |
|---|---|---|
| Boulris | Shareholder | $975 |
| McGinn | Shareholder | $850 |
| Muniz | Associate | $435 |
| Perez | Associate | $350 |
| Saka | Associate | $600 |
| Horsburgh | Counsel | $755 |
| Wilkerson | Paralegal | $150 |
| Cohen | Paralegal | $125 |
| Owens | Coordinator | $200 |

## II. The Objections to Specific Time Entries

The Village next argues that the 3,588.2 hours Megladon says it billed "are not only excessive on their face, especially in comparison to the hours expended by the Village, but also . . . contain[ ] entries for items that are not compensable[.]" Response at 9. We turn to those specific challenges below.

### a. Block Billing

The Village first insists that 821.8 of the total 3,588.2 hours consist of "block billing"—that is, "the practice of including multiple distinct tasks within the same time entry." *Id.* at 10 (cleaned up); *see also* Gonzalez Declaration Exhibit A [ECF No. 352-4] (summarizing the alleged block billing). That practice, the Village claims, "inhibits the . . . ability to determine what time was spent on each task and whether the amount of time spent on the particular task was reasonable." Response at 10. In turn, Megladon argues that "[e]very single one of the examples of alleged block billing highlighted by the Village grouped highly related activities." Reply in Support of the Motion (the "Reply") [ECF No.

355] at 7 (citation omitted). In support of that defense, Megladon invokes *Otto v. City of Boca Raton*, 2025 WL 2952783 (11th Cir. Oct. 20, 2025). In that case, the Eleventh Circuit explained that, even though "[t]he billing records at issue . . . contain[ed] multiple block-billed entries," the entries did "not impede the court's task of calculating a reasonable fee award because they describe[d] only closely related compensable activities billed in small blocks of time that are easily assessed for reasonableness." *Otto*, 2025 WL 2952783, at *5. As an example, the panel pointed to "a one-hour-and-twelve-minute block to 'receive and review email correspondence from Hamilton regarding providing initial responses to discovery request; and review same and consider incorporation into responses,'" noting that "[e]ntries like these that do not include excessive, redundant, or otherwise unnecessary activities do not support a reduction in billable hours." *Ibid.*

The Village provides six examples of the block-billing practices to which it objects. *See* Response at 10–11. And of those six examples, only one—the five hours billed by Boulris on September 17, 2025, for "finaliz[ing] draft Daubert motion and related communications with T. McGinn regarding finalization for filing"—appears to pass *Otto*'s closely-related standard. The other five examples, in contrast, group together activities that—at least on their face—appear unrelated. Response at 11. *See, e.g.*, *ibid.* (summarizing the 9.9 hours billed on March 6, 2026, for "research" regarding a "motion for directed verdict" and a "motion for reconsideration").

The problem, however, is that the five examples account for only 17.8 of the 821.8 hours in question. To be sure, "[t]he fee applicant bears the burden of establishing entitlement to attorney's fees, the number of compensable hours, and the applicable hourly rate." *Otto*, 2025 WL 2952783, at *2. But "[t]hose opposing fee applications have obligations, too." *Am. C.L. Union of Georgia v. Barnes*, 168 F.3d 423, 428 (11th Cir. 1999). Indeed, "[i]n order for courts to carry out their duties in this area, objections and proof from fee opponents concerning hours that should be excluded must be specific and reasonably precise." *Ibid.* (cleaned up). So, while we understand why the Village declined to "spend

its entire response page limit detailing block-billed time entries," Response at 11, we cannot scour the entries for the remaining 799 contested hours on the Village's behalf. *See Alhassid v. Bank of Am., N.A.*, 688 F. App'x 753, 758 (11th Cir. 2017) ("When faced with a voluminous fee application, an hour-by-hour review is both impractical and a waste of judicial resources. Thus, we have approved of across-the-board percentage cuts to the number of hours claimed."). We'll instead impose an across-the-board reduction of 50% as to the 821.8 block-billed hours. *See* Gonzalez Declaration Exhibit A. And that reduction amounts to $264,230.75. *See ibid.* (showing 340.3 hours billed at a rate of $950; 146.7 hours billed at a rate of $850; 16.7 hours billed at a rate of $390, which we've adjusted to a rate of $125; 10 hours billed at a rate of $755; 21.4 hours billed at a rate of $500, which we've adjusted to a rate of $435; 47.6 hours billed at a rate of $600, which we've adjusted to a rate of $200; 37.1 hours billed at a rate of $510, which we've adjusted to a rate of $350; 19.4 hours billed at a rate of $600; and 182.6 hours billed at a rate of $440, which we've adjusted to a rate of $150).

**b. Excessive Time**

The Village next argues that "the time records provided in support of the Motion . . . demonstrate excessive time spent on specific tasks." Response at 12. For instance, the Village claims that "partners were performing tasks associates should be performing." *Id.* at 13; *see also ibid.* ("[T]he Village calculates that Attorneys McGinn and Boulris spent approximately 480.9 hours researching in this action; in comparison, the Village calculates that associates spent 433.5 hours researching the same exact issues."); *id.* at 12 (listing eight examples—accounting for 27.4 hours—of "attorneys[ ] performing associate levels of work"); *id.* at 14 ("Additionally, Megladon's attorneys spent an astronomical amount of time conferencing with each other."). The Village submits that, of the 3,588.2 combined hours Megladon billed, 274 were spent on double billing, 799.3 were generally excessive, 37.9 were spent in excessive conferencing, and 40.9 were "not reasonable rates" because "partners [were] doing tasks associates should do and/or fail[ed] to delegate." *Id.* at 9; *see also* Gonzalez

Declaration Exhibit A. It thus asks that we "either . . . reduce[ ]" the rates of Boulris, McGinn, and Horsburgh to "associate rates" or "cut" the fees at issue "by a larger percentage." *Id.* at 13.

Megladon responds that "the complex nature of this case, the need to conduct national research on issues of first impression, and the need to address new arguments and update prior research over the years-long life of this case [ ] justifies the time spent [on research]." Reply at 7. But it offers no response to the claims that the Gunster partners engaged in excessive conferencing and failed to delegate tasks to associates. *See Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned." (cleaned up)). Given Megladon's failure to respond to the excessive-conferencing and failure-to-delegate objections, we'll deduct the former by 50% and readjust the latter by billing Boulris and McGinn at the average associate rate (*i.e.*, $461.6). That deduction comes to $70,402.79. *See* Gonzalez Declaration Exhibit A (listing the excessive-conferencing hours as 37.9 hours at a rate of $950; 90.7 hours at a rate of $850; 1.1 hours at a rate of $755; 2.6 hours at a rate of $500, which we've reduced to a rate of $435; 1.8 hours at a rate of $600, which we've reduced to a rate of $200; 1.1 hours at a rate of $510, which we've reduced to a rate of $350; and 1.1 hours at a rate of $440, which we've reduced to a rate of $150); *see also ibid.* (listing the failure-to-delegate hours as 14 hours at a rate of $950, which we'll lower to $461.6, and 26.9 hours at a rate of $850, which we'll lower to $461.1). And, as to the debate over what the Village claims are 274 double-billed hours and 799.3 excessive-time hours, *see ibid.*, we'll impose a 25% reduction of those fees, which amounts to another $185,657.875 deduction, *see ibid.* (attributing the 274 double-billed hours to 59 hours at a rate of $950; 78.9 hours at a rate of $850; 0.3 hours at a rate of $390, which we'll reduce to a rate of $125; 48.6 hours at a rate of $755; 8.1 hours at a rate of $500, which we'll reduce to a rate of $435; 1.7 hours at a rate of $600, which we'll reduce to a rate of $200; 14.3 hours at a rate of $510, which we'll reduce to a rate of $350; and 63.1 hours at a rate of $440, which we'll reduce to a rate of $150); *see also ibid.*

(attributing the 799.3 excessive-time hours to 150.2 hours at a rate of $950; 307.1 hours at a rate of $850; 3.4 hours at a rate of $390, which we'll reduce to a rate of $125; 65.7 hours at a rate of $755; 168.4 hours at a rate of $500, which we'll reduce to a rate of $435; 82.3 hours at a rate of $510, which we'll reduce to a rate of $350; 11.8 hours at a rate of $600; and 10.4 hours at a rate of $440, which we'll reduce to a rate of $150); *cf. Alhassid*, 688 F. App'x at 758 ("In ascertaining the number of hours reasonably expended on the litigation, the district court should exclude any excessive, redundant, or otherwise unnecessary hours from the amount claimed." (cleaned up)).

**c. Clerical Tasks**

The Village claims that "Megladon's billing entries are also riddled with clerical tasks either being done by attorneys or done by paralegals/support staff at attorney rates." Response at 15. Specifically, the Village "calculates that approximately 129 hours consisted of such clerical work." *Ibid.* That figure represents 3.8 hours billed by Boulris, 6.3 by McGinn, 11.3 by Cohen, 36.4 by Owens, 7.8 by Perez, and 63.4 by Wilkerson. *See* Gonzalez Declaration Exhibit A.

Megladon offers no response to this objection. *See generally* Reply. Accordingly, we'll deduct those 129 hours from the total award. *See Norman*, 836 F.2d at 1306 ("[A] fee applicant is not entitled to compensation at an attorney's rate simply because an attorney undertook tasks which were mundane, clerical or which did not require the full exercise of an attorney's education and judgment."). So, under the relevant hourly rates, we'll reduce the total award by another $29,897.5.

**d. Counts on Which the Village Prevailed**

As noted above, we entered judgment in favor of the Village as to Count I and in favor of Megladon as to Counts II and IV. *See* Final Judgment at 1.[4] Because Megladon lost as to Count I, the

[4] The Village represents that "Megladon is the prevailing party in this action but Megladon wholly lost on Count II[.]" Response at 16. That's incorrect. *See* Final Judgment at 1 (entering final judgment in the Village's favor as to "Count I," in Megladon's favor as to "Count II," and in Megladon's favor as to "Count IV"). We'll chalk up the Village's misstatement to a clerical error.

Village argues, "Megladon is not entitled to seek recovery for entries clearly associated [with] that claim." Response at 16. To that end, the Village insists that "Megladon has made no showing in their [M]otion that such entries were intertwined [such] that allocation was not feasible"—and that, "in any event, its billing entries demonstrate that such allocation *was* feasible." *Id.* at 16–17 (emphasis added). In total, the Village identifies "22.2 hours wherein Megladon seeks recovery for fees on which it did not prevail." *Id.* at 17.

Resisting that conclusion, Megladon maintains that "[t]he Village's assertion that time expended on Count I should be deducted is ill founded" because "Count I was so intertwined with other Counts that allocating time to only Count I is infeasible." Reply at 6 (citations omitted). Specifically, Megladon contends that "[t]he issues and evidence of the Village's unconstitutional conditioning of the residential building permit sought by Megladon overlapped on each of Megladon's claims in this case" and that "the evidence underlying Count I was also relevant to and supported this Court's findings concerning final decision ripeness, the merits of the exaction claim, the jury's consideration of probability of approval ('as of right application' for purposes of damages), and the jury's findings regarding reasonable mitigation (efforts to resolve prior to litigating) by Megladon." *Ibid.*

"A court should compensate the plaintiff for the time his attorney reasonably spent in achieving the favorable outcome, even if the plaintiff failed to prevail on every contention." *Fox v. Vice*, 563 U.S. 826, 834 (2011) (quotation marks omitted). But "[t]he fee award of course, should not reimburse the plaintiff for work performed on claims that bore no relation to the grant of relief." *Ibid.* Here, we disagree with Megladon's contention that "allocating time to only Count I [wa]s infeasible," Reply at 6, given that the Village provides examples of Count I-specific billing, *see* Response at 17 (detailing billing entries concerning FLA. STAT. § 70.45). What's more, the total time at issue here—22.2 hours—represents less than 1% of the 3,588.2 hours Megladon claims. All things considered,

then, we'll scrap the entirety of those 22.8 hours, which—using the relevant rates, *see* Gonzalez Declaration Exhibit A (attributing 8.6 hours billed at a rate of $975, 0.8 hours billed at a rate of $850, and 12.8 hours billed at a rate of $500, which we'll reduce to a rate of $435)—amounts to a $14,633 deduction.

**e. Vague Entries**

According to the Village, "[a] number of Megladon's entries contain vague or insufficient detail as to what the timekeeper was doing." Response at 17; *see also id.* at 17–18 (listing examples of the alleged practice). On the Village's count, "150.3 hours . . . contained insufficient detail." *Id.* at 18. Because Megladon again declines to respond to that challenge, *see generally* Docket, we'll deduct from the total award those 150.3 hours. Based on the relevant rates for the attorneys at issue, *see* Gonzalez Declaration Exhibit A (attributing the 150.3 hours to 2.8 hours billed at a rate of $950; 46.5 hours billed at a rate of $850; 15.9 hours billed at a rate of $600, which we'll reduce to a rate of $200; 20 hours billed at a rate of $510, which we'll reduce to a rate of $350; and 65.1 hours billed at a rate of $440, which we'll reduce to a rate of $150), that deduction amounts to $62,130.

**f. Across-the-Board Reduction**

The Village next proposes an "across-the-board cut of 60% (in addition to the reduction in rates)" of "the hours reasonably expended by Megladon's counsel." Response at 18–19. In support of that proposal, the Village offers four arguments. *First*, it notes that the Village spent "nearly 1,000" fewer hours "in this litigation for the exact same work." *Id.* at 18; *see also ibid.* ("The nearly additional 1,000 hours in this action where the Village succeeded on one count and Megladon obtained a fraction of its claimed damages is clearly excessive."). *Second*, the Village points to the fact that Megladon's billing records are "voluminous and excessive," "span[ ] over 200 pages," and contain (in the Village's view) "numerous inefficiencies and billing irregularities . . . identified . . . in th[e] [R]esponse." *Ibid.*; *see also ibid.* ("Given that the number of individual billing entries are likely well in excess of 1,700, it would

be impractical and an inefficient use of judicial resources for the Court to engage in an hour-by-hour review."). *Third*, the Village submits that Megladon, "at best, achieved partial success and was awarded 30% of the damages it sought [at] trial" and yet "seeks a reward of attorney's fees nearly seven times the actual damage award." *Id.* at 19 (cleaned up). And *fourth*, the Village maintains that "this action remained dormant for two years by no fault of the Village" and that Megladon's "hours are excessive given that this case was only actively litigated for 3 years approximately"—"certainly not enough to warrant 3,500 hours." *Ibid.*

Megladon contests those arguments. As to its success at trial, Megladon maintains that "[t]here was no tie" and that it instead "succeeded in achieving every objective—keeping its land, confirming its right to build its originally proposed 'as of right' design, entitlement to supplemental injunctive relief as necessary, and collection of damages for the delay of its project." Reply at 1; *see also id.* at 1–2 ("The remedial rulings and verdict obtained by Megladon's counsel are precedential, picking up where the Supreme Court left off in *Koontz* and providing deterrence which, as the evidence adduced at trial illustrated, was lacking, particularly for individuals and small businesses especially vulnerable to delay-leveraging by local governments seeking to circumvent their obligations under the Fifth Amendment."). As to the difference in total hours billed between the two firms, Megladon deems the Village's arguments "misleading because they conveniently omit that the Village effectively had co-counsel assistance from the Miami-Dade County attorney's office whose attorneys attended all depositions, hearings and appeared on defense court filings as much as the Village's lawyers, from the time of the County's intervention in the spring of 2022 until issuance of the partial summary judgment order in May 2025." Reply at 5. Megladon further notes that "the Village did not have the time intensive evidentiary burden of gathering evidence to prove custom under *Monell*, nor did it prepare and present any damages expert of its own[.]" *Ibid.* As to the timeline of this action, Megladon emphasizes that "the unanticipated . . . delay encountered in bringing this matter through trial" was

"by no fault . . . Megladon's" and attributes the "exceptional delay" and "significant outlay of expenses" to "the [Village's] attorney." *Id.* at 8. All in all, Megladon concludes that the Village "offers no rational basis for th[e] proposed magnitude of a [60%] cut" and "could not produce an independent expert to opine that the 60% of the hours in this case should be cut[.]" Reply at 7–8.

We reject as unwarranted the Village's proposal for a 60% across-the-board reduction. The Village itself concedes that "it is not the prevailing party in this action," Response at 2, and we disagree with the Village's attempt to minimize the outcome of the trial. That Megladon lost on Count I hardly overshadows its success as to Counts II and IV. After all, "[a] civil rights plaintiff who obtains meaningful relief has corrected a violation of federal law and, in so doing, has vindicated Congress's statutory purposes." *Fox*, 563 U.S. at 834; *see also Hensley*, 461 U.S. at 435 ("Many civil rights cases will present only a single claim. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories . . . . [T]he district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."). What's more, "[i]n the civil rights context, the Supreme Court explicitly rejected a proportionality requirement between the amount of damages awarded and the amount of damages initially sought by the plaintiff." *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 846 F.3d 1159, 1164 (11th Cir. 2017).

That's not all. We find persuasive Megladon's observation that the Village used attorneys from the County throughout this action and carried different—sometimes lesser—evidentiary burdens. We fail to see how the Village arrived at its 60% proposal and note that the Village neglects to provide *any* justification for that figure. And, although we agree with the Village that certain aspects of Megladon's billing practices warrant reductions, we make those reductions where appropriate and see no basis, on the record before us, for imposing an *additional*—even punitive—60% cut. *See* Barnes, 168 F.3d at 437 ("The ultimate touchstone for fee awards under § 1988 is reasonableness."); *Martinez v. Hernando Cnty.*

*Sheriff's Off.*, 579 F. App'x 710, 715 (11th Cir. 2014) ("The district court did not impermissibly 'double count' because the factors considered by the court in determining the lodestar figure were not considered by the court in adjusting the lodestar downward[.]"). So, we decline the Village's request for a 60% blanket reduction.

### III. The Objections to Megladon's Results at Trial

The Village next argues that "a further reduction of the lodestar is necessary" because "the results obtained by Megladon were minimal in comparison to the relief sought." Response at 19–20. We entirely disagree with this argument, have already disposed of it elsewhere, *see supra* at 13–15, and see no need to reiterate our findings here.

### IV. The Objections to the Non-Taxable Costs

Finally, the Village challenges the $112,414.70 in non-taxable costs Megladon is seeking. That sum consists of two parts: $82,827.65 in "expert fees" and $39,587.05 "for other costs that are 'non-taxable' under Rule 54 and . . . § 1920." Motion at 3. As to the expert fees, the Village notes that "it is well-settled that [p]laintiffs cannot recover for expert fees under section 1988 unless the cause of action was to enforce a right under section 1981 or 1981a." Response at 20. In any event, the Village adds, we should "decline to award such expert fees" since "Megladon's award at trial could very well have encompassed their expert fee expenses because such expenses were presented to the jury"—and so a "double recovery" "should not be allowed." *Id.* at 21. And as to the other non-taxable costs, the Village argues that "Megladon does not elaborate as to what these non-taxable costs are." *Id.* at 20; *see also id.* at 21 ("Megladon attaches several invoices from *Consilio*. The Village has no idea what this company does, nor does Megladon, who bears the burden of proof, make any attempt to explain the cost. It appears to be a hosting database but Megladon provides *zero* description as to whether the expense is reasonable or even necessary to this action.").

Megladon declines to address any of these objections in its Reply. *See generally* Reply. Accordingly, we'll deduct the full $112,414.70 in non-taxable costs from the total award.

## CONCLUSION

After careful review, therefore, we **ORDER and ADJUDGE** as follows:

1. The Motion for Attorney's Fees [ECF No. 349] is **GRANTED in part** and **DENIED in part**.
2. The Motion for Judicial Notice [ECF No. 359] is **DENIED as moot**.
3. The Motion to Disregard Evidence [ECF No. 360] is **DENIED as moot**.
4. We enter an award in favor of Megladon for **$1,700,283.89** in attorney's fees.[5]

**DONE AND ORDERED** in the Southern District of Florida on October 26, 2026.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record

[5] We arrived at this figure in two steps. *First*, we multiplied the total hours billed by the hourly rates we used, which gave us $2,439,650.5 in requested fees. *Second*, we subtracted from that figure the total deductions we've imposed—*i.e.*, $739,366.61.